**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| CORDIS CORPORATION,<br><br>               Plaintiff,<br><br>         v.<br><br>BOSTON SCIENTIFIC CORPORATION<br>and BOSTON SCIENTIFIC SCIMED, INC.,<br><br>               Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)     C.A. No. 08-779-SLR<br><br>**REDACTED<br>PUBLIC VERSION** |

## BSC'S OPENING BRIEF ON *RES JUDICATA* AND OTHER PRE-HEARING ISSUES

Josy W. Ingersoll (I.D. #1088)
John W. Shaw (I.D. # 3362)
Adam W. Poff (I.D. #3990)
YOUNG CONAWAY
STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19801
(302) 571-6600

*Attorneys for Defendants
Boston Scientific Corporation
and Boston Scientific Scimed, Inc.*

*Of Counsel:*

John M. Desmarais
Peter J. Armenio
Young J. Park
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022
(212) 446-4800

Dated: May 1, 2009

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

STATEMENT OF FACTS ......................................................................................................4

    I.    Cordis Strategically Chose To Try Its Claim Against Taxus Liberté In The 03-027 Case ...........................................................................................................4

    II.    Cordis Failed To Offer Any Proof On The Merits Of Its Claim Against Taxus Liberté At Trial In The 03-027 Case............................................................5

    III.    The Federal Circuit Ruled That The Dismissal Of Cordis' Claim In The 03-027 Case Is With Prejudice .....................................................................................8

    IV.    Cordis' Claim Against Taxus Liberté In The 08-779 Case Mirrors Its Failed Claim Against Taxus Liberté In The 03-027 Case .......................................8

ARGUMENT.........................................................................................................................9

    I.    The Doctrine Of *Res Judicata* Bars Cordis' Claim Against Taxus Liberté In This Action .......................................................................................................9

        A.    Cordis' Prior Failure On The Same Claim Bars Its Present Assertion .......................................................................................................10

        B.    Cordis' Attempts To Escape *Res Judicata* Fail ...........................................14

        C.    Cordis' Prior Failure Of Proof Is Binding On Cordis Notwithstanding Any Intent In Ruling On That Failure............................18

    II.    Even If *Res Judicata* Somehow Does Not Bar Cordis' Claim, Cordis Is Not Entitled To Summary Judgment Or Injunctive Relief....................................19

        A.    Genuine Issues Of Material Fact Preclude Cordis' Requested Summary Judgment ...............................................................................19

        B.    Cordis Cannot Demonstrate Irreparable Harm ...........................................20

        C.    Cordis' New Reply Arguments Are Untimely And Without Merit ...........22

        D.    Equity Disfavors Rewarding Cordis For Infringing BSC's '021 Patent.........................................................................................................26

CONCLUSION....................................................................................................................27

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Acumed LLC v. Stryker Corp.,*
    525 F.3d 1319 (Fed. Cir. 2008)..................................................................... 10, 15, 16, 17

*Foster v. Hallco Mfg. Co.,*
    947 F.2d 469 (Fed. Cir. 1991)........................................................................ 9, 12

*Fresenius Med. Care Holdings, Inc. v. Baxter Int'l, Inc.,*
    No. 03-1431, 2008 WL 928496 (N.D. Cal. Apr. 4, 2008)................................ 24

*Gambocz v. Yelencsics,*
    468 F.2d 837 (3d Cir. 1972)........................................................................... 10

*Hazelquist v. Guchi Moochie Tackle Co.,*
    437 F.3d 1178 (Fed. Cir. 2006)...................................................................... 14

*Hemphill v. Kimberly-Clark Corp.,*
    530 F. Supp. 2d 108 (D.D.C. 2008) ............................................................... 12

*In re Mullarkey,*
    536 F.3d 215 (3d Cir. 2008)........................................................................... 10, 14, 18

*Kessler v. Eldred,*
    206 U.S. 285 (1907)....................................................................................... 3, 9, 12, 19

*Labelle Processing Co. v. Swarrow,*
    72 F.3d 308 (3d Cir. 1995)............................................................................. 14

*Lawlor v. Nat'l Screen Serv. Corp.,*
    349 U.S. 322 (1955)....................................................................................... 10

*Litecubes, LLC v. North Light Prods., Inc.,*
    523 F.3d 1353 (Fed. Cir. 2008)...................................................................... 8

*MGA, Inc. v. General Motors Corp.,*
    827 F.2d 729 (Fed. Cir. 1987)........................................................................ 10, 18, 19

*Molinaro v. AT&T,*
    460 F. Supp. 673 (E.D. Pa. 1978) .................................................................. 12

*Reebok Int'l Ltd. v. J. Baker, Inc.,*
    32 F.3d 1552 (Fed. Cir. 1994)........................................................................ 20

*Roche Palo Alto LLC v. Apotex, Inc.,*
    531 F.3d 1372 (Fed. Cir. 2008)...................................................................................... passim

*Single Chip Sys. Corp. v. Intermec IP Corp.,*
    495 F. Supp. 2d 1052 (S.D. Cal. 2007).......................................................................... 13

*Taylor v. Sturgell,*
    128 S. Ct. 2161 (2008) ................................................................................................... 16

*Trading Techs. Int'l, Inc. v. eSpeed, Inc.,*
    No. 04-5312, 2008 WL 4531371 (N.D. Ill. May 22, 2008)............................................. 24

*TruePosition Inc. v. Andrew Corp.,*
    568 F. Supp. 2d 500 (D. Del. 2008)................................................................................ 23

*Williams v. Gillette Co.,*
    887 F. Supp. 181 (N.D. Ill. 1995) ................................................................................... 13

*Young Eng'rs, Inc. v. ITC,*
    721 F.2d 1305 (Fed. Cir. 1983)................................................................................... 2, 11

Defendants Boston Scientific Corporation and Boston Scientific Scimed, Inc. (collectively, "BSC") respectfully submit this brief in support of their motion to dismiss Cordis Corporation's ("Cordis'") Complaint as barred by *res judicata* and in further opposition to Cordis' motions for a preliminary injunction, summary judgment and a permanent injunction (D.I. 4).

**INTRODUCTION**

On May 7, 2004, Cordis moved for leave to amend its Complaint in the 03-027-SLR case to add infringement claims against all stents "using the name[] . . . Liberté as all or part of the trademark." (D.I. 135, Ex. A at 3)  This was the same language Cordis used to assert its claims against the Express family of stents, and Cordis' motivation for doing so was clear — Cordis hoped to bolster its damages claims against BSC's Express family of stents by removing the Liberté family of stents as non-infringing alternatives.

BSC opposed Cordis' motion to amend, stating that "the most efficient way to address the dispute between the parties is for Cordis to file a separate action with respect to the Liberté family of stents . . . ." (D.I. 144 (03-027) at 12)  But Cordis refused to pursue its new claims in a separate case, arguing that "[t]he interests of efficiency and judicial economy overwhelmingly favor granting Cordis leave to amend and trying all its claims against BSC together." (D.I. 147 (03-027) at 9)  In short, Cordis made a premeditated, strategic choice to accuse the Liberté family of stents, including Taxus Liberté, in the 03-027 case.

On August 4, 2004, the Court granted Cordis' motion, allowing Cordis to add the Liberté family of stents to the 03-027 case. (D.I. 161 (03-027))  Cordis proceeded to conduct substantial discovery on its claims against the Liberté and Taxus Liberté stents.  Throughout the pre-trial proceedings, Cordis consistently treated Taxus Liberté as a separate and distinct product, including accusing it of infringing a unique combination of patent claims.

In the 2005 Joint Proposed Pretrial Order in the 03-027 case, Cordis stated that it was prepared to try whether "BSC has infringed claims 1, 2, 11, 12, and 13 of the '406 patent . . . by making, using, offering for sale, or selling the . . . Taxus Liberté stents. 35 U.S.C. § 271." (D.I. 332 (03-027) at Tab 4, p. 1)  Cordis never requested that this Pretrial Order be modified.

Cordis failed to prove its claim against the Taxus Liberté stent at trial.  Indeed, Cordis offered no evidence whatsoever regarding Taxus Liberté.  As a result, the Court dismissed the claim.  (D.I. 416 (03-027) at 60-64)  Although the Court's dismissal was initially without prejudice, the Federal Circuit reversed the "without prejudice" aspect of that dismissal and remanded with instructions to dismiss the claim with prejudice.  *Cordis Corp. v. Boston Scientific Corp.*, Nos. 2008-1003, -1072, 2009 WL 819055, at *13-*14 (Fed. Cir. Mar. 31, 2009).

In this case, Cordis seeks to repeat its failed claim against Taxus Liberté, re-alleging that "BSC is infringing claim 2 of the Gray '406 patent by making, using, offering for sale and/or selling the Taxus Liberté stent . . . in violation of 35 U.S.C. § 271." (D.I. 1 at ¶ 28)  But under binding Federal Circuit precedent, *res judicata*, *i.e.*, claim preclusion, mandates that "where the alleged infringer prevails, the accused devices have the status of noninfringements, and the defendant acquires the status of a noninfringer to that extent." *Young Eng'rs, Inc. v. ITC*, 721 F.2d 1305, 1316 (Fed. Cir. 1983).  Cordis' prior failure on the merits in the 03-027 case bars it, as a matter of law, from attempting to re-try the same infringement claim in this case.  This bar moots Cordis' pending requests for a preliminary injunction, summary judgment and a permanent injunction.  Because Cordis' Complaint is properly dismissed based on *res judicata*, the Court need not even reach the merits of Cordis' motions.

2

The motivation, intent or merit underlying the prior adjudication is not a factor in the application of *res judicata*. "This judgment, whether it proceeds upon good reasons or upon bad reasons, whether it was right or wrong, settled finally and everywhere" that BSC has the right to make, use, sell and offer for sale the Taxus Liberté stent. *Kessler v. Eldred*, 206 U.S. 285, 288 (1907). The prior adjudication was final, and *res judicata* prevents it from being re-litigated or otherwise disturbed.

But even if this Court were to allow Cordis to re-litigate its claim, Cordis' motions would still fail. As set forth in BSC's Opposition To Cordis' Motion For A Preliminary Injunction And Other Relief, Cordis cannot demonstrate any irreparable harm warranting injunctive relief. For example, market share data proves that Cordis had the                  REDACTED

REDACTED                  the month before BSC's launch of Taxus Liberté. Apparently conceding the lack of any irreparable harm, Cordis raises multiple new arguments in its Reply Brief. But these arguments are untimely and, in any event, without merit.

Indeed, even if Cordis somehow could prove that          REDACTED          constitutes irreparable harm, equity and the public interest preclude its requested injunction. Cordis' request is based on the speculation that, if granted, an injunction would enable Cordis to sell more Cypher stents. But the Federal Circuit has affirmed that the Cypher stent infringes BSC's Jang '021 patent. In essence, Cordis asks this Court to enjoin Taxus Liberté so that Cordis will have greater freedom to infringe the Jang '021 patent. Neither equity nor the public interest countenances such relief. Nor does the public interest countenance removing the best paclitaxel-eluting stent from the market, which for some patients is the best possible treatment option.

## STATEMENT OF FACTS

**I.    CORDIS STRATEGICALLY CHOSE TO TRY ITS CLAIM
AGAINST TAXUS LIBERTÉ IN THE 03-027 CASE**

On January 14, 2003, Cordis filed its Complaint in the 03-027 case.  (D.I. 1 (03-027))

Cordis initially asserted claims against only BSC's Express family of stents — Cordis did not

accuse Liberté or Taxus Liberté of infringement.  (*Id.*)

As the litigation unfolded, Cordis became concerned that the Liberté and Taxus Liberté

stents constituted acceptable non-infringing alternatives to the accused Express and Taxus

Express products.  (*E.g.*, Ex. 1, Apr. 28, 2004 Letter From K. Landsman to P. Armenio)  Even

though Liberté and Taxus Liberté had not yet received FDA approval, Cordis deemed them

important to its litigation strategy:  "BSC introduced in Europe — and announced plans to

introduce in the United States — a successor to the Express stent called Liberté.  BSC has further

stated that the Liberté will eventually take the place of Express as the new platform for its drug-

eluting Taxus stent."  (D.I. 135 (03-027) at 1)  Accordingly, on May 7, 2004, Cordis moved to

file an amended complaint in the 03-027 case.  In briefing on its motion, Cordis explicitly

rejected BSC's proposal to try Cordis' claims against the Liberté family of stents separately.

(D.I. 147 (03-027) at 8)  Seeking to pursue all of its claims in the 03-027 case, Cordis argued that

"trying all claims against BSC together is more efficient than bifurcation."  (*Id.* at 1-2)

Cordis' Amended Complaint broadly asserted that "making, using, offering for sale,

and/or selling within the United States and/or importing into the United States, stents —

including but not limited to those using the name Liberté as all or part of the trademark,"

including the Taxus Liberté stent, infringed the Gray '406 patent under 35 U.S.C. § 271.  (D.I.

161 (03-027) at ¶ 12)  Cordis pursued substantial discovery on these claims.  In fact, Cordis

represented that its discovery on these claims dated back to at least February 11, 2004, over

4

sixteen months prior to trial. (D.I. 135 (03-027) at 3) As a result of this discovery, Cordis had

full knowledge of, *inter alia*, the structure and use of the Taxus Liberté stent.

As shown by Cordis' January 20, 2005 interrogatory responses, Cordis treated Taxus

Liberté as a separate and distinct product, alleged to infringe a unique set of asserted claims,

throughout the pre-trial process:

> ### INTERROGATORY NO. 19:
>
> Identify each claim of the asserted patents that Cordis contends
> has been infringed by BSC and for each such claim identify every
> BSC product that Cordis contends infringes the claim
>
> ### AMENDED RESPONSE TO INTERROGATORY NO. 19
>
> * * *
>
> Cordis further responds that the Liberté and Taxus Liberté stents
> infringe at least Claims 1-2 and 11-13 of the '406 patent. In
> addition, Cordis responds that the Liberté and Taxus Liberté stents
> infringe at least claims 1, 9 (Taxus Liberté only), 12 (Taxus
> Liberté only), 23, 19 (Taxus Liberté only), and 22 (Taxus Liberté
> only) of the '762 patent as reexamined.

(Ex. 2, Plaintiff's Amended Objections And Responses To Defendant's Third Set Of Post-

Preliminary Injunction Interrogatories (03-027), at 2) Cordis' expert Dr. Buller similarly recited

Taxus Liberté as a separate product accused of infringement in his Opening Expert Report in the

03-027 case. (Ex. 3, Excerpt from Opening Expert Report Of Nigel Buller, at 1) Cordis

conducted this discovery and made these allegations to support its litigation strategy of proving

at trial that Liberté and Taxus Liberté were not non-infringing alternatives to Express and Taxus

Express.

## II.    CORDIS FAILED TO OFFER ANY PROOF ON THE MERITS OF ITS CLAIM AGAINST TAXUS LIBERTÉ AT TRIAL IN THE 03-027 CASE

The parties treated Taxus Liberté as a separate and distinct product for trial. The Joint

Proposed Pretrial Order recited "Taxus Liberté" as a separate stent accused of infringement

(along with "Express," "Taxus Express," "Liberté" and "Express peripheral stents"). (D.I. 332 (03-027) at 1) Cordis' Proposed Special Verdict Form accused Taxus Liberté of infringing a unique set of patent claims. (D.I. 329 (03-027)) And the parties segregated Taxus Liberté for damages purposes. (*Id.* at Tab 3, p. 10; Tab 5 at 15)

As it planned from the day it filed its motion to amend on May 7, 2004 through the May 27, 2005 filing of the Joint Proposed Pretrial Order, Cordis tried its § 271 claim against Taxus Liberté as part of the 03-027 case. Cordis, however, failed to prove that claim at trial. Indeed, Cordis did not prove that Taxus Liberté satisfied any of the elements of Claim 2 of the Gray '406 patent at trial. Cordis offered the conclusory assertion by Dr. Buller that Taxus Liberté "ha[s] the basic geometry of the Liberté." (D.I. 365 (03-027) at 414:7-8) But it is undisputed that the Taxus Liberté stent is not identical to the Liberté stent. For example, the Taxus Liberté stent has less "axial flexibility" than the Liberté stent — as explained by Dr. Buller himself — because the drug and polymer coating on Taxus Liberté increase the thickness and tackiness of the stent. (D.I. 39 at 9/n.2) "Axial flexibility" was argued by Cordis and accepted by the Court as a limitation of Claim 2 of the Gray '406 patent, but Cordis offered no proof regarding Taxus Liberté on this issue. Cordis additionally failed to prove the geographic elements for its Taxus Liberté claim under 35 U.S.C. § 271. (D.I. 367 (03-027) at 1027:18-20, 1030:25-1031:5) As a result, BSC moved for judgment as a matter of law. (*Id.* at 1027:17-1031:22)

In arguing that motion, Cordis asserted that, notwithstanding its prior admissions and the Joint Proposed Pretrial Order, the Taxus Liberté stent and the Liberté stent were somehow the same product. (D.I. 367 (03-027) at 1029:7-11 ("It is the -- they're the same stent.")) But "[t]he court disagreed and considered the Taxus Liberté stent to be a different product than the Liberté bare metal stent." (D.I. 416 (03-027) at 62) As the Court explained, "[t]he problem is that at this

point, *there is no proof that the Taxus Liberté*, as it might be sold in the United States, *has the same structure*." (D.I. 368 (03-027) at 1050:2-5) (emphases added)  The Federal Circuit affirmed this conclusion.  *Cordis Corp.*, Nos. 2008-1003, -1072, 2009 WL 819055, at *13 n.17.

In arguing against dismissal, Cordis represented that it had evidence regarding infringement by Taxus Liberté that it could have offered at trial to prove its claims.  (*E.g.*, D.I. 56 at 6; D.I. 367 (03-027) at 1029:22-23)  But as BSC pointed out, Cordis did not offer any such evidence *during trial*:

> It's open and closed unless he can put to proof that the Taxus
> Liberté product was made, used or sold in the United States.
> Unless he can prove that, that product is out.

(D.I. 368 (03-027) at 1048:20-1049:2)

Implicitly conceding its failure of proof on its claim against Taxus Liberté, Cordis asked to reopen the record as part of its opposition to BSC's motion for JMOL:  "We will prove that Liberté stents — Taxus Liberté stents are made in the United States . . . I will ask for permission to reopen and put it in."  (*Id.* at 1052:12-19)  But as BSC responded, there was no justification for allowing Cordis a second bite at the apple:

> What we said in our — this is in BSC's statements of the issues
> that remain to be litigated right from the pretrial order, and what
> we said, the very first issue is whether BSC has made, marketed
> and/or soiled [sic] Taxus Liberté coronary stents outside of the
> United States.  Whether BSC has made the bare metal stent portion
> of Taxus Liberté coronary stents in the United States. . . . Mr.
> Diskant was on notice of this throughout the entire negotiations of
> the pretrial order in this case, and if he believed he had proof . . .
> he should have put it in.  There is no basis to reopen the record.
> He has been on notice the entire time.

(*Id.* at 1053:16-1054:12)  The Court did not allow Cordis to reopen the record, and Cordis did not appeal that ruling.  (*E.g.*, *id.* at 1066:16-18)

The Court ruled on BSC's motion for JMOL by dismissing Cordis' claims against Taxus Liberté. (D.I. 416 (03-027) at 60-62)  The Court viewed Cordis' failure of proof as divesting the Court of subject matter jurisdiction and entered the dismissal without prejudice. (*Id.*)  BSC lodged a timely objection that Cordis' failure of proof warranted dismissal with prejudice. (D.I. 368 (03-027) at 1307:12-1308:2)  BSC then moved for reconsideration of the "without prejudice" aspect of the Court's ruling. (D.I. 383 (03-027) at 7-8)  The Court denied BSC's motion. (D.I. 416 (03-027) at 60-62)

### III. THE FEDERAL CIRCUIT RULED THAT THE DISMISSAL OF CORDIS' CLAIM IN THE 03-027 CASE IS WITH PREJUDICE

BSC appealed the "without prejudice" aspect of the Court's dismissal of Cordis' Taxus Liberté claim. (D.I. 442 (03-027))  On May 31, 2009, the Federal Circuit reversed this aspect of the Court's dismissal, and remanded with instructions to dismiss Cordis' claims against Taxus Liberté with prejudice. *Cordis Corp.*, Nos. 2008-1003, -1072, 2009 WL 819055, at *13-*14. The Federal Circuit's decision relied on the holding of *Litecubes, LLC v. North Light Products, Inc.*, which stated that "whether the allegedly infringing act happened in the United States is an element of the claim for patent infringement, not a prerequisite for subject matter jurisdiction." 523 F.3d 1353, 1366 (Fed. Cir. 2008).  The Federal Circuit affirmed every other aspect of the Court's rulings and judgments, including that the Liberté and Taxus Liberté stents "are different products." *Cordis Corp.*, Nos. 2008-1003, -1072, 2009 WL 819055, at *13 n.17.

### IV. CORDIS' CLAIM AGAINST TAXUS LIBERTÉ IN THE 08-779 CASE MIRRORS ITS FAILED CLAIM AGAINST TAXUS LIBERTÉ IN THE 03-027 CASE

Cordis filed its Complaint in the 08-779 case on October 17, 2008, re-alleging that BSC's Taxus Liberté stent infringes the Gray '406 patent. (D.I. 1)  Cordis' claim against Taxus Liberté in the 08-779 case is the same as its failed claim against Taxus Liberté in the 03-027 case. This can be readily seen below:

| | |
|---|---|
| "BSC and Scimed have infringed the '406 . . . patent[] by making, using, offering for sale, and/or selling within the United States, and/or importing into the United Stents, stents — including but not limited to those using the name Liberté as all or part of the trademark . . . in violation of 35 U.S.C. § 271." (D.I. 161 (03-027) at ¶ 12)<br><br>* * *<br><br>"BSC has infringed claims 1, 2, 11, 12, and 13 of the [Gray]'406 patent, either literally or under the doctrine of equivalents, by making, using, offering for sale, or selling the Liberté or Taxus Liberté stents. 35 U.S.C. § 271" (D.I. 332 (03-027) at Tab 4, p. 1) | "BSC is infringing claim 2 of the Gray '406 patent by making, using, offering for sale and/or selling the Taxus Liberté stent in the United States, and/or importing the Taxus Liberté stent into the United States, in violation of 35 U.S.C. § 271." (D.I. 1 (08-779) at ¶ 28) |

BSC filed its Answer And Counterclaims in the 08-779 case on December 1, 2008, raising, *inter alia*, an affirmative defense of *res judicata* and a counterclaim for a declaratory judgment of *res judicata*. (D.I. 18)

The Court held a telephonic conference on April 24, 2009 to discuss the implications of the Federal Circuit's March 31, 2009 decision. Pursuant to the Court's request during that conference, BSC respectfully submits this brief in support of its request to dismiss Cordis' Complaint based on *res judicata* and in further opposition to Cordis' motions.

## ARGUMENT

I. **THE DOCTRINE OF *RES JUDICATA* BARS CORDIS' CLAIM AGAINST TAXUS LIBERTÉ IN THIS ACTION**

"In its simplest construct, *res judicata* precludes the relitigation of a claim, or cause of action . . . which is ended by a judgment of the court." *Foster v. Hallco Mfg. Co.*, 947 F.2d 469, 476 (Fed. Cir. 1991). "If rights between litigants are once established by the final judgment of a court of competent jurisdiction those rights must be recognized in every way, and wherever the judgment is entitled to respect, by those who are bound by it." *Kessler*, 206 U.S. at 289. "The

9

result need not be the result that a second court would reach to invoke principles of res judicata. Finality, not correctness is the key." *MGA, Inc. v. General Motors Corp.*, 827 F.2d 729, 733 (Fed. Cir. 1987).

### A.   Cordis' Prior Failure On The Same Claim Bars Its Present Assertion

#### 1.   *Res Judicata* Bars The Re-litigation Of The Same Claim Against The Same Party

"To the extent that a case turns on general principles of claim preclusion, as opposed to a rule of law having special applicability to patent cases, this court applies the law of the regional circuit in which the district court sits . . . ." *Acumed LLC v. Stryker Corp.*, 525 F.3d 1319, 1323 (Fed. Cir. 2008). Under Third Circuit law, claim preclusion requires: (1) a final judgment on the merits in a prior suit; (2) involving the same parties or their privies; and (3) a subsequent suit based on the same cause of action. *See In re Mullarkey*, 536 F.3d 215, 225 (3d Cir. 2008).

There can be no dispute that the first two requirements of *res judicata* are met. First, the dismissal with prejudice of Cordis' claim in the 03-027 case is a final judgment on the merits. *Cordis Corp.*, No. 2008-1003, -1072, 2009 WL 819055, at *13 ("Because 'a failure to prove the allegations alleged in a complaint requires a decision on the merits, not a dismissal for lack of subject matter jurisdiction,' the district court's dismissal of Cordis' infringement claims regarding the Taxus Liberté stent should have been with prejudice.") (citation omitted); *see also Gambocz v. Yelencsics*, 468 F.2d 837, 840 (3d Cir. 1972) ("Dismissal with prejudice constitutes an adjudication of the merits as fully and completely as if the order had been entered after trial. Therefore *res judicata* bars relitigation of the claims dismissed in the prior suit."); *see also Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 327 (1955) ("[J]udgment dismissing the previous suit 'with prejudice' bars a later suit on the same cause of action."). Second, the 03-027 case and the 08-779 case involve the same parties. (*Compare* D.I. 134 (03-027) *with* D.I. 1)

10

Cordis seeks to dispute whether its allegation in the 08-779 case that Taxus Liberté infringes Claim 2 of the Gray '406 patent is the same "claim" as its failed allegation in the 03-027 case that Taxus Liberté infringes Claim 2 of the Gray '406 patent. But as explained in detail below, there is no merit to Cordis' argument and no basis for Cordis to dispute this point.

### 2.    Under Patent Law, A "Claim" For Purposes Of *Res Judicata* Is Defined By The Features Of The Accused Products

"Whether two claims for infringement constitute the 'same claim' is an issue particular to patent law and thus Federal Circuit law applies." *Roche Palo Alto LLC v. Apotex, Inc.*, 531 F.3d 1372, 1379 (Fed. Cir. 2008). Under patent law, a "claim" for *res judicata* purposes is defined by the asserted patent and the device accused of infringement. *Young Eng'rs,* 721 F.2d at 1316 ("[W]here the alleged infringer prevails, the accused devices have the status of noninfringements, and the defendant acquires the status of a noninfringer to that extent.").

Here, Cordis' asserted Gray '406 patent is the same patent as in the 03-027 case, and the Taxus Liberté stent is the same accused product as in the 03-027 case, rendering Cordis' claim the same for *res judicata* purposes. Cordis' "continuing tort" theory cannot change this dispositive fact. An adjudication on the merits of a patent claim not only applies retroactively to acts involving the accused product, but also bars future actions on the same product and the same patent. This has been the law since the Supreme Court addressed this question over a century ago in *Kessler*:

> First. Did the decree in [defendant's] favor . . . have the effect of entitling [defendant] *to continue the business of manufacturing and selling* throughout the United States the same [product] he had theretofore been manufacturing and selling, without molestation by [plaintiff], through the [prior asserted] patent?

11

*Kessler*, 206 U.S. at 287 (emphasis added). The Supreme Court answered this question in the

affirmative, holding that the prior adjudication barred the plaintiff from re-asserting its patent

claims, even against future acts by the alleged infringer:

> The court, having before it the respective rights and duties on the matter in question of the parties to the litigation, **conclusively decreed the right of [defendant] to manufacture and sell his manufactures** free from all interference from [plaintiff] by virtue of the [prior asserted] patent, **and the corresponding duty of [plaintiff] to recognize and yield to that right everywhere and always.**

*Id.* at 288 (emphases added).

District court decisions have accordingly barred the re-litigation of adjudicated patent

claims against the same product. *See Molinaro v. AT&T*, 460 F. Supp. 673, 676 (E.D. Pa. 1978),

*aff'd* 620 F.2d 288 (3d Cir. 1980) (applying *res judicata* to bar re-litigation of an infringement

claim previously dismissed for discovery misconduct); *Hemphill v. Kimberly-Clark Corp.*, 530

F. Supp. 2d 108, 111 (D.D.C. 2008) (applying *res judicata* to bar a second infringement suit on

the same product and same patent). Cordis' asserted claim in the 08-779 case seeks to re-litigate

the same patent, the Gray '406 patent, against the same accused product, the Taxus Liberté stent,

at issue in the 03-027 case. *Res judicata* squarely applies and bars Cordis' repetitious claim.

Cordis' argument that each alleged act of infringement somehow represents a "new

claim" unaffected by *res judicata* is incorrect as a matter of law and ignores the holdings of

*Kessler, Young Engineers, Foster* and the other cases cited above. Indeed, if Cordis' argument

were correct, no patent dispute could ever reach resolution — the losing party could choose to

re-litigate an infringement claim every time it sold another accused product because each such

post-judgment act would somehow give rise to a new "claim."

Notably, the only case Cordis cites for its proposed never-ending litigation, *Williams v.*

*Gillette Co.*, explicitly (and improperly) refused to apply Federal Circuit law. 887 F. Supp. 181,

12

183 n.2 (N.D. Ill. 1995). ***This was legal error.*** *See Roche*, 531 F.3d at 1379 (holding that Federal Circuit precedent controlled whether two claims for infringement constitute the "same claim" for *res judicata* purposes). As a result of this error, the court in *Williams* failed to consider *Young Engineers*, which is controlling. The *Williams* court similarly failed to consider the Supreme Court's binding *Kessler* decision. In any event, it is beyond dispute that, unlike *Kessler* and *Young Engineers*, *Williams* is not binding precedent. *Williams* offers no persuasive authority either, as it applied the wrong law. At most, it represents a single district court opinion in conflict with controlling Supreme Court and Federal Circuit precedent.

Cordis' remaining cases do not address the relevant issue, *i.e.*, the scope of a prior patent infringement "claim" for *res judicata* purposes. For example, Cordis cites *Lawlor* for the proposition that prior judgments "cannot be given the effect of extinguishing claims which did not even then exist." (D.I. 56 at 9) But *Lawlor* addressed an antitrust claim, not a claim for patent infringement. 349 U.S. at 325. And *Lawlor* did not address repetition of the same accused acts, but rather found that "there are new antitrust violations alleged here — deliberately slow deliveries and tie-in sales, among others — not present in the former action." *Id.* at 328. While Cordis argues that *Lawlor* applies to continuing torts such as patent infringement, *Lawlor* explicitly did not rely on the characterization of the defendants' conduct as a continuing tort in reaching its holding. *Id.* at 328-30. Notably, courts have rejected Cordis' proposed application of *Lawlor* to patent cases. *See, e.g., Single Chip Sys. Corp. v. Intermec IP Corp.*, 495 F. Supp. 2d 1052, 1064 (S.D. Cal. 2007) ("[T]he alleged nature of patent infringement as a 'continuing tort' plays only a minor role, if any, in determining whether successive lawsuits have the same cause of action.").

Cordis' citation to *Labelle Processing Co. v. Swarrow*, D.I. 56 at 9-10, is similarly unavailing as this case neither addressed a patent infringement claim nor applied any of the controlling precedent discussed above. 72 F.3d 308 (3d Cir. 1995). Moreover, as *Labelle* states, "new factual allegations supporting a previously denied claim will not create a new cause of action for the same injury previously adjudicated." *Id.* at 314. Cordis' claim for infringement in this case is based on the same alleged injury it claimed in the 2005 trial: that the Gray '406 patent is infringed by the Taxus Liberté stent. Even if Cordis has new purported evidence it desires to present, *Labelle* does not excuse Cordis' prior failure of proof at trial.

Cordis' reliance on *Hazelquist v. Guchi Moochie Tackle Co.*, D.I. 56 at 10, is misplaced as that case merely addressed the discharge of debts in bankruptcy and the date on which those debts accrued. 437 F.3d 1178, 1180 (Fed. Cir. 2006). It did not address the issue before this Court, nor did it consider the controlling precedent of *Kessler, Young Engineers* or *Foster*.

Under controlling Supreme Court and Federal Circuit precedent, Cordis' claim for patent infringement in the 08-779 case is the same as its claim for patent infringement in the 03-027 case. Therefore, *res judicata* applies and bars Cordis' claim. *See Mullarkey*, 536 F.3d at 225.

**B.  Cordis' Attempts To Escape *Res Judicata* Fail**

**1.  Cordis' Claim In The 03-027 Case Failed On The Merits**

Cordis has argued that its failure of proof was merely due to a lack of evidence regarding the geographical elements of its claim. (D.I. 12 at 9-10) But this is false. As discussed above, Cordis' failure of proof was total. Cordis offered no evidence that the Taxus Liberté stent satisfied any of the limitations of the asserted patent claim. As this Court concluded, "[t]he problem is that at this point, ***there is no proof that the Taxus Liberté***, as it might be sold in the United States, ***has the same structure***." (D.I. 368 (03-027) at 1050:2-5) (emphases added)

14

But even if Cordis' failure of proof were somehow limited to the geographical elements of its claim, that is still a failure on the merits. *Cordis Corp.*, 2009 WL 819055, at *13 ("Because 'a failure to prove the allegations alleged in a complaint requires a decision on the merits, not a dismissal for lack of subject matter jurisdiction,' the district court's dismissal of Cordis' infringement claims regarding the Taxus Liberté stent should have been with prejudice.") (*citing Litecubes*, 523 F.3d at 1361). Cordis argues that it should not be bound by *Litecubes* because that decision allegedly constituted a change in the law. (Ex. 4, Excerpt from Cordis' 8/22/08 Response and Reply Brief (2008-1003), at 72) But as set forth in BSC's briefing on the appeal of the 03-027 case, there was ample caselaw basis to dismiss Cordis' claim with prejudice before the decision in *Litecubes*. (Ex. 5, Excerpt from BSC's 5/12/08 Brief (2008-1003), at 61-62; Ex. 6, Excerpt from BSC's 9/22/08 Reply Brief (2008-1003), at 34) Moreover, "there is no 'change of law' . . . exception to prevent application of claim preclusion." *Roche*, 531 F.3d at 1380.

### 2.    The Judgment Regarding The Liberté Stent Is Inapposite Since It Is A Different Product

Cordis has argued that, notwithstanding the prior adjudication regarding the Taxus Liberté stent, prior proceedings regarding the bare-metal Liberté stent should somehow control this case. (D.I. 56 at 5-7) But the prior proceedings regarding the Liberté stent are inapposite, because the Taxus Liberté stent is a different product. *Young Eng'rs*, 721 F.2d at 1316 ("With respect to patent litigation, we are unpersuaded that an 'infringement claim,' for purposes of claim preclusion, embraces more than the specific devices before the court in the first suit."); *Acumed LLC*, 525 F.3d at 1324 ("[C]laim preclusion does *not* apply unless the accused device in the action before the court is 'essentially the same' as the accused device in a prior action between the parties that was resolved by a judgment on the merits.").

15

This Court specifically determined that the Taxus Liberté stent is a different product than the Liberté stent. (D.I. 416 (03-027) at 62) ("The court . . . considered the Taxus Liberté stent to be a different product than the Liberté bare metal stent.") And the Federal Circuit affirmed that determination. *Cordis Corp.*, Nos. 2008-1003, -1072, 2009 WL 819055, at *13 n.17 ("We see no error in the district court's determination that the Taxus Liberté stent and the Liberté stent are different products."). Cordis is barred under the doctrine of issue preclusion from contesting this decided fact, which disposes of Cordis' argument. *See Taylor v. Sturgell*, 128 S. Ct. 2161, 2171 (2008) (issue preclusion "bars 'successive litigation of an issue of fact or law actually litigated and resolved'" in a prior proceeding).

But even if Cordis were allowed to re-argue this issue, Cordis' argument would still fail. "Whether two claims for infringement constitute the 'same claim' is an issue particular to patent law and thus Federal Circuit law applies." *Roche*, 531 F.3d at 1379. Under Federal Circuit precedent, two accused products present separate claims if they have differences relevant to the asserted patents. *See Acumed*, 525 F.3d at 1326-27 (finding that claim preclusion did not apply where device in second suit was longer than device in first suit, and this difference could impact a claim limitation regarding the device's positioning).

The Taxus Liberté stent differs from the Liberté stent in that, *inter alia*, the Taxus Liberté stent has a drug and polymer coating. This difference is relevant to the claim limitations of the Gray '406 patent asserted by Cordis and applied by the Court during the 2005 trial. For example, Claim 1 of the Gray '406 patent, from which Claim 2 depends, recites a "stent . . . having axial flexibility in the unexpanded state." Cordis' expert Dr. Buller has testified that he would ascertain the existence of this "axial flexibility" by measuring a stent's "trackability," *i.e.*, how easy it was to push a stent through a curved passage. (D.I. 39 at 9/n.2) And he has testified that

16

the inclusion of the drug and polymer coating in the Taxus Liberté stent makes that stent thicker and tackier than the Liberté stent, leading to a difference in trackability. (*Id.*) Cordis does not dispute that Taxus Liberté has less "axial flexibility" than the Liberté stent. (*E.g.*, D.I. 56 at 5-6) This difference — directly relevant to the claim limitations applied in the 2005 trial — is fatal to Cordis' argument that the Taxus Liberté stent and the Liberté stent are somehow the same product. *Acumed*, 525 F.3d at 1326-27. Tellingly, Cordis separately accused the Liberté and Taxus Liberté stents of infringement in the 03-027 case and did not try to lump them together until after it had closed its case and BSC had moved for JMOL.

Cordis harps on an alleged admission "that BSC would be 'in trouble' if it began selling Taxus Liberté in the United States if Cordis prevailed on its liability case against Liberté in the 03-027 Case." (*E.g.*, D.I. 5 at 1) But counsel for BSC actually stated that:

> Let's assume we go forward in time and you grant an injunction based on . . . the Liberté design . . . then we were to launch a product that had the same or — I forget what the words are, but substantially the same or colorable difference [sic] or whatever the legal words are . . . If we brought an identical patent [sic, product] or colorable differences, I'm sure they would be right on that . . . *If it was the same, we'd be in trouble. If it was different, we wouldn't be in trouble.*

(D.I. 368 (03-027) at 1062:10-1063:15 (emphasis added)) As discussed above, Taxus Liberté is different. At a minimum, it is different in terms of "axial flexibility," which is a limitation of Claim 2 of the Gray '406 patent applied during the 2005 trial. (D.I. 39 at 9/n.2) Because it is different — and different in a manner relevant to the claim limitations tried in 2005 — BSC would not be "in trouble" for selling the stent in the United States.

Cordis knew that the Taxus Liberté stent was different from Liberté since at least 2004, when it first accused the Taxus Liberté stent of infringing the Gray '406 patent and conducted substantial discovery on the stent. And Cordis knew that the Taxus Liberté stent was different in

17

2005, when it chose to separately accuse the stent of infringement at trial. Cordis has even represented that it had proof of infringement specific to Taxus Liberté, including for the geographic elements of its claim and for axial flexibility. (D.I. 368 (03-027) at 1057:14-25, 1058:21-25; D.I. 56 at 6) But Cordis failed to offer any evidence or otherwise meet the burden of proof on its claim against the Taxus Liberté stent at trial. Because both this Court and the Federal Circuit found that Taxus Liberté is a different product, it is the prior adjudication on the Taxus Liberté stent that controls the 08-779 case.

### C. Cordis' Prior Failure Of Proof Is Binding On Cordis Notwithstanding Any Intent In Ruling On That Failure

Cordis' prior claim against Taxus Liberté based on the Gray '406 patent failed. Accordingly, *res judicata* bars Cordis' current claim as a matter of law. *Mullarkey*, 536 F.3d at 225. Whether this was the result contemplated by the Court or the parties is not a factor in the *res judicata* analysis. *See Roche*, 531 F.3d at 1380 (noting that "there is no . . . fairness exception to prevent the application of claim preclusion"). As *Roche* explained, a rigid application of *res judicata* was necessary because:

> [T]he indulgence of a contrary view would result in creating elements of uncertainty and confusion and in undermining the conclusive character of judgments, consequences which it was the very purpose of the doctrine of *res judicata* to avert.

*Id.* at 1381 (quoting *Federated Dep't Stores v. Moitie*, 452 U.S. 394, 398-99 (1981)). Moreover, "[t]he result need not be the result that a second court would reach in order to invoke principles of res judicata. Finality, not correctness is the key." *MGA*, 827 F.2d at 733. As expressed by the Supreme Court:

> This judgment, *whether it proceeds upon good reasons or upon bad reasons, whether it was right or wrong, settled finally and everywhere* . . . that [the defendant] had the right to manufacture, use, and sell the [accused product].

18

*Kessler*, 206 U.S. at 288 (emphasis added).

Cordis rejected BSC's 2004 proposal to try the Liberté and Taxus Liberté stents in a separate case from the 03-027 case. Instead, Cordis pressed ahead to bolster its damages claims, took substantial discovery on Taxus Liberté, and tried its claim in 2005. Cordis chose to try its case against Taxus Liberté as part of the 03-027 case and had a full and fair opportunity to do so. Cordis failed to prove its claim, but has no one to blame but itself. The judgment against Cordis' Taxus Liberté claim was both fair and warranted.

Cordis "does not allege that it was denied an opportunity to present any theory of its case, submit exhibits, offer testimony, or to rebut evidence submitted by the other party." *MGA*, 827 F.2d at 733. There was no procedural prejudice that Cordis can claim. This Court gave Cordis a full and fair opportunity to try its claim against Taxus Liberté. That Cordis now regrets its litigation decisions in the 2005 trial cannot bar the application of *res judicata*.

*Kessler*, *Young Engineers* and *Foster* control the application of *res judicata* in this case. There is no difference between the Gray '406 patent asserted in the 03-027 case and the Gray '406 patent asserted here. Nor is there any difference between the Taxus Liberté stent that Cordis accused of infringement in the 03-027 case and the Taxus Liberté stent accused of infringement here. *Res judicata* applies and bars Cordis' claim, which should be dismissed as a matter of law.

## II.    EVEN IF *RES JUDICATA* SOMEHOW DOES NOT BAR CORDIS' CLAIM, CORDIS IS NOT ENTITLED TO SUMMARY JUDGMENT OR INJUNCTIVE RELIEF

### A.    Genuine Issues Of Material Fact Preclude Cordis' Requested Summary Judgment

Even if the doctrine of *res judicata* somehow did not bar Cordis' claims against Taxus Liberté, the existence of genuine issues of material fact renders summary judgment inappropriate. Fed. R. Civ. P. 56(c). As set forth in BSC's Opposition To Cordis' Motion For A

Preliminary Injunction, genuine issues of material fact exist regarding the questions of non-infringement (*e.g.*, regarding "axial flexibility") and unenforceability (*e.g.*, Cordis' intent in withholding the '762 patent from the PTO). (D.I. 39 at 36-37) The existence of these issues precludes summary judgment. Moreover, Cordis' premature motion for summary judgment — made prior to a Scheduling Order or any discovery on its claim — is untimely and properly denied *a priori*. (*Id.*)

### B.    Cordis Cannot Demonstrate Irreparable Harm

Cordis' motion for a preliminary injunction should likewise fail, if considered, because Cordis has failed to demonstrate irreparable harm. *Reebok Int'l Ltd. v. J. Baker, Inc.*, 32 F.3d 1552, 1556 (Fed. Cir. 1994) ("[A] movant cannot be granted a preliminary injunction without findings by the district court that the movant carried its burden on both factors [likelihood of success on the merits and irreparable harm]."). That Cordis has not suffered any irreparable harm is apparent from its market share over the past five months, which demonstrates that the U.S. launch of Taxus Liberté has not affected Cordis' sales of its Cypher stent.[1]

As set forth in BSC's Opposition Brief, Cordis' market share had already declined precipitously before Taxus Liberté's U.S. launch in November 2008. (D.I. 6, Suehnholz Decl., at ¶ 8) According to Cordis' declarant, other "newer stents have captured significant market share and sales of both Taxus Express and CYPHER have declined." (*Id.*) Indeed, Cypher's market REDACTED October 2008, one month *before* Taxus Liberté's U.S. launch. (D.I. 39, Ex. 2, at 71:23-72:2; 79:16-20; D.I. 42, Kucheman Decl., at ¶ 14)

---

[1] As noted above, all of Cordis' sales of the Cypher stent from that stent's U.S. launch to the present have been adjudicated to infringe BSC's '021 patent.

At the time BSC filed its Opposition Brief, Cordis' market share in January 2009 REDACTED

REDACTED (D.I. 39, Ex. 2, at 80:22-81:4; D.I. 42, Kucheman Decl., at ¶ 15)  Cordis' market share

REDACTED    in February and March 2009.  (Ex. 7, March MRG Data, at BSCTL000082358)

Cordis' steady market share confirms that sales of Taxus Liberté have not harmed Cordis, let

alone caused it irreparable harm.  This result is unsurprising considering that, for physicians that

prefer stents that elute an -olimus-type drug, *e.g.*, sir*olimus* (Cypher), ever*olimus* (Promus and

Xience) and zotar*olimus* (Endeavor), they will primarily consider using Cypher, Endeavor,

Promus or Xience for their procedures.  (D.I. 42, Kucheman Decl., at ¶ 17; D.I. 40, Garratt Decl.,

at ¶ 11; D.I. 41, Turco Decl., at ¶ 10)  The following is a chart tracking U.S. market share of

Cypher and the other currently available drug-eluting stents over the past twelve months:

REDACTED

(Ex. 7 at BSCTL000082358)  As this chart confirms, Cypher's        REDACTED

REDACTED        is not irreparably harming Cordis.

Cordis' own statements confirm that Taxus Liberté has not caused it any harm.  As

discussed in BSC's Opposition Brief,                          REDACTED

21

REDACTED

REDACTED     Cordis publicly acknowledged this belief in its April 2009 earnings call with investors: "Estimated share in US of 15% was flat sequentially and down 28 points from the first quarter of 2008, due to the market entry of two new competitors     REDACTED     in 2008." (Ex. 8, 4/14/09 Q1 2009 Earnings Conference Call Transcript, at BSCTL000082394) Cordis has admitted, through its internal documents and public statements, that the launch of Taxus Liberté has not caused it irreparable harm.

In an effort to divert the Court's attention from its failure to prove any irreparable harm, Cordis focuses on irrelevant facts. For example, Cordis argues that, because the NIR and Taxus Express stents were found to infringe the expired Palmaz '762 patent that Taxus Liberté is not accused of infringing, the Court should preliminarily enjoin Taxus Liberté due to its alleged infringement of the Gray '406 patent. That is a non-sequitur. Prior infringement findings on a different patent by different stents — findings that BSC is still in the process of appealing — cannot prove that Cordis has been irreparably harmed by Taxus Liberté. The only possible irreparable harm argument that Cordis presented in its Opening Brief — BSC's alleged inability to pay a potential damages award in this case — has been withdrawn. Cordis therefore has no proof that its     REDACTED     is causing it irreparable harm.

## C.   Cordis' New Reply Arguments Are Untimely And Without Merit

Unable to rebut the fact that it has not been irreparably harmed by Taxus Liberté, Cordis raises several new arguments in its reply brief. None of these arguments, however, can erase the fact that Taxus Liberté has not had any effect on Cordis' infringing sales of Cypher.

### 1.   Cordis Has Not Proven Loss Of Any Goodwill

Desperate to counter the fact that it has not lost *any* market share to Taxus Liberté, including public statements that the infringing Cypher stent has been losing sales to the Xience

22

and Promus stents, Cordis argues for the first time in its Reply Brief that it has somehow lost "goodwill" due to sales of Taxus Liberté. Cordis' argument is not only too late, it is wholly unsupported.

According to Cordis, BSC is somehow taking goodwill that belongs to Cordis by portraying itself as an innovator. (D.I. 56 at 16) First, Cordis' argument is impossibly vague. Cordis has not articulated how BSC has taken goodwill from it by selling the Taxus Liberté stent. Nor does Cordis provide any evidence to support its contention that BSC has taken goodwill from Cordis by identifying itself as an innovative company. Indeed, since 2003, when Cordis launched Cypher in the U.S., BSC has launched 4 drug-eluting stents in the U.S. — Taxus Express, Taxus Liberté, Promus and Taxus Express Atom. No other drug-eluting stent supplier has more than one product on the market. BSC is an innovator, and its reputation as an innovator is well deserved. Cordis cannot legitimately complain that BSC holds itself out as an innovative company, or tie that complaint to any harm related to the asserted Gray '406 patent. This is especially true where, as here, Cordis does not practice the Gray '406 patent and is only able to sell its Cypher stent by infringing BSC's '021 patent.

None of Cordis' cases supports its position that a patentee can obtain a preliminary injunction by failing to prove any lost sales and nebulously arguing that it has lost goodwill. In *TruePosition Inc. v. Andrew Corp.*, this Court found loss of goodwill based on the identification of lost sales involving the plaintiff and defendant and their customers. 568 F. Supp. 2d 500, 531-32 (D. Del. 2008). This Court explained that "[a]s plaintiff and defendant are the only suppliers in a two-supplier market, defendant's infringement has necessarily affected plaintiff's market position." *Id.* at 532. Here, Cordis has not specifically identified any lost sales due to Taxus

23

Liberté's U.S. launch.  Cordis and BSC are also not the only suppliers in the drug-eluting stent market.

Cordis' reliance on *Trading Technologies International, Inc. v. eSpeed, Inc.* is also misplaced.  No. 04-5312, 2008 WL 4531371 (N.D. Ill. May 22, 2008).  According to the court, "where a patentee has built a successful business around core patented technology, an infringing competitor in the same marketplace causes irreparable harm to the patentee." *Id.* at *3.  Here, Cordis' product, Cypher, infringes BSC's patented technology, and does not even practice the Gray '406 patent.  In addition, as noted above, Cordis has provided no evidence of lost sales or lost goodwill.[2]

    **2.**    **Cordis Has Not Proven**    REDACTED

In its Reply Brief, Cordis argues for the first time that it has somehow    REDACTED

    REDACTED    For the reasons stated above, Cordis' position is untenable.

REDACTED

This confirms that Cordis has not

---

[2] The Court in *Fresenius Medical Care Holdings, Inc. v. Baxter International, Inc.* did not specifically identify the facts it considered in finding loss of goodwill supporting a permanent injunction.  No. 03-1431, 2008 WL 928496, at *3 (N.D. Cal. Apr. 4, 2008).

REDACTED

Cordis has no answer to this question other than rank speculation that is contradicted by Cordis' corporate declarant, who admitted that it is either          REDACTED          to prove such a relationship between Taxus Liberté and Cypher.  (D.I. 39, Ex. 2 at 131:5-132:3)

To support its flawed position, Cordis grossly misrepresents a BSC *draft* document.  (D.I. 56 at 16-17)

REDACTED

### 3.    Cordis Has Not Proven That The Launch Of Taxus Liberté Has Resulted In Price Erosion

Lastly, Cordis misrepresents testimony from Mr. Kucheman regarding the impact of Taxus Liberté on the prices of drug-eluting stents.  (D.I. 56 at 17)

REDACTED

Indeed, Cordis conveniently ignores the fact that Taxus Liberté was introduced after six other drug-eluting stents were already in the U.S. market.

The record reveals that BSC stents are not responsible for any price erosion.

REDACTED

Tellingly, Cordis cites no evidence that

the launch of Taxus Liberté resulted in price erosion. Cordis relies only on unsupported lawyer arguments.

### D.    Equity Disfavors Rewarding Cordis For Infringing BSC's '021 Patent

The Federal Circuit recently affirmed the jury verdict that Cordis' Cypher stent infringes BSC's '021 patent and that the '021 patent is not invalid. As a result, equity favors denying Cordis' motion for a preliminary and permanent injunction. While constantly harping on the fact that certain BSC stents were found to infringe Cordis' patents, Cordis conveniently ignores the irrefutable fact that each and every Cypher stent that Cordis has ever made or sold in the U.S. infringes BSC's '021 patent. Cordis further ignores the fact that it continued to make and sell infringing Cypher stents even after a jury found that stent to infringe BSC's valid patent in 2005. Even today, after the Federal Circuit's affirmance of the jury verdict, Cordis continues to infringe BSC's '021 patent. Cordis does not even bother to acknowledge, let alone justify, its continuing infringement of BSC's '021 patent, much less show why the Court should reward that infringement with an injunction on another drug-eluting stent. If equity is to be given any weight, this Court should deny Cordis' attempt to promote its infringing Cypher stent at the expense of Taxus Liberté.

26

## CONCLUSION

For all the foregoing reasons, as well as those set forth in BSC's Opposition To Cordis' Motion For A Preliminary Injunction And Other Relief, BSC respectfully requests that this Court dismiss Cordis' claims against Taxus Liberté as barred by *res judicata* or, in the alternative, deny Cordis' motions for a preliminary injunction, summary judgment and a permanent injunction.

Dated: May 1, 2009                                    Respectfully submitted,


   /s/ Adam W. Poff
Josy W. Ingersoll (I.D. #1088)
John W. Shaw (I.D. #3362)
Adam W. Poff (I.D. #3990)
YOUNG CONAWAY STARGATT
& TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19801
(302) 571-6600

*Attorneys for Defendants*
*Boston Scientific Corporation and*
*Boston Scientific Scimed, Inc.*


*Of Counsel*:

John M. Desmarais
Peter J. Armenio
Young J. Park
KIRKLAND & ELLIS
153 East 53rd Street
New York, New York 10022
(212) 446-4800

## CERTIFICATE OF SERVICE

I, Adam W. Poff, hereby certify that on May 1, 2009, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Steven J. Balick, Esquire
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

I further certify that on May 1, 2009, I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY E-MAIL**

Gregory L. Diskant, Esquire
Patterson, Belknap, Webb & Tyler
1133 Avenue of the Americas
New York, NY 10036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Adam W. Poff*
Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Adam W. Poff (No. 3990)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
apoff@ycst.com

Attorneys for Boston Scientific Corporation and
  Boston Scientific Scimed, Inc.

# EXHIBIT 1

## Patterson, Belknap, Webb & Tyler ʟʟᴘ

1133 Avenue of the Americas
New York, NY 10036-6710
(212) 336-2000
Fax (212) 336-2222

Kim J. Landsman

Direct Phone
(212) 336-2960

Direct Fax
(212) 336-2985

Email Address
kjlandsman@pbwt.com

April 28, 2004

**By Fax**

Peter J. Armenio, Esq.
Kirkland & Ellis
Citigroup Center
153 East 53rd Street
New York, New York  10022-4675

Re:    **Cordis Corp. v. Boston Scientific Corp., C.A. No. 03-027-SLR**

Dear Peter:

This will confirm our conversation today that you expect to be able to respond to our question about the relevance to this litigation of the Liberté stent tomorrow afternoon and that, based on that intended response date, BSC will stipulate to an extension of the April 30 deadline in which to amend the pleadings to at least May 7.

As you know from our conference on Monday, Cordis contends that the Liberté stent infringes its patents, but had not intended to bring that claim as part of this litigation.  If, however, BSC plans to make Liberté an issue in the damages phase by contending that it would have been an available non-infringing alternative, Cordis may reconsider and wish to amend its complaint.

This will also confirm that you have agreed to extend to May 10 Cordis' time in which to respond the BSC's Second Set of Second Set of Post-Preliminary Injunction Requests for the Production of Documents and Things, Second Set of Post-Preliminary Injunction Requests for Admission, and Second Set of Post-Preliminary Injunction Hearing Interrogatories.

Thank you for your courtesy and cooperation.

Sincerely yours,

Kim J. Landsman

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CORDIS CORPORATION,              )
                                 )
          Plaintiff,             )
                                 )
     v.                          )      C.A. No. 03-027-SLR
                                 )
BOSTON SCIENTIFIC CORPORATION and )
SCIMED LIFE SYSTEMS, INC.,       )
                                 )
          Defendants.            )

## NOTICE OF SERVICE

The undersigned hereby certifies that on the 20th day of January, 2005, **PLAINTIFF'S**

**AMENDED OBJECTIONS AND RESPONSES TO DEFENDANTS' THIRD SET OF**

**POST-PRELIMINARYINJUNCTION INTERROGATORIES** was served upon the

following counsel of record at the address and in the manner indicated:


Josy W. Ingersoll, Esquire                    HAND DELIVERY
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19899-0391

Peter J. Armenio, Esquire                     VIA FEDERAL EXPRESS
Kirkland & Ellis
Citigroup Center
153 East 53rd Street
New York, NY  10022-4675

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of January, 2005, the attached **NOTICE OF**

**SERVICE** was served upon the below-named counsel of record at the address and in the manner

indicated:

Josy W. Ingersoll, Esquire
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19899-0391

HAND DELIVERY

Peter J. Armenio, Esquire
Kirkland & Ellis
Citigroup Center
153 East 53rd Street
New York, NY  10022-4675

VIA FEDERAL EXPRESS

John G. Day

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CORDIS CORPORATION,                      )
                                         )
            Plaintiff,                   )
                                         )        C.A. No. 03-27-SLR
      v.                                 )
                                         )
BOSTON SCIENTIFIC CORPORATION            )
and SCIMED LIFE SYSTEMS, INC.,           )
                                         )
            Defendants.                  )

**PLAINTIFF'S AMENDED OBJECTIONS AND
RESPONSES TO DEFENDANTS' THIRD SET OF
POST-PRELIMINARYINJUNCTION INTERROGATORIES**

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff Cordis

Corporation ("Cordis") amends its objections and responses to Defendants' Third Set of Post-

Preliminary Injunction Interrogatories Nos. 19, 20, and 27 as follows:

**GENERAL OBJECTIONS**

1.      Cordis incorporates by reference the General Objections set forth in

Plaintiff's Objections and Responses to Defendants' First and Second Sets of Post-Preliminary

Injunction Hearing Requests for the Production of Documents and Things To Plaintiff Cordis

and Plaintiff's Objections and Responses to Defendant's First and Second Sets of Post-

Preliminary Injunction Hearing Interrogatories to Plaintiff Cordis, as amended.

2.      Cordis also objects to Defendants' interrogatories to the extent they are

multi-part interrogatories mischaracterized as single-part interrogatories. By responding to

Defendants' interrogatories, Cordis in no way waives its rights to object to the number of

interrogatories, including subparts, that Defendants have propounded or will propound in this

action. Cordis also reserves the right to refuse to answer any interrogatories beyond the number

permitted under the Federal Rules of Civil Procedure, Local Rule 26.1(b) and applicable court rules.

## INTERROGATORIES

### INTERROGATORY NO. 19:

Identify each claim of the asserted patents that Cordis contends has been infringed by BSC and for each such claim identify every BSC product that Cordis contends infringes the claim.

### AMENDED RESPONSE TO INTERROGATORY NO. 19

Cordis objects to this contention interrogatory as premature. The Amended Scheduling Order in this case provides for expert reports for issues on which a party has the burden of proof to be submitted on January 28, 2005. Cordis' allegations regarding infringement will be contained within the reports submitted by its experts according to the Scheduling Order. Cordis further objects to this interrogatory as cumulative, to the extent it seeks information about the infringement of the '762 patent by the Express and Taxus Express[2] products.

Subject to, and without waiving, these objections and its General Objections, at this time Cordis refers BSC to Plaintiff's Amended Responses and Objections to Interrogatory No. 12 of Defendants' Second Set of Post-Preliminary Injunction Hearing Interrogatories. Cordis further responds that the Liberté and Taxus Liberté stents infringe at least Claims 1-2 and 11-13 of the '406 patent. In addition, Cordis responds that the Liberté and Taxus Liberté stents infringe at least claims 1, 9 (Taxus Liberté only), 12 (Taxus Liberté only), 23, 19 (Taxus Liberté only), and 22 (Taxus Liberté only) of the '762 patent as reexamined. Cordis reserves the right to supplement or amend this list of claims, especially if the prior jury verdict that claim 44 is invalid is reversed, vacated, or otherwise rendered inoperative, and to limit the claims asserted at trial.

2

**INTERROGATORY NO. 20:**

Provide a claim chart reflecting Cordis' proposed construction of each limitation of each claim identified in response to Interrogatory No. 19 and describe in detail where and how Cordis contends each such limitation is found in the accused BSC product(s). This detailed description should include, without limitation, a statement for each such limitation of whether Cordis contends the limitation is found literally or under the doctrine of equivalents.

**AMENDED RESPONSE TO INTERROGATORY NO. 20**

Cordis objects to this interrogatory on the ground that it is premature. The Amended Scheduling Order in this case provides for expert reports for issues on which a party has the burden of proof to be submitted on January 28, 2005. Cordis' allegations regarding infringement will be contained within the reports submitted by its experts according to the Scheduling Order. Furthermore, the Amended Scheduling Order in this case provides for proposed claim construction of claim terms to be submitted on March 17, 2005.

Subject to, and without waiving, these objections and its General Objections, at this time Cordis refers BSC to Cordis' expert reports and testimony from the preliminary injunction hearing in this action as well as from the Other Stent Actions listed in Paragraph 9 of the Protective Order entered in this action. With respect to claims 9, 12, 19, and 22 of the Palmaz '762 patent, BSC has agreed that "the SIBS polymer used in Taxus is biologically inert." *See* June 22, 2004 letter from Meloro to Timmons; *see also* June 23, 2004 letter from Armenio to Landsman.

With respect to the Liberté and Taxus Liberté stent products, the Liberté and Taxus Liberté stents contain every limitation of the asserted claims of the '762 patent as listed in Cordis' response to Interrogatory No. 19, both literally and under the doctrine of equivalents. The Liberté and Taxus Liberté stents and each ring within them is a "thin-walled tubular member." The Liberté and Taxus Liberté stents have "slots formed therein" because each ring has openings between its struts whose length is substantially greater than its width. These slots

3

are "disposed substantially parallel to the longitudinal axis of the tubular member" in that they run substantially parallel to the longitudinal axis. The Liberté and Taxus Liberté stents are sold "disposed . . . on a catheter," with a "first diameter which permits intraluminal delivery." The Liberté and Taxus Liberté stents are implanted by doctors via percutaneous insertion to the "location of an existing natural obstruction," such as an area of stenosis. The stent delivery systems on which the Liberté and Taxus Liberté stents are mounted contain a "portion of the catheter associated with the prosthesis" which is then expanded, forcing the Liberté and Taxus Liberté stents "radially outwardly into contact with the body passageway" and causing the Liberté and Taxus Liberté stents to be "deformed beyond its elastic limit." Moreover, the Liberté and Taxus Liberté stents have a "wall surface" in that, for example, they are disposed in a common cylindrical plane when they are cut from a tube and then crimped on a catheter. The Liberté and Taxus Liberté stents are also "smooth" because the metal that makes up the stent is smooth. With respect to claims 9, 12, 19, and 22 of the Palmaz '762 patent, BSC has agreed that "the SIBS polymer used in Taxus is biologically inert." *See* June 22, 2004 letter from Meloro to Timmons; *See also* June 23, 2004 letter from Armenio to Landsman.

With respect to the Gray '406 patent, the claims identified in the response to Interrogatory No. 19 require a "plurality of longitudinally disposed bands, wherein each band defines a generally continuous wave . . . ." A plurality of such "bands" can be found, e.g., in a single ring (a circumferential spring) of a Liberté or Taxus Liberté stent, or running from end to end of each stent. The Liberté and Taxus Liberté stents also have a plurality of "links for maintaining the bands in a tubular structure." For example, at either end of a band in a single ring of a Liberté or Taxus Liberté stent, there is a "link" connecting it to a circumferentially adjacent band. Links also connect the bands that run the entire length of the Liberté and Taxus

4

Liberté stents. These "links" are so disposed that the circumferential path formed by the links is discontinuous. Furthermore, each "link" is "axially displaced from any circumferentially adjacent link." The waves associated with the "bands" in the Liberté and Taxus Liberté stents are "in phase." Furthermore, the Liberté and Taxus Liberté stents are flexible, balloon expandable stents.

Cordis reserves the right to amend or supplement this response in light of further proceedings in this case, including discovery, claim construction and positions taken by BSC. Cordis reserves the right to assert infringement by equivalents as to appropriate limitations should the Court's claim construction preclude a claim of literal infringement but permit a claim of infringement under the Doctrine of Equivalents.

**INTERROGATORY NO. 27:**

To the extent Cordis' response to any of BSC's Request for Admission Nos. 36-45 is other than an unqualified admission, describe in detail the bases for Cordis' response and identify all documents and other information that Cordis contends supports its response.

**AMENDED RESPONSE TO INTERROGATORY NO. 27**

Cordis objects to this interrogatory on the ground that it is premature. The Amended Scheduling Order in this case provides for rebuttal expert reports to be submitted on February 25, 2005. Cordis' allegations regarding validity will be contained within the reports submitted by its experts according to the Scheduling Order.

With respect to Cordis' response to Request for Admissions 36-41, the factual bases for the responses are the complete file histories for the asserted Gray patents and documents reflecting the assignment of all rights in these patents to Cordis produced in the Other Stent Actions listed in Paragraph 9 of the Protective Order entered in this action. At the least, this includes the following documents: COR1046493-98, CBX 0210433-35, CBX0210397, CBX0210404, CBX0210699-702, CBX0210713-15, CBX021195-58. Cordis reserves the right

to rely on documents other than those expressly listed above, including but not limited to other copies of the same document located at different bates numbers.

ASHBY & GEDDES

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
222 Delaware Avenue, 17th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888

*Attorneys for Plaintiff*

*Of Counsel:*

Gregory L. Diskant
William F. Cavanaugh, Jr.
Kim J. Landsman
Michael J. Timmons
PATTERSON, BELKNAP, WEBB & TYLER LLP
1133 Avenue of the Americas
New York, New York 10036-6710
(212) 336-2000

Theodore B. Van Itallie, Jr.
Eric I. Harris
Paul A. Coletti
JOHNSON & JOHNSON
One Johnson & Johnson Plaza
New Brunswick, New Jersey 08933

Date: January 20, 2005
152495.1

6

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of January, 2005, the attached **PLAINTIFF'S AMENDED OBJECTIONS AND RESPONSES TO DEFENDANTS' THIRD SET OF POST-PRELIMINARYINJUNCTION INTERROGATORIES** was served upon the below-named counsel of record at the address and in the manner indicated:

Josy W. Ingersoll, Esquire                                    HAND DELIVERY
Young Conaway Stargatt & Taylor, LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE  19899-0391

Peter J. Armenio, Esquire                                     VIA FEDERAL EXPRESS
Kirkland & Ellis
Citigroup Center
153 East 53rd Street
New York, NY  10022-4675

John G. Day

122444.1

# EXHIBIT 3

# REDACTED IN ITS ENTIRETY

# EXHIBIT 4

# United States Court of Appeals

*for the*

# Federal Circuit

Appeal Nos. 2008-1003, -1072

CORDIS CORPORATION,

*Plaintiff-Appellant,*

— v. —

BOSTON SCIENTIFIC CORPORATION
and SCIMED LIFE SYSTEMS, INC.,

*Defendants-Cross Appellants.*

APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE IN CASE NO. 03-CV-027, JUDGE SUE L. ROBINSON

## RESPONSE AND REPLY BRIEF FOR PLAINTIFF-APPELLANT CORDIS CORPORATION

|  |  |
|---|---|
|  | Gregory L. Diskant |
|  | Eugene M. Gelernter |
|  | Scott B. Howard |
|  | Kathleen M. Crotty |
|  | Scott W. Parker |
|  | PATTERSON BELKNAP WEBB |
| *Of Counsel:* | & TYLER LLP |
| Constantine L. Trela, Jr. | *Attorneys for Plaintiff-Appellant* |
| SIDLEY AUSTIN LLP | *Cordis Corporation* |
| One South Dearborn | 1133 Avenue of the Americas |
| Chicago, Illinois 60603 | New York, New York 10036 |
| (312) 853-7000 | (212) 336-2000 |

August 22, 2008

### III.   THIS COURT SHOULD AFFIRM THE DISMISSAL OF CLAIMS REGARDING TAXUS LIBERTÉ WITHOUT PREJUDICE

The district court dismissed Cordis's claim regarding Taxus Liberté without prejudice.  A2752-53/Tr.1307:12-1308:2, A168-69.  That decision should be affirmed.

Taxus Liberté has the same structure as Liberté plus an additional drug/polymer coating that is irrelevant to infringement.  A2688/Tr.1050:8-12; A2400/Tr.414:14-22.  Thus, Liberté and Taxus Liberté are the same product for purposes of the Gray patent and Cordis treated them as such at trial.  In the liability phase, it did not introduce evidence that BSC had made some Liberté stents in the United States for coating and ex-U.S. sale under the Taxus Liberté name.  Cordis viewed that issue as relating solely to damages, not liability.  A2687/Tr.1046:14-1047:16, A2688/Tr.1049:24-1050:14, A2690/Tr.1058:21-25.

BSC moved to dismiss, insisting that it had not made or sold any Taxus Liberté stents in the United States, A2688/Tr.1048:2-23, and arguing that absent proof to the contrary in the liability phase, Taxus Liberté "was out" of the case.  A2688/Tr.1048:24-1049:2.  In response to the district court's stated concern about possible "mischief" that might occur if BSC later were to begin selling Taxus Liberté – with the same infringing structure as Liberté – in the United States, A2689/Tr.1054:23-1055:11, BSC assured the court that, assuming there were no

71

"colorable differences" between Liberté and Taxus Liberté, BSC would be "in trouble" if it began selling Taxus Liberté in the United States in the face of a liability verdict and injunction against Liberté. A2691/Tr.1063:6-15.

Based on BSC's representations, the district court dismissed claims relating to Taxus Liberté for lack of a jurisdictional nexus to the United States, A2752-53/Tr.1307:12-1308:2, rather than permitting Cordis to reopen its case to prove the nexus. It emphasized, however, that its dismissal was "without prejudice." A2752-53/Tr.1307:12-1308:2; A168-69. Subsequently, this Court held for the first time that whether an accused product is "made . . . in the United States" relates to the merits, not jurisdiction. *Litecubes, L.L.C. v. Northern Light Prods., Inc.*, 523 F.3d 1353, 1365-66 (Fed. Cir. 2008). (Although *Litecubes* was decided before BSC filed its brief, BSC has not relied on that case.).

On appeal, BSC seeks to abandon its representations to the district court. It argues that Cordis sued too early and suggests that it should be able to sell Taxus Liberté in the United States – which it threatens to do beginning this Fall – without regard to Liberté's adjudicated infringement of the Gray patent. On the facts of this case, the district court's dismissal without prejudice was correct and should be affirmed. In this case, unlike *Litecubes*, there was a verdict that an identical product that *was* on sale in the U.S. – Liberté – infringes, together with

72

the infringer's acknowledgement that a judgment against Liberté deserves collateral estoppel effect in an action against future Taxus Liberté sales.

In any event, the dismissal – whether with or without prejudice – for failure to prove a U.S. nexus as of June 2005 does not permit BSC to infringe the Gray patent in 2008. An earlier judgment "cannot be given the effect of extinguishing claims which did not even then exist." *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955); *see also Labelle Processing Co. v. Swarrow*, 72 F.3d 308, 314 (3d Cir. 1995) ("events occurring after the events giving rise to the earlier claim ... may give rise to a new claim, which is not precluded by the earlier judgment."). This principle is fully applicable here. A dismissal, even with prejudice, does not permit future infringement since "each act of infringement gives rise to a separate cause of action," *Hazelquist v. Guchi Moochie Tackle Co., Inc.*, 437 F.3d 1178, 1180 (Fed. Cir. 2006), and since Cordis's Liberté verdict will be enforceable against any future sales of Taxus Liberté upon proof that there are no colorable differences between the products. *See Acumed LLC v. Stryker Corp.*, 525 F.3d 1319, 1324 (Fed. Cir. 2008) (structural differences "'unrelated to the [claim] limitations'" make two devices "'essentially the same'" (citation omitted)).

On the facts of this case, the dismissal without prejudice was correct.

73

## CONCLUSION

The judgment regarding the Jang patent should be reversed.  In all other respects, the judgment should be affirmed.

Dated:  August 22, 2008

<br>

Gregory L. Diskant
Eugene M. Gelernter
Scott B. Howard
Kathleen M. Crotty
Scott W. Parker

*Of Counsel*:

Constantine L. Trela, Jr.
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603

PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000
*Attorneys for Plaintiff-Appellant*
*Cordis Corporation*

74

# EXHIBIT 5

Appeal Nos. 2008-1003, -1072

# United States Court of Appeals

*for the*

# Federal Circuit

CORDIS CORPORATION,

*Plaintiff-Appellant,*

– v. –

BOSTON SCIENTIFIC CORPORATION
and SCIMED LIFE SYSTEMS, INC.,

*Defendants-Cross Appellants.*

APPEALS FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE IN CASE NO. 03-CV-027,
JUDGE SUE L. ROBINSON

## BRIEF FOR DEFENDANTS-CROSS APPELLANTS

JOHN M. DESMARAIS
PETER J. ARMENIO
YOUNG J. PARK
TIMOTHY K. GILMAN
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022
(212) 446-48001

*Attorneys for Defendants-Cross Appellants*

May 12, 2008

## VI. The JMOL That Taxus Liberté Does Not Infringe Should Have Been With Prejudice

When a patentee fails to prove its case, adverse judgment with prejudice is warranted. *See, e.g., Power Mosfet Techs., LLC v. Siemens AG*, 378 F.3d 1396, 1414 (Fed. Cir. 2004) (affirming noninfringement where evidence was insufficient to prove infringement); *Pellegrini v. Analog Devices, Inc.*, 375 F.3d 1113, 1118 (Fed. Cir. 2004) (same).

Patentees choose what products to accuse of infringement and when to do so. With this freedom, however, patentees are bound by the evidence they introduce at trial — even when it results in JMOL of noninfringement. *See, e.g., CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1162 (Fed. Cir. 1997) (noting patentee "confined its proof at trial"); *Exxon Chem. Pats., Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1561 (Fed. Cir. 1995) (noting patentee did not "introduce proofs").

This Court should not allow patentees "do-overs" to cure their failure of proof at trial. *Exxon*, 64 F.3d at 1561; *Vulcan Eng'g Co. v. Fata Aluminum, Inc.*, 278 F.3d 1366, 1379-80 (Fed. Cir. 2002) ("A party must present its evidence at trial, absent some extraordinary development or surprise.").

Cordis accused four BSC stents of infringement in this case — Express, Taxus, Liberté and Taxus Liberté. Cordis accused these stents throughout the litigation, including in the pre-trial order. (A10328) The district court thus had

jurisdiction over Cordis' claim, whether or not Cordis adduced any evidence at trial to support it.

The grant of JMOL in such circumstances is not based on jurisdiction, but on plaintiff's failure to carry its burden of proof on a claim it voluntary asserted. *See, e.g., Pellegrini*, 375 F.3d at 1118 (affirming JMOL where "there is no evidence of record" of infringement); *Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1257-58 (Fed. Cir. 2000) (affirming JMOL of noninfringement under § 271(f) for lack of evidence).

The district court had jurisdiction over Cordis' claim and its decision to grant JMOL *without* prejudice based on a purported lack of jurisdiction was legal error. This Court should revise the dismissal of Cordis' claims against Taxus Liberté to be with prejudice.

## CONCLUSION

For the reasons set forth above, BSC respectfully requests that this Court reverse the summary judgment ruling regarding the Monograph, reverse the denial of BSC's post-trial motions, and affirm the denial of Cordis' post-trial motions and request for a post-trial claim construction.

Date:  May 12, 2008                Respectfully submitted,

                                   John M. Desmarais
                                   Peter J. Armenio
                                   Young J. Park
                                   Timothy K. Gilman
                                   KIRKLAND & ELLIS LLP
                                   Citigroup Center
                                   153 East 53rd Street
                                   New York, New York  10022-4611
                                   (212) 446-4800

                                   *Attorneys for Defendant-Cross-Appellants*
                                   *Boston Scientific Corporation*
                                   *and Scimed Life Systems Inc.*

# EXHIBIT 6

Appeal Nos. 2008-1003, -1072

# United States Court of Appeals

*for the*

# Federal Circuit

RECEIVED

SEP 2 3 2008

United States Court of Appeals
For The Federal Circuit

CORDIS CORPORATION,

*Plaintiff-Appellant,*

— v. —

BOSTON SCIENTIFIC CORPORATION
and SCIMED LIFE SYSTEMS, INC.,

*Defendants-Cross Appellants.*

APPEALS FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE IN CASE NO. 03-CV-027,
JUDGE SUE L. ROBINSON

## REPLY BRIEF FOR DEFENDANTS-CROSS APPELLANTS

JOHN M. DESMARAIS
PETER J. ARMENIO
YOUNG J. PARK
TIMOTHY K. GILMAN
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022
(212) 446-4800

*Attorneys for Defendants-Cross Appellants*

September 22, 2008



(BP 59) Cordis' combination of metal and air is outside the claim construction — it thus cannot prove infringement.

Cordis' citations to the trial record (CR 60, 62-63) confirm its "metal-plus-air" testimony. For example, Dr. Buller's testimony confirms that metal was a component of Cordis' "wave," rather than its sole constituent: "In red is shown the metal *of* what can be called a band with a wave." (A2430/535:8-21) This proffer is legally insufficient to sustain an infringement verdict.

Cordis' cited "spring" testimony is similarly deficient. (BP 60) Comparison of Liberté to alleged descriptions of the preferred embodiment of the '406 patent (CR 61-62) is legally insufficient to prove infringement. *Johnson & Johnston Assoc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1052 (Fed. Cir. 2002) ("Infringement . . . does not arise by comparing the accused product 'with a preferred embodiment . . .'"). JMOL of noninfringement should have been entered below.

## VI.  The JMOL That Taxus Liberté Does Not Infringe Should Have Been With Prejudice

Cordis accused four BSC products of infringing the '762 and '406 patents — Express, Taxus Express, Liberté and Taxus Liberté. (A10328) Cordis states that it

had evidence it could have adduced at trial concerning Taxus Liberté. (CR 71) But Cordis chose not to do so. (BP 61-62; CR 71) Cordis' choice justifies JMOL, with prejudice. *See Power Mosfet Techs., LLC v. Siemens AG*, 378 F.3d 1396, 1413-14 (Fed. Cir. 2004).

The district court focused on Cordis' failure to prove the geographic elements of its § 271(f) claim, and dismissed the claims without prejudice due to a perceived lack of jurisdiction. (A166-70) This was legally improper; a failure of proof at trial under § 271(f) still warrants JMOL. *See Rotec Indus., Inc. v. Mitsubishi Corp.*, 215 F.3d 1246, 1257-58 (Fed. Cir. 2000). And plaintiff's failure to prove the geographic elements of a claim under § 271 is no different than failure to prove any other element. *Litecubes, LLC v. Northern Light Prods., Inc.*, 523 F.3d 1353, 1365-66 (Fed. Cir. 2008).

Cordis suggests that the state of the law was uncertain at the time of the trial. (CR 72) That is neither true nor an excuse. As the caselaw cited by BSC demonstrates, the relevant law existed prior to *Litecubes*. (BP 61-62) Indeed, *Litecubes* relied on prior decisions for support. 523 F.3d at 1365.

Cordis also argues that its proof regarding Liberté should excuse its failure of proof regarding Taxus Liberté. (CR 71-73) But it is axiomatic that each separately accused device needs to be addressed on its own merits. Notably, Cordis asserted a *different* set of claims against Taxus Liberté than it did against

-34-

Liberté in the pre-trial order, contradicting its claim that there are "no 'colorable differences'" between the two products. (CR 73; A10328)

Cordis' argument that there can be no dismissal with prejudice because its purported claims against Taxus Liberté "did not even then exist" at the time of trial is meritless. (CR 73) Throughout the litigation, and at trial, Cordis represented that it had evidence of infringement:

> Our understanding is that some of the Taxus Liberté are cut and made — let me get it straight. The structure is made in the U.S. It's shipped overseas, outside the U.S. ***That is enough, it's enough activity in the United States to made it an infringing act in the U.S.***

(A2690/1067:20-25) [13] On appeal, Cordis continues to represent that it had evidence it chose not to present at trial. (CR 71-72) Cordis' claims were ripe in 2005, and the judgment against it should have been with prejudice.[14]

---

[13] BSC did not "insist[] that it had not made or sold any Taxus Liberté stents in the United States." (CR 71) Rather, BSC sought JMOL because ***"there's not any proof*** that Taxus Liberté is made, used or sold in the United States, which is a necessary prerequisite to an infringement finding." (A2688/1048:2-5)

[14] The holding of *Hazelquist v. Guchi Moochie Tackle Co.*, 437 F.3d 1178, 1180 (Fed. Cir. 2006), is inapposite. (CR 73) That case concerned the discharge of debts in bankruptcy and the date those debts accrued. *Id.* at 1180-81. It did not authorize serial litigation on a product judged not to infringe.

## CONCLUSION

For the reasons set forth above, as well as in Boston Scientific's Principal Appellate Brief, BSC respectfully requests that this Court reverse the summary judgment ruling regarding the Monograph and reverse the denial of BSC's post-trial motions.

Date: September 22, 2008          Respectfully submitted,

John M. Desmarais
Peter J. Armenio
Young J. Park
Timothy K. Gilman
KIRKLAND & ELLIS LLP
Citigroup Center
153 East 53rd Street
New York, New York 10022-4611
(212) 446-4800

*Attorneys for Defendant-Cross-Appellants*
*Boston Scientific Corporation*
*and Scimed Life Systems Inc.*

# EXHIBIT 7

# REDACTED IN ITS ENTIRETY

# EXHIBIT 8

| Company Name: Johnson & Johnson | Market Cap: 142,079.40 | Bloomberg Estimates - EPS |
|---|---|---|
| Company Ticker: JNJ US | Current PX: 51.37 | Current Quarter: 1.122 |
| Date: 2009-04-14 | YTD Change($): -8.46 | Current Year: 4.485 |
| Event Description: Q1 2009 Earnings Call | YTD Change(%): -14.140 | Bloomberg Estimates - Sales |
| | | Current Quarter: 15354.700 |
| | | Current Year: 61684.077 |

# Q1 2009 Earnings Call

## Company Participants

- Louise Mehrotra, Vice President, Investor Relations
- Dominic J. Caruso, Vice President, Finance and Chief Financial Officer

## Other Participants

- Matthew Dodds
- Bruce Nudell
- Sara Michelmore
- Frederick Wise
- Michael Weinstein
- Tao Levy
- Robert Hopkins
- Larry Biegelsen
- Catherine Arnold
- David Lewis
- Glenn Novarro

## MANAGEMENT DISCUSSION SECTION

### Operator

Good morning and welcome to the Johnson & Johnson first quarter 2009 earnings conference call. All participants will be able to listen only until the question-and-answer session of the conference. The call is being recorded. If anyone has any objections, you may disconnect at this time. [Operator Instructions]

I would now like to turn the call over to Johnson & Johnson. You may now begin.

### Louise Mehrotra, Vice President, Investor Relations

Good morning and welcome. I'm Louise Mehrotra, Vice President of Investor Relations for Johnson & Johnson, and it is my pleasure this morning to review our business results for the first quarter of 2009. Joining me on the call today is Dominic Caruso, Vice President, Finance and Chief Financial Officer.

A few logistics before we get into the details; this review is being made available to a broader audience via a webcast, accessible through the Investor Relations section of the Johnson & Johnson website. I will begin by briefly reviewing highlights of the first quarter for the corporation and highlights for our three business segments. Following my remarks, Dominic will provide some additional commentary on the first quarter results and guidance for the full year of 2009. We will then open the call to your questions. We expect the call to last approximately one hour.

Included with the press release that was sent to the investment community earlier this morning is a schedule showing sales for major products and/or business franchises to facilitate updating your models. These are also available on the Johnson & Johnson website as is the press release.

Bloomberg

BSCTL000082390

| | | |
|---|---|---|
| Company Name: Johnson & Johnson | Market Cap: 142,079.40 | Bloomberg Estimates - EPS |
| Company Ticker: JNJ US | Current PX: 51.37 | Current Quarter: 1.122 |
| Date: 2009-04-14 | YTD Change($): -8.46 | Current Year: 4.485 |
| Event Description: Q1 2009 Earnings Call | YTD Change(%): -14.140 | Bloomberg Estimates - Sales |
| | | Current Quarter: 15354.700 |
| | | Current Year: 61684.077 |

Before I get into the results, let me remind you that some of the statements made during this call may be considered forward-looking statements. The 10-K for the fiscal year 2008 identifies certain factors that could cause the company's actual results to differ materially from those projected in any forward-looking statements made this morning. The company does not undertake to update any forward-looking statements as a result of new information or future events or developments. The 10-K is available through the company or online.

Last item, during the call non-GAAP financial measures may be used to provide information pertinent to ongoing business performance. These measures are reconciled to the GAAP measures and are available in the press release or on the Johnson & Johnson website.

Now I would like to review our results for the first quarter of 2009. If you would refer to your copy of the press release, let's begin with the schedule titled Supplementary Sales Data by Geographic Area. Worldwide sales to customers were $15 billion for the first quarter of 2009, down 7.2% as compared to the first quarter of 2008. On an operational basis, sales were down 1.2% and currency had a negative impact of 6%.

In the US, sales declined 5%. In regions outside the US, our operational growth was 3% while the effective currency exchange rates negatively impacted our reported results by 12.6 points. Our strongest performing region was the Asia-Pacific/Africa region, which grew 8.5% on an operational basis. The Western Hemisphere excluding the US grew by 4.5% operationally while Europe declined 0.2% operationally.

If you now turn to the Consolidated Statement of Earnings, net earnings on a reported basis were $3.5 billion compared to $3.6 billion in the same period in 2008, a decrease of 2.5%. Earnings per share were $1.26 in both periods.

I would now like to make some additional comments relative to the components leading to earnings before we move on to the segment highlights. Cost of goods sold at 28.3% of sales was 20 basis points less than the same period in 2008 due to cost containment, primarily in our MD&D [Medical Devices and Diagnostics] business, partially offset by unfavorable mix in our Consumer and Pharmaceutical businesses.

Selling, marketing, and administrative expenses at 30.7% of sales were down 90 basis points versus last year, driven by leverage across the businesses, most notably Consumer. Our investment in research and development as a percent to sales was 10.1%, 50 basis points less than the first quarter of 2008, due to a change in the mix of the businesses and reductions in spending levels.

Interest expense net of interest income of $81 million compares to $16 million in the first quarter of 2008. This change in the net expense was due primarily to lower interest rates on our cash balances. Other income net of other expense was $75 million in the first quarter of 2009 compared to $18 million in the same period last year. The 2008 result included expenses related to the integration of Pfizer Consumer Healthcare.

Taxes were 24.5% in the first quarter of 2009 versus 24.2% in the first quarter of 2008, reflecting the change in the mix of the businesses.

Turning now to business segment highlights, please refer to your supplementary sales schedules highlighting major products or business franchises. I'll begin with the Consumer segment. Worldwide Consumer segment sales for the first quarter of 2009 of $3.7 billion decreased 8.7% as compared to the same period last year. On an operational basis, sales declined 1% while the impact of currency was negative 7.7 points. US sales were down 5.1% while international sales grew 2.4% on an operational basis. The first quarter results for 2008 included the launch of ZYRTEC OTC. Excluding the impact of ZYRTEC, the Consumer business grew approximately 1% operationally.

For the first quarter of 2009, sales for the over-the-counter pharmaceuticals and nutritionals declined 8.4% on an operational basis compared to the same period in 2008. Sales in the US were down 13.8% with approximately half the decline due to the 2008 inventory build for initial stocking related to the launch of ZYRTEC. The OTC category in the US in the first quarter is estimated to have declined by 2 to 3% and competition from private label has intensified. A milder flu and fever season has impacted sales in the upper respiratory and analgesics categories. Sales outside the US were down 2.4% operationally due to the general softness in the economy and new competitive entrants in certain categories.

Bloomberg

BSCTL000082391

| | | |
|---|---|---|
| Company Name: Johnson & Johnson | Market Cap: 142,079.40 | Bloomberg Estimates - EPS |
| Company Ticker: JNJ US | Current PX: 51.37 | Current Quarter: 1.122 |
| Date: 2009-04-14 | YTD Change($): -8.46 | Current Year: 4.485 |
| Event Description: Q1 2009 Earnings Call | YTD Change(%): -14.140 | Bloomberg Estimates - Sales |
| | | Current Quarter: 15354.700 |
| | | Current Year: 61684.077 |

Our Skin Care business achieved operational sales growth of 7.8% in the first quarter of 2009, with sales in the US growing at 10.7% and sales outside the US up 5.4% on an operational basis. Strong growth was driven by the newly acquired products from Dabao, the leading moisturizer in China, NEUTROGENA, and AVEENO, partially offset by lower sales of RoC products outside the US.

Baby Care products achieved operational growth of 0.9% when compared to the first quarter of 2008. Sales in the US were down 11.3%, primarily due to lower sales for BabyCenter.com. BabyCenter has exited the online retail business and will focus on online content. Sales outside the US were up 4.3% operationally due to strong growth in cleansers and powders.

Women's Health achieved operational growth of 0.7%. Sales in the US were up 0.7% while sales outside the US were up on an operational basis by 0.5%. Strong growth in the K-Y product line was driven by the success of new product launches. The feminine hygiene products were negatively impacted in the quarter by competitive pressures.

Operational sales growth in the Oral Care franchise was 2.8%. In the US, sales were down 5.5% due to slower sales in whitening strips and mouth fresheners, compounded by declining category growth overall. This was partially offset by increased sales of LISTERINE due to a gain in share driven by the launch of new products. Sales outside the US increased 11.6% operationally, driven by very strong growth for LISTERINE across the major regions.

Sales in the Wound Care/Other category were up 4% on an operational basis, with the US up 3.8% and the business outside the US up 4.2% operationally. US growth was driven by the recent acquisitions in wellness and prevention, partially offset by slower category growth and lower trade inventory levels in the Wound Care business.

That completes our review of the Consumer segment, and I'll now review highlights for the Pharmaceutical segment. Worldwide net sales for the first quarter of $5.8 million were down 10.1% versus the same period last year. On an operational basis, sales were down 5.1% with a currency impact of negative five points. Sales in the US decreased 9.7% while sales outside the US increased on an operational basis by 2.8%.

Our results continue to be impacted by generic competition on some of our products, namely RISPERDAL Oral, RAZADYNE, and TOPAMAX. The marketing exclusivity for RISPERDAL expired in the US at the end of June 2008, and there are generic competitors for RISPERDAL in most markets. Marketing exclusivity for TOPAMAX expired at the end of March this year and multiple generics have entered the market, while generic competitors for RAZADYNE entered the US market in the latter half of 2008.

The combined impact of these three products has reduced the first quarter worldwide Pharmaceutical operational growth rate by approximately 10 points, with the US impact estimated at approximately 14% and the impact outside the US estimated at 3%. Excluding the impact of generic competition on these products, worldwide operational sales growth was approximately 5%.

Now reviewing the major products, sales of REMICADE, a biologic approved for the treatment of a number of immune mediated inflammatory diseases, were up 3% when compared to the first quarter of 2008. Sales growth in the US was 9% due to strong market growth. Sales to our customers for markets outside the US were down 10.6%. As we previously mentioned, the first quarter 2008 sales included a significant inventory build due to inventory planning on our customers' part. Excluding the impact of inventory builds, sales outside the US were estimated to have grown over 20%.

PROCRIT/EPREX declined operationally by 6.8% during the quarter as compared to the same quarter last year, with PROCRIT down 3.9% and EPREX down 10% operationally. A softening of the market has contributed to the lower sales results for EPREX. PROCRIT results have been impacted by a decline in the market versus the first quarter of 2008 estimated at 13%, partially offset by an increase in overall market share. PROCRIT aggregate share across all markets was approximately 48% in the first quarter of 2009, up three points versus the same period last year.

Sales of LEVAQUIN, our anti-infective, were down 13.4% on an operational basis when compared to the same period a year ago. The US anti-infective market is estimated to be down over 15% in the quarter due to a lower incidence of respiratory illness and flu.

Bloomberg

BSCTL000082392

Company Name: Johnson & Johnson

Company Ticker: JNJ US

Date: 2009-04-14

Event Description: Q1 2009 Earnings Call

Market Cap: 142,079.40

Current PX: 51.37

YTD Change($): -8.46

YTD Change(%): -14.140

Bloomberg Estimates - EPS

Current Quarter: 1.122

Current Year: 4.485

Bloomberg Estimates - Sales

Current Quarter: 15354.700

Current Year: 61684.077

CONCERTA, a product for attention deficit hyperactivity disorder, grew 23.9% operationally in the first quarter as compared to the same period last year, with sales in US up 20.1% partially due to strong market growth. Sales outside the US were up 37% operationally, with strong growth seen across the major regions.

RISPERDAL CONSTA, our long-acting injectable formulation, achieved first quarter sales growth of 17.5% on an operational basis. US sales growth was 24.8% while sales outside the US were up 13.9% operationally, with continued positive momentum in share.

ACIPHEX, as it's known in the US market and PARIET outside the US, is a proton pump inhibitor or PPI that we co-market with Eisai. On an operational basis, sales were up 3%, with US sales up 19% and sales outside the US down 8.4% operationally. In the US, sales in the first quarter of 2008 were such that the year-over-year comparison was favorably impacted. Script share in the US was down 1%. Sales outside the US have been impacted by the market entry in Canada of generic rabeprazole, the active ingredient in PARIET.

VELCADE, a treatment for multiple myeloma, is being co-developed with Millennium Pharmaceuticals. We have commercialization rights in Europe and the rest of the world outside the US. Operational sales growth was strong at 20.5%, driven by the additional approval last year for first-line therapy.

To provide more insight into results for our new pharmaceutical products, going forward we will report a new product once it has reached the $200 million milestone in annual revenue. PREZISTA and INVEGA reached this important milestone in 2008, and are included in the schedule of Pharmaceutical segment sales by product. We have included on our website 2008 information for these products to help you in updating your models.

PREZISTA, a protease inhibitor for treatment of HIV, grew operationally 77.3% with the US growing 125% and sales outside the US growing at 41.1%. Expanded labeling to include treatment-naïve patients contributed to the positive results.

INVEGA, our newest atypical antipsychotic, grew operationally 43.8% with the US growing 15.8% and sales outside the US growing over 200%, driven by continued positive momentum in share.

Wrapping up the review of the Pharmaceutical segment, we continue to make progress in advancing our Pharmaceutical pipeline. In February, we submitted our response to the FDA on the complete response letter for paliperidone palmitate. This submission was designated as a Class II response and has been assigned a six months review clock.

Also in our antipsychotic franchise, we submitted two sNDAs for INVEGA in schizoaffective disorder, which received priority review designation.

And with RISPERDAL CONSTA, we submitted our response to the complete response letter for the bipolar indication, which the FDA has assigned a Class I or two months review.

Also in Europe and Canada, PREZISTA, our HIV compound, received an additional approval for the treatment of naïve patients.

I'll now review the Medical Devices and Diagnostics segment results. Worldwide Medical Devices and Diagnostics segment sales of $5.5 billion grew 3.1% operationally as compared to the same period in 2008. Currency had a negative impact of six points, resulting in total sales decline of 2.9%. Sales in the US were up 2.5% while sales outside the US increased on an operational basis by 3.6%. Results have been impacted by lower sales of drug-eluting stents. Sales excluding the impact of lower sales of drug-eluting stents grew nearly 6% operationally.

Now turning to the franchises, starting with Cordis; Cordis sales were down 12.9% operationally with the US down 28.1% and sales outside the US down 1.7% operationally. Cordis results were impacted by lower sales of CYPHER, our sirolimus-eluting stent, partially offset by the solid growth in our Biosense Webster business. CYPHER sales were approximately $250 million, down 36% on an operational basis versus the prior year. Sales in the US of approximately $70 million were down 60%.

Bloomberg

BSCTL000082393

Company Name: Johnson & Johnson
Company Ticker: JNJ US
Date: 2009-04-14
Event Description: Q1 2009 Earnings Call

Market Cap: 142,079.40
Current PX: 51.37
YTD Change($): -8.46
YTD Change(%): -14.140

Bloomberg Estimates - EPS
Current Quarter: 1.122
Current Year: 4.485
Bloomberg Estimates - Sales
Current Quarter: 15354.700
Current Year: 61684.077

In comparison to the first quarter of 2008, the US drug-eluting stent market growth is estimated at 6%. Penetration rates are estimated at 74%, up from 65% a year ago, while PCI procedures are up approximately 4% in the quarter versus the same period last year.

The estimated price for CYPHER in the US is down approximately 5% versus the first quarter of 2008. Estimated share in US of 15% was flat sequentially and down 28 points from the first quarter of 2008, due to the market entry of two new competitors in 2008. Sales outside the US of approximately $180 million declined 18% operationally. The estimated market share in the quarter of 31% was flat on a sequential basis and down five points from the first quarter of 2008. Increased competition has impacted the share outside the US. CYPHER estimated worldwide share for the quarter was 24%, down one point sequentially and down 15 points from the first quarter of 2008.

Biosense Webster, our electrophysiology business, achieved strong double digit operational growth in the quarter, due to the strong performance of the LASSO and SOUNDSTAR catheters.

The Neurovascular business, previously reported in our Cordis franchise, and the Codman business that is part of our DePuy franchise have been combined to form a global neuroscience business that is now reported in the DePuy franchise. A schedule of 2008 results by quarter reflecting this structure is available on our website, and the 2009 comparisons reflect the new reporting in both periods.

Our DePuy franchise had operational growth of 7.3% when compared to the same period in 2008, with the US growing 8% and the business outside the US growing by 6.4% operationally.

Hip growth on a worldwide basis was approximately 9% operational with the US growth at approximately 13%, significantly outpacing the market. On an operational basis, worldwide knee growth was approximately 3%. Spine achieved strong operational growth of approximately 13%, continuing the acceleration of the rate of growth due to the successful launch of a number of products.

Mitek, our sports medicine business, grew approximately 11% operationally, above the estimated market growth.

The Diabetes franchise was down 6% operationally in the first quarter of 2009 with the US business down 10.9%. Positive momentum in share has been offset by pricing pressure and a decline in the market due to the current economic pressures and the out-of-pocket expenditure associated with this business. Similar dynamics impacted the business outside the US, with sales decreasing 1.3% operationally.

Animas, our insulin pump business, grew over 30% on an operational basis due to new product launches and continued development of the international market.

Ethicon worldwide sales grew operationally by 9.1%, with the US up 18.8% and sales outside the US up 3.7% operationally. The acquisitions of Mentor and Omrix, offset by the divestiture of the Professional Wound Care business, added approximately two points to the worldwide growth. Sales in the US on a pro forma basis for our newly acquired aesthetics products from Mentor, although lower than 2008, performed better than the estimated market. Strong double digit growth was achieved in meshes and biosurgicals.

Ethicon Endo-Surgery achieved operational growth of 8.6% in the first quarter of 2009, with the US sales growing 5.8% and sales outside the US growing on an operational basis by 11.4%. The HARMONIC technology business achieved strong double digit operational growth due to the global success of recently launched products and the underlying strength of this platform. Also contributing to the growth in the quarter was the REALIZE Gastric Band, launched last year in the US, and the strong performance of the endoscopy products in the international markets, driven by the increased awareness of the benefits of minimally invasive procedures as well as the metabolic benefits of obesity surgery.

Ortho Clinical Diagnostics achieved operational growth of 10.3% in the first quarter. Sales growth in the US was 16.4% while sales outside the US were up 3.2% on an operational basis. The launch of the VITROS 5600 and 3600 made strong contributions to the results this quarter. Also contributing to the growth were the strong results for donor screening and automated blood bank testing.

BSCTL000082394

Company Name: Johnson & Johnson

Company Ticker: JNJ US

Date: 2009-04-14

Event Description: Q1 2009 Earnings Call

Market Cap: 142,079.40

Current PX: 51.37

YTD Change($): -8.46

YTD Change(%): -14.140

Bloomberg Estimates - EPS

Current Quarter: 1.122

Current Year: 4.485

Bloomberg Estimates - Sales

Current Quarter: 15354.700

Current Year: 61684.077

Rounding out the review of the Medical Devices and Diagnostics segment, our Vision Care franchise achieved operational sales growth of 0.6% in the first quarter compared to the same period last year. Sales in the US increased 3.5%. Sales outside the US declined 1.1% on an operational basis. The lens market overall is estimated to be flat compared to the same period last year. Despite the softness in the market, ACUVUE OASYS, 1-Day ACUVUE MOIST, and the ACUVUE OASYS for Astigmatism achieved strong double digit growth.

That completes highlights for the Medical Devices and Diagnostics segment and concludes segment highlights for Johnson & Johnson's first quarter of 2009. I will now turn the call over to Dominic Caruso. Dominic?

## Dominic J. Caruso, Vice President, Finance and Chief Financial Officer

Thank you, Louise, and good morning everyone. We are pleased with our results for the first quarter of 2009, which Louise has already highlighted for you. And now I would like to walk you through some additional points on the quarter, our progress on a number of fronts, and our guidance for your models for full-year 2009.

When we met with you in January, we outlined several factors that would influence our 2009 business performance, and those are playing out much as we expected in the first quarter. As Louise pointed out earlier, excluding the impact of generics, the launch of new drug-eluting stent competitors, and the effect of launching ZYRTEC last year, the underlying business is growing at approximately 4% operationally in this difficult economy.

Consistent with what we said in January, the economic slowdown was reflected in lower sales this quarter for some of our Consumer products where we saw a decline in the overall markets, some increased private label competition, and some lower levels of retail inventories. Our Consumer sales also reflected a tougher comparison to the first quarter of 2008 when we launched ZYRTEC. And excluding this impact, Consumer sales grew nearly 1% operationally.

As you can see from the solid performances of our Skin Care products and LISTERINE, the market still appreciates innovation and high quality brands, and we are continuing to invest to bring these to the marketplace.

As we expected, we also felt the effects of tighter customer spending in the more consumer-facing parts of our Medical Device businesses, which typically require out-of-pocket expenditures such as contact lenses and diabetes test strips. However, we also saw some parts of our Medical Device business such as orthopedics and surgery performing very well in the face of economic challenges and partially offsetting declines in the more economically sensitive parts of the business. Overall, our Medical Device and Diagnostic business was impacted by additional competitors in the drug-eluting stent market, and excluding this impact grew 6% operationally for the quarter.

Our Pharmaceutical business saw the impact of generic competition; and excluding that impact, the business grew approximately 5% operationally.

Our broad base of healthcare businesses, the strength of our brands, and our ability to bring innovations to the market continue to demonstrate why Johnson & Johnson has performed well historically through challenging economic cycles.

Our strong earnings performance also demonstrated once again our financial discipline and the ability of our business leaders to continue managing costs and improving margins. Our first quarter results reflected an improvement in our pre-tax operating margin, as we expected when providing our annual guidance in January.

We also discussed currency in January and how we would speak to its effects this year. As we said, we are providing both reported and operational actual results for sales and EPS each quarter and for our full-year guidance, therefore calling out for you the impact of currency movements. This quarter, we continue to experience significant impacts from fluctuating currency exchange rates.

Based on our full-year guidance in January, you would have expected the impact of currency this quarter to have been negative by about 4% on sales and approximately $0.05 per share on EPS for the quarter based on a 2009 projected average euro exchange rate of $1.35. The impact of currency translation on sales, however, was actually negative 6% and the impact on earnings per share was actually negative by approximately $0.07 per share based on an actual average euro rate of $1.31 for the quarter, reflecting a slightly stronger US dollar.

BSCTL000082395

Company Name: Johnson & Johnson
Company Ticker: JNJ US
Date: 2009-04-14
Event Description: Q1 2009 Earnings Call

Market Cap: 142,079.40
Current PX: 51.37
YTD Change($): -8.46
YTD Change(%): -14.140

Bloomberg Estimates - EPS
Current Quarter: 1.122
Current Year: 4.485
Bloomberg Estimates - Sales
Current Quarter: 15354.700
Current Year: 61684.077

Our strong operational EPS growth offset the negative impact of currency translation on earnings per share. Overall, our first quarter 2009 EPS reflects approximately $0.07 of operational EPS growth, offset by the approximately $0.07 of negative currency translation impact to EPS as compared to first quarter 2008.

Now I would like to turn to a few of the business highlights in the quarter that illustrate where we are headed with some of the long-term investments in the business and the progress we are making in advancing our Pharmaceutical pipeline. We completed our acquisition of Mentor Corporation at the end of January, and we are moving full speed ahead on integrations of Mentor and Omrix Biopharmaceuticals within our Ethicon Surgical business. We are making progress with the integrations of HealthMedia and the Human Performance Institute as we advance our new wellness and prevention platform. This business is now being reported as part of the Consumer segment's financial results.

These and our other acquisitions like Dabao Cosmetics and SurgRx are adding important sales and growth opportunities to our business. But I would remind you that this quarter and the year's results will also reflect the divestiture of our Professional Wound Care business, which was sold in the fourth quarter of 2008.

We continue to make progress with our ramp up and introduction of new products across the business. In terms of the MD&D pipeline and clinical trials, this quarter Cordis announced plans for a global head-to-head randomized clinical trial comparing our NEVO sirolimus-eluting coronary stent to the XIENCE stent. We continue to feel very positive about NEVO and want to compare it to a recently approved and well-received product. Results from our first NEVO trial comparing NEVO to the TAXUS stent are targeted to be presented next month at the EuroPCR meeting in Barcelona.

As we look to strengthen our cardiovascular franchise, our Biosense Webster business received FDA approval to market the NAVISTAR THERMOCOOL catheter for the treatment of atrial fibrillation, which is one of the most common causes of stroke. Biosense Webster is the first and only company with an approved indication in the United States for an ablation catheter to treat this disorder, which affects an estimated 10 million people worldwide.

We also made progress in our Pharmaceutical pipeline with the approval of STELARA in Europe. STELARA also known as ustekinumab, is the first in a new class of biologics for the treatment of moderate to severe plaque psoriasis. It is undergoing regulatory review in the US.

Meanwhile, SIMPONI, or golimumab, another important biologic in our pipeline, received its first market approval in Canada for the treatment of rheumatoid arthritis, psoriatic arthritis, and ankylosing spondylitis. It is under regulatory review in the US. And we also received approval in several European countries for PRILIGY, or dapoxetine, which is for the treatment of premature ejaculation.

There are several key milestones for our pipeline over the next six months as responses from the FDA are expected on SIMPONI, STELARA, rivaroxaban, and paliperidone palmitate. We look forward to a deeper discussion of our pipeline with you when we hold our Pharmaceutical business review on June 4.

Now, I'd like to provide some guidance for you to consider as you refine your models for 2009. Let's start with a discussion of cash and interest income and expense. At the end of the first quarter, we had approximately $200 million of net debt. This consists of approximately $13.9 billion of cash and investments and $14.1 billion of debt. This was a decrease of $1.1 billion in our overall net cash position from year end 2008 as we continued to buy back our shares and we completed the acquisition of Mentor Corporation.

During the first quarter, we used approximately $500 million to repurchase shares of our stock in connection with our $10 billion share repurchase program, which began in 2007. To date, we have purchased approximately $8.6 billion of our stock and we expect to complete this program during 2009.

Our financial position remains strong. We generate strong cash flows and we continue to have good access to the credit markets for our financing needs at reasonable rates. As always, we will examine the best uses of our financial strength to invest in the long-term growth of our business and to return value to our shareholders.

BSCTL000082396

| | | |
|---|---|---|
| Company Name: Johnson & Johnson | Market Cap: 142,079.40 | Bloomberg Estimates - EPS |
| Company Ticker: JNJ US | Current PX: 51.37 | Current Quarter: 1.122 |
| Date: 2009-04-14 | YTD Change($): -8.46 | Current Year: 4.485 |
| Event Description: Q1 2009 Earnings Call | YTD Change(%): -14.140 | Bloomberg Estimates - Sales |
| | | Current Quarter: 15354.700 |
| | | Current Year: 61684.077 |

For purposes of your models, assuming no major acquisitions and the completion of the share repurchase program, I suggest you consider modeling net interest expense of between 200 million and $300 million, a slight increase from our previous guidance.

Turning to other income and expense, as a reminder, this is the account where we record royalty income as well as one-time gains and losses arising from such items as litigation, investments by our development corporation, and asset sales or write-offs. This account is difficult to forecast, but assuming no major one-time gains or losses, I would recommend that you consider modeling other income and expense for 2009 as a net gain ranging from approximately $200 million to $300 million, a slight increase from our previous guidance.

And now a word on taxes, for the first quarter of 2009, the company's effective tax rate was 24.5%. We suggest that you model our effective tax rate for 2009 in the range of 24% to 25%, consistent with our previous guidance. As always, we will continue to pursue opportunities in this area to improve upon this rate throughout the year.

Now turning to sales and earnings, it remains very difficult to predict movements in currency exchange rates and their impact on sales and earnings, especially given the ongoing economic volatility and the resulting monetary policy changes that governments around the world are employing to address the situation. As we told to you in January, our guidance for 2009 will continue to be based first on a constant currency basis, reflecting our results from operations assuming that average currency rates for 2009 will be the same as they were for 2008. This is the way we manage our business and we believe this provides a good understanding of the underlying operational performance of the business. We will also continue to provide an estimate of our reported sales and EPS results for the year with the impact that currency exchange rates could have, using the euro as an example.

Turning to sales and taking into consideration the loss of US market exclusivity of both RISPERDAL Oral and TOPAMAX, which have about a 4 to 5% impact on our overall sales growth rate, we would be comfortable with your models reflecting an operational sales change on a constant currency basis of between negative 1% and positive 1%, consistent with our previous guidance. This would result in sales for 2009 from operations, again on a constant currency basis, of between 63 billion and $64 billion.

While we are not predicting the impact of currency movements, to give you an idea of the potential impact if average currency exchange rates for the remainder of 2009 were to remain where they were as of last week, using the euro as an example, this would imply an average rate for the euro of $1.32 for the year. Then our sales growth rate would be negatively impacted by approximately 5% or approximately $3 billion. This is an increased negative impact as compared to our previous guidance. Thus under this scenario, we would expect reported sales to decline to a range between negative 4% and negative 6% or a total expected level of reported sales of between 60 billion and $61 billion, slightly below our previous guidance range, but due solely to the impact of currency movements.

Now turning to earnings; when I last checked, the recent First Call mean estimate for our EPS for full-year 2009 was $4.49 per share. I suggest that you consider full-year 2009 EPS estimates excluding the impact of special items of between $4.60 and $4.70 per share on an operational basis. That is assuming the same average exchange rates for 2009 as we saw in 2008. This represents an operational growth rate of 1 to 3%, consistent with our previous guidance.

While we are not predicting the impact of currency movements, to give you an idea of the potential impact on EPS if currency exchange rates for the remainder of 2009 were to remain where they were as of last week, with the average euro rate for the year at $1.32, then our EPS growth rate would be negatively impacted by approximately 4% or approximately $0.20 per share, compared to an anticipated negative impact when we provided guidance in January of approximately $0.15 per share.

The dollar has strengthened slightly versus our estimates in January, and therefore we would expect a slightly more negative impact to EPS due solely to currency fluctuation. However, given the strength of our first quarter EPS performance, we would be comfortable with your models reflecting full-year reported EPS excluding special items around the midpoint, between $4.45 and $4.55 per share, consistent with our previous guidance.

As you refine your models for 2009, I want to remind you to consider the impact to our results from the loss of US market exclusivity of RISPERDAL Oral at the end of June 2008, and the loss of US market exclusivity of TOPAMAX

Bloomberg

BSCTL000082397

| | | |
|---|---|---|
| Company Name: Johnson & Johnson | Market Cap: 142,079.40 | Bloomberg Estimates - EPS |
| Company Ticker: JNJ US | Current PX: 51.37 | Current Quarter: 1.122 |
| Date: 2009-04-14 | YTD Change($): -8.46 | Current Year: 4.485 |
| Event Description: Q1 2009 Earnings Call | YTD Change(%): -14.140 | Bloomberg Estimates - Sales |
| | | Current Quarter: 15354.700 |
| | | Current Year: 61684.077 |

at the end of March 2009. These events will obviously have significant impacts on the quarterly year-over-year comparisons, especially on the second quarter results. It appears that many of the analysts have reflected this in their models, but may not have reflected the full negative currency impact.

As for operating margins, many of your models already reflect an improvement in pre-tax operating margins for 2009. We are comfortable with that, but not to the extent we saw the first quarter. While operating margins may vary by business segment year to year or may be impacted from time to time by short-term dilutive impacts of acquisitions, improving the overall pre-tax operating margin by growing income faster than sales over time is a fundamental discipline we use in managing our business.

With that, Louise, back to you.

## Louise Mehrotra, Vice President, Investor Relations

Thank you. Morris, could you give the instructions for the Q&A session, please?

# Q&A

## Operator

[Operator Instructions] Your first question will come from the line of Matthew Dodds of Citigroup.

<A - Louise Mehrotra>: Good morning, Matthew.

<Q - Matthew Dodds>: Good morning, Louise. Thanks for getting me on first. First, Dominic, for you on the gross margins...

<A - Dominic Caruso>: Yes.

<Q - Matthew Dodds>: I'm surprised. It's up year over year and I'm just trying to understand if foreign exchange was negative or positive, first of all. And then second, was there anything unique in the quarter that may have inflated it or increased it versus where you expect it to be for the rest of the year? That's the first question.

<A - Dominic Caruso>: Right, I think there was good improvement in the gross margin year over year, as you saw, 20 basis points. I would say that that is not something we would expect to continue for the year, especially as TOPAMAX now rolls off, of course another high margin product rolling off to the generic competition. We did see cost improvement across primarily the MD&D business, but there were some items in the prior year that were a little bit not repetitive in the current year, and so we saw those as slight benefits in the first quarter. So we don't expect that improvement to continue through the year, which is why I mentioned our pre-tax operating margin improvement year over year is expected, but not to the extent that we saw in the first quarter.

<Q - Matthew Dodds>: Great, and then one follow-up on pharma. Were there any drugs in particular where you might have seen a large change in inventory distributor levels that break out or on the negative side?

<A - Dominic Caruso>: I think the only one that's worth noting is REMICADE OUS [Outside the US], which as Louise mentioned was a result of our customers' inventory planning from last year. So that comparison was the only thing that we saw of any significance.

<Q - Matthew Dodds>: Okay. Thanks, Dominic.

<A - Dominic Caruso>: Okay, Matt.

<A - Louise Mehrotra>: Next question, please?

BSCTL000082398

| Company Name: Johnson & Johnson | Market Cap: 142,079.40 | Bloomberg Estimates - EPS |
| Company Ticker: JNJ US | Current PX: 51.37 | Current Quarter: 1.122 |
| Date: 2009-04-14 | YTD Change($): -8.46 | Current Year: 4.485 |
| Event Description: Q1 2009 Earnings Call | YTD Change(%): -14.140 | Bloomberg Estimates - Sales |
| | | Current Quarter: 15354.700 |
| | | Current Year: 61684.077 |

## Operator

And your next question is from the line of Bruce Nudell of UBS.

**<A - Louise Mehrotra>**: Good morning, Bruce.

**<Q - Bruce Nudell>**: Thanks so much. Good morning.

**<A - Dominic Caruso>**: Good morning, Bruce.

**<Q - Bruce Nudell>**: I had a couple of questions on the pipeline drugs. Is there anything notable that we should know about that you can share with regards to FDA questions regarding golimumab and ustekinumab?

**<A - Louise Mehrotra>**: Yes.

**<A - Dominic Caruso>**: Let's see. Louise, I don't know if you want to add anything, but I don't think so. We submitted our responses to the FDA. We have a PDUFA date of April, end of April for golimumab, and I think the date is sometime in July for ustekinumab. We responded pretty rapidly to those questions when they came in; ongoing dialog with the FDA as usual. So nothing else that I could add to that except those two expected responses in April and July.

**<Q - Bruce Nudell>**: And my follow-up is pertaining to the elephant in the room regarding REMICADE and golimumab ex-US. Could you enlighten us as to the company's leans or discussions or do you think there will be a satisfactory resolution of that Schering/Merck issue?

**<A - Dominic Caruso>**: Bruce, we're not going to comment on that matter.

**<Q - Bruce Nudell>**: Thanks so much.

**<A - Louise Mehrotra>**: Next question, please?

## Operator

And your next question will come from the line of Sara Michelmore of Cowen.

**<Q - Sara Michelmore>**: Thank you. Just to clarify again, Dominic, on your comments on Q2, so it sounds like we should not expect the pre-tax income improvements that we saw in Q1 to reoccur in Q2. But are we still expecting the pre-tax income to be – sorry, the margins to be up in Q2 or should we be thinking about that more conservatively for that quarter given the sales headwinds?

**<A - Dominic Caruso>**: Yes; as you know Sara, we don't give quarterly guidance. I would say for the year, it's still going to be up. Pre-tax margin improvement is going to be up but not to the extent that we saw it in the first quarter, so then you could model accordingly. Obviously, second quarter would be a tough quarter for us with TOPAMAX going off patent of course.

**<Q - Sara Michelmore>**: Yes, okay, and then just on the R&D from an absolute dollar standpoint, it was down quite a bit this quarter. And just to clarify the moving parts there, I assume a lot of that is related to just some of the Phase III trials you had last year rolling off the P&L. If you could just give us a little color about the general trajectory of that R&D line and what some of the underlying factors may be, that would be helpful.

**<A - Dominic Caruso>**: Sure, just as a general trajectory, as we know, as the mix of the business changes with Consumer sales up and Pharma sales going down obviously because of the generic impact, the mix would cause a lower percent of sales overall for the R&D line. But as we've noted before in several meetings, we do see a reduction in the absolute level of R&D spend, particularly in the Pharma business as we're moderating that total spend to be now closer to the industry norm. And you know we had for many years invested at above the industry norm, and we're very proud of the pipeline that resulted as a result of that investment. So I'd say this is just consistent with what we've said before. It will moderate down toward more of an industry norm throughout the year and into the following years.

BSCTL000082399

| | | |
|---|---|---|
| Company Name: Johnson & Johnson | Market Cap: 142,079.40 | Bloomberg Estimates - EPS |
| Company Ticker: JNJ US | Current PX: 51.37 | Current Quarter: 1.122 |
| Date: 2009-04-14 | YTD Change($): -8.46 | Current Year: 4.485 |
| Event Description: Q1 2009 Earnings Call | YTD Change(%): -14.140 | Bloomberg Estimates - Sales |
| | | Current Quarter: 15354.700 |
| | | Current Year: 61684.077 |

**<Q - Sara Michelmore>**: Okay, that's helpful. And is there any update on the CONCERTA Citizen's Petition? I know there were some developments in terms of the legal front there, but just wondering if there was any update from your end on what should we expect vis-à-vis that outstanding Citizen's Petition for CONCERTA. Thank you.

**<A - Dominic Caruso>**: As you know, the Citizen's Petition was filed back in 2004. There were several ANDA filers even before the new patents were issued. Two new patents were issued and there were at least two new ANDA filers even before they were issued. We have not had any other discussion or input from the FDA on the Citizen's Petition. Obviously, we feel that we have a meritorious Citizen's Petition on file and the recent patent litigation that resulted in a ruling against us is something that we don't believe changes the outlook for CONCERTA. In my guidance for the year, we don't assume that that a generic CONCERTA will come to market.

**<Q - Sara Michelmore>**: Great. Thank you for the color, Dominic.

**<A - Dominic Caruso>**: You're welcome.

**<A - Louise Mehrotra>**: Next question, please?

## Operator

And your next question will come from the line of Rick Wise with Leerink Swann.

**<Q - Frederick Wise>**: Good morning, Dominic and Louise.

**<A - Dominic Caruso>**: Good morning, Rick.

**<Q - Frederick Wise>**: A couple of questions; first, can you discuss a little more specifically your comments on REMICADE? If I heard you correctly, Louise, you said REMICADE did well in the context of a strong US market growth. But we've been concerned about how economically sensitive the anti-TNF market is and that you're expecting slower growth or continued strong growth here? Just if you could review those for us, it would be helpful.

**<A - Louise Mehrotra>**: Okay, so in the first quarter, the US grew about 13%. That's consistent with 2008, although it's slightly down from the first quarter of 2008, where it grew about 16.5%. REMICADE is an infusion, so we think it may be a little less sensitive to the economic cycles. That's what we're seeing in the market at this point.

**<Q - Frederick Wise>**: Okay. Turning to two other issues, one, Dominic, can you expand a little more on the operating leverage issue? Clearly it's visible as you all have done a great job of maintaining gross margins and lowering SG&A and R&D as a percentage of sales. Can you help us think about your operating margin goals over the next couple of years just directionally? And do you think you'll need to do another restructuring to continue to expand operating margins in 2010 and beyond?

**<A - Dominic Caruso>**: Rick, as I have said many times, when we look at our business, our business leaders around the world just do a fabulous job of growing the business profitably, of growing their income faster than the rate of growth in sales.

In terms of restructuring, these are very unusual events for Johnson & Johnson. As you know, we did one in 2007. It was specifically related to the Cordis business because of the advent of the new competitors in the drug-eluting stent market and specifically related to the Pharmaceutical business because what we all knew was coming, which was the scheduled patent expirations of two very significant products. Prior to that, I think it was something like 10 years before we did – 10 years ago when another restructuring took place at Johnson & Johnson.

So I would say typically we're pretty good. I'm very proud of the folks in the company in managing through either economic cycles or dips in the business or competitive threats et cetera. And it's only when there's something severe like the impact of generics and drug-eluting stents happening in the same time period that we felt we needed to get ahead of that. And as you know, we took those restructuring actions in 2007.

Bloomberg

BSCTL000082400

| Company Name: Johnson & Johnson | Market Cap: 142,079.40 | Bloomberg Estimates - EPS |
| Company Ticker: JNJ US | Current PX: 51.37 | Current Quarter: 1.122 |
| Date: 2009-04-14 | YTD Change($): -8.46 | Current Year: 4.485 |
| Event Description: Q1 2009 Earnings Call | YTD Change(%): -14.140 | Bloomberg Estimates - Sales |
| | | Current Quarter: 15354.700 |
| | | Current Year: 61684.077 |

So barring any other significant impact like those two, I would say we'd be able to continue to manage our operating expenses appropriately as we've always had throughout the years. And again, that's a tribute to the folks, the men and women that run these businesses around the world for us.

**<Q - Frederick Wise>**: So basically, you think we can see continued operating margin improvement in the years ahead?

**<A - Dominic Caruso>**: Yes, and I think that would vary by year and by sector depending on our investment opportunities. And obviously as you get to a point where the competitiveness is impacted by how profitable you are, you want to maybe slow that down a little bit to make sure you're not missing investment opportunities, but that's what we do all the time. That's what our business leaders are always constantly balancing, the appropriateness of improving operating profit compared to the investment opportunities that they have available to them.

**<Q - Frederick Wise>**: One other quick one, Dominic, deferred foreign income seems to be possibly set up to get taxed in a way it has not in the past under the Obama administration. How are you planning for it? Should we expect that J&J is going to see higher tax rates in '10,'11,'12 as a result? Thank you.

**<A - Dominic Caruso>**: Sure. We won't comment, as you know, on guidance for any year beyond the current year, but you're absolutely right that the President's budget proposal includes a provision to raise some $200 billion over 10 years by reforming the tax rules on the treatment of international income. The way we're dealing with it, Rick, quite frankly is we're doing everything we can to help educate the administration on why deferral is important to keep US multinationals competitive in a global economy. 5% of the consumers in the world reside in the US, so much of the competitive pressure that we'll face will be throughout the world, and we want to remain competitive as a US multinational as do many other US multinationals.

So we're spending quite a bit of time educating the administration and the Treasury Department on the benefits that US multinationals bring to the US in terms of increased employment and in terms of increased research and development spending, and the fact that they are competitive on a worldwide scale because of this deferral of US income tax on foreign operations. And to eliminate that might be a shortsighted way of filling a budget gap that would have a longer term impact on the competitiveness of US corporations. So we're actively engaged in the dialogue. And so far, as I said, we're not going to comment on what tax rates might be beyond 2009.

**<Q - Frederick Wise>**: Thank you.

**<A - Dominic Caruso>**: Yes.

**<A - Louise Mehrotra>**: Next question, please?

## Operator

And your next question will come from the line of Mike Weinstein of JPMorgan.

**<Q - Michael Weinstein>**: Thank you. Good morning, Dominic. Good morning, Louise.

**<A - Dominic Caruso>**: Good morning, Mike.

**<A - Louise Mehrotra>**: Good morning, Mike.

**<Q - Michael Weinstein>**: Let me start with Pharmaceuticals. VELCADE sales showed a fairly significant deceleration from the growth rates we saw in 2008. I was hoping you can add some additional color on the performance there.

**<A - Dominic Caruso>**: I think that VELCADE had obviously a ramp up nicely in 2008 as it was growing throughout the world. I think part of it is just a tougher comparison as the business was ramping up in 2008 versus today. And we saw REMICADE was a major growth driver in countries such as Russia, and we've seen a little bit of a deceleration of – VELCADE saw a deceleration of healthcare spending in certain economies like Russia that are impacted by certain

BSCTL000082401

**final**

**Bloomberg Transcript**

| | | |
|---|---|---|
| Company Name: Johnson & Johnson | Market Cap: 142,079.40 | Bloomberg Estimates - EPS |
| Company Ticker: JNJ US | Current PX: 51.37 | Current Quarter: 1.122 |
| Date: 2009-04-14 | YTD Change($): -8.46 | Current Year: 4.485 |
| Event Description: Q1 2009 Earnings Call | YTD Change(%): -14.140 | Bloomberg Estimates - Sales |
| | | Current Quarter: 15354.700 |
| | | Current Year: 61684.077 |

matters that are unrelated to healthcare like oil prices. So I would say partly it is the comparison and partly due to the slower growth in economies such as Russia.

**<Q - Michael Weinstein>**: I want to make sure I understand your comments on CONCERTA, Dominic. You commented that you're not expecting to see generic competition this year and you haven't had any incremental dialogue with the FDA. Your comfort level that you don't expect to see competition this year, from which angle does that stem? Is it just the fact that there hasn't been any new dialogue or you're not expecting the FDA to rule on the Citizen's Petition in 2009? What gives you the comfort at this point?

**<A - Dominic Caruso>**: A couple of things, one is that, obviously we feel that the Citizen's Petition is meritorious, number one. Number two, it has been in the FDA's hands now for quite a while. And in fact just to remind you, we were actually requested by the FDA to submit the Citizen's Petition to describe the bioequivalency and clinical equivalency aspects of that product. And lastly, the various competitors had filed their ANDAs, as I said earlier, even before the various patents, the new patents issued. So they could have been approved some time ago, even before the patents issued. So there is a combination factors that gives us reasonable comfort that our guidance for the year does not include the launch of a generic competitor for CONCERTA.

**<Q - Michael Weinstein>**: Okay. Let me just touch – maybe touch quickly just on some of the pipeline products that were brought up earlier. You have a number of products where you are expecting to hear back from the agency either for the first time or second time over the course of the year. Let me just rattle them off if I could: golimumab, ustekinumab, paliperidone palmitate, XARELTO, maybe again ceftobiprole. Which of those products are in your guidance for the back half of the year?

**<A - Dominic Caruso>**: Let's see, basis the expected approval dates by the FDA, I would say, STELARA obviously; SIMPONI; which is golimumab; XARELTO, which is at the end of '08. Actually, all the products that have this year as an expected response from the FDA are included in our estimates.

As I said at our meeting in January, we're relatively conservative when we estimate these products in our plans because of sometimes the uncertainty related to the actual approval date given the PDUFA date. So we do take that into consideration when we include these products in our own internal models going forward. We may be a little bit more conservative than you all might be in that regard.

**<Q - Michael Weinstein>**: Okay, last question. You said in the fourth quarter call that you expect to complete the share repurchase program during the early part of 2009. You didn't repurchase as much stock as we thought you were doing during the first quarter, and now you're saying over the course of 2009; any commentary you want to provide there?

**<A - Dominic Caruso>**: Yes, I think the only thing I would say that's a little different in our expectation for completion of it, I didn't want to commit to '09 now that I saw what happened in – sorry, I didn't want to commit to early part of '09 now that I saw what happened in the first quarter. During the first quarter, a number of things happened. We issue stock to our employees as part of our compensation programs. And you may be aware that we're not permitted to buy stock under more than one program at any one time. And so what we do in that case is we suspend the $10 billion share repurchase and we buy back stock that's issued in our compensation programs. We've done that historically. That basically eliminates any dilution from the compensation program's issuance of stock.

And secondly, when the market is ticking – when the stock price is ticking down, you might expect that we'd be buying a lot more. That's a natural expectation. But the rules for purchasing your stock are that you cannot buy the stock unless it's on an uptick. So when the stock is decreasing as it was in the first quarter, it makes it harder actually to buy stock because you actually can't enter the market and buy until you see an uptick. So we've just modified our expectation, and we'll still get it done this year, but it may not be early in the year.

**<Q - Michael Weinstein>**: Great. Thanks for taking my questions.

**<A - Dominic Caruso>**: Okay, you're welcome.

**<A - Louise Mehrotra>**: Next question, please?

Bloomberg

BSCTL000082402

| | | |
|---|---|---|
| Company Name: Johnson & Johnson | Market Cap: 142,079.40 | Bloomberg Estimates - EPS |
| Company Ticker: JNJ US | Current PX: 51.37 | Current Quarter: 1.122 |
| Date: 2009-04-14 | YTD Change($): -8.46 | Current Year: 4.485 |
| Event Description: Q1 2009 Earnings Call | YTD Change(%): -14.140 | Bloomberg Estimates - Sales |
| | | Current Quarter: 15354.700 |
| | | Current Year: 61684.077 |

## Operator

And your next question will come from the line of Tao Levy of Deutsche Bank.

<Q - Tao Levy>: Hi, I had a couple of quick questions on the surgical part of the businesses. If you look at your Orthopedic business, it seemed like it did fairly well, and again in the backdrop of potentially slowing elective surgeries. Have you not seen a slowdown in the ortho procedures, knees, hip, spine?

<A - Dominic Caruso>: Right, we did see a slowdown in some of the ortho procedures, particularly knees, although hips performed nicely, very strong growth. And actually our spine business performed very strongly during the quarter. So I think that offsets some of the slowdown that we saw in knee procedures. And we have mentioned before that some of the elective parts of the orthopedics business, the sports medicine part of the business, that was slowing. We commented on that even at the end of last year, but that slowdown has moderated now. So we haven't seen a pronounced slowdown in that particular area of the business.

<Q - Tao Levy>: And you had also mentioned on cost containment in MD&D, can you flesh that out a little bit?

<A - Dominic Caruso>: Yes, I was commenting on the fact that in our gross margin, some of the most significant impacts to the slightly better performance in gross margin than maybe some of you had anticipated was through cost containment, particularly in the MD&D business. We've been on a plant rationalization effort for quite some time in our MD&D businesses, particularly in Europe. And so we're seeing the benefits of that come to fruition now.

<Q - Tao Levy>: Okay, great. And just last one, the impact from acquisitions in MD&D, you made a few in the fourth quarter or first quarter. Is there a number you could provide?

<A - Dominic Caruso>: I think overall, the impact – let me just see if I can estimate that for you. I want to remind you that also in the end of last year, we divested something in our MD&D business. And so the total impact from both adding acquisitions and removing divestitures in just the MD&D business from an operational perspective is probably about 0.4 point. So the 3.1 would have been 2.7 or 2.8.

<Q - Tao Levy>: Great, thanks a lot.

<A - Dominic Caruso>: You're welcome.

<A - Louise Mehrotra>: Next question, please?

## Operator

And your next question will come from the line of Bob Hopkins of Banc of America.

<Q - Robert Hopkins>: Hi, thanks very much. Thanks for taking the call.

<A - Dominic Caruso>: Hi, Bob.

<Q - Robert Hopkins>: Hi, good morning. I wanted to ask about the Consumer division because your guidance being on a constant currency basis for the full year being the same as you provided at the end of the year I assume suggests that the consumer decline you feel has now stabilized and won't get much worse. One, is that the case? And two, does the implied stability in your guidance, is that across all the Consumer businesses or do you expect further weakness in some parts and strength in some of the brands? I'm just wondering what we can read into your guidance as it relates to the Consumer business and frankly to the overall economy?

<A - Dominic Caruso>: Sure, good question, thanks for the question. Obviously the guidance that we provide for the year is for the enterprise overall. And so I think what that implies is that when we estimated what was going to happen in 2009, we considered that in our guidance across all factors of the business or all aspects of the business. And as I

Bloomberg

BSCTL000082403

Company Name: Johnson & Johnson

Company Ticker: JNJ US

Date: 2009-04-14

Event Description: Q1 2009 Earnings Call

Market Cap: 142,079.40

Current PX: 51.37

YTD Change($): -8.46

YTD Change(%): -14.140

Bloomberg Estimates - EPS

Current Quarter: 1.122

Current Year: 4.485

Bloomberg Estimates - Sales

Current Quarter: 15354.700

Current Year: 61684.077

said in my earlier comments, it appears as if those factors are playing out much as we had expected they would play out. I do think that in the Consumer business, we did see some more pronounced impact of the economy in the first quarter in certain aspects of the Consumer business. But in other aspects of the business, as I mentioned in our Skin Care for example or our LISTERINE business, they seem to hold up pretty well.

So I would say the only thing to take away from my comment, Bob, is that we had projected what the year might look like in the economic impact to the overall business of J&J. And it's pretty much working out as we anticipated in the first quarter. So we saw no reason to change our overall guidance for the year.

<Q - Robert Hopkins>: Okay, and then two really quick ones. One on the Medical Device franchise to follow-up on Tao's question, are you getting any sense from your business heads as you talked about the first quarter as far as their expectations for the DePuy businesses and the Ethicon business as we look forward? Do they expect growth to moderate in those areas as a result of the economy? Or do they feel good about the ability to continue to drive the kind of decent growth that we've seen in the last quarter or two?

<A - Dominic Caruso>: I would say generally speaking for the Surgery businesses excluding orthopedics, as you have seen both from the performance of Ethicon and Ethicon Endo, not much of an impact from the overall economy to the Surgery businesses. We've seen, as we mentioned before, some impact to Women's Health procedures as elective procedures within surgery, but that seems to have stabilized a little bit. And then in terms of orthopedics, we did project consistent with some other published sources that the joint reconstruction business overall would just be a little bit slower growth of a point or so slower than the prior year, and that's what we're seeing as we look at the marketplace.

<Q - Robert Hopkins>: Okay, and then just one quick one on a strategic basis. Historically, J&J hasn't done a large pharmaceutical deal. And I just wanted to get your perspective, Dominic, on has that been due more to issues relating to price and strategic fit, or is it simply that J&J has intentionally not pursued large cost cutting deals in pharma because you just don't think that that type of deal can ultimately add a lot of long-term value?

<A - Dominic Caruso>: Bob, I think the best way to characterize our acquisition approach in general is obviously we look for acquisitions that are going to create significant shareholder value and are probably going to get us or most desirably get us into new spaces or areas where we currently don't participate. That's primarily our goal. Obviously that's to create shareholder value and then get into new spaces.

I think in the Pharma business you've seen over the years that we've taken several approaches to the Pharma business. We've obviously increased our own internal R&D spend. So obviously, we're excited about our business. We've invested internally. We thought that was the most capital efficient way to grow the business. And secondly, we've done quite a bit of licensing in the Pharma business. So rather than a major acquisition, we've done some licensing in some products such as rivaroxaban for example or exciting new products in our pipeline as a result of licensing. So I would say we don't rule out anything in particular. I'd say we have several plays in our playbook and we operate on which of those plays make the most sense in any particular point in time. It's not — you shouldn't read too much more into it than that.

<Q - Robert Hopkins>: Great. Thanks, Dominic. Thank you, Louise.

<A - Dominic Caruso>: You're welcome.

<A - Louise Mehrotra>: Next question?

## Operator

And your next question will come from the line of Larry Biegelsen of Wachovia.

<Q - Larry Biegelsen>: Good morning and thanks for fitting me in.

<A - Dominic Caruso>: Hi, Larry.

Bloomberg

BSCTL000082404

| | | |
|---|---|---|
| Company Name: Johnson & Johnson | Market Cap: 142,079.40 | Bloomberg Estimates - EPS |
| Company Ticker: JNJ US | Current PX: 51.37 | Current Quarter: 1.122 |
| Date: 2009-04-14 | YTD Change($): -8.46 | Current Year: 4.485 |
| Event Description: Q1 2009 Earnings Call | YTD Change(%): -14.140 | Bloomberg Estimates - Sales |
| | | Current Quarter: 15354.700 |
| | | Current Year: 61684.077 |

**<A - Louise Mehrotra>**: Hi, Larry.

**<Q - Larry Biegelsen>**: Just two, on the sales guidance, Dominic, operational growth of negative one to 1%. I'm asking one of the earlier questions just a different way. It was negative 1.2% in the first quarter. But it would seem to get tougher with TOPAMAX going generic at the end of March. What gets better throughout the year? And then I just have one quick one on the Pharma pipeline.

**<A - Dominic Caruso>**: Yes, a couple things. Obviously, we're launching new products across all of our businesses throughout the year. And then you're right, it gets particularly worse with TOPAMAX in particular in the second quarter. But then in the back half of the year, remember RISPERDAL went off patent in June of 2008. So the back half of the year comparisons won't be as pronounced for RISPERDAL in particular, right, and that's a much more significant product than TOPAMAX was. I missed the second part of your question.

**<A - Louise Mehrotra>**: On the pipeline, what was your question on the pipeline?

**<Q - Larry Biegelsen>**: Sure. I didn't hear any mention of cefto [ceftobiprole], carisbamate, or tapentadol. I'm sorry if I missed an update on those three.

**<A - Dominic Caruso>**: Maybe, Louise, you could just rattle off where we are with those.

**<A - Louise Mehrotra>**: Larry, carisbamate, we filed it in October last year, and it's a standard ten-month review, so we'll hear toward the end of the year. Regarding cefto, we continue to work with the FDA. We've met and we've actually designed an audit plan with them and we intend to meet with them again at the end of the year to review that one. And tapentadol is actually, the 30-day comment period is now over and the remaining scheduling will be in the next couple of months, hopefully.

**<A - Dominic Caruso>**: Right.

**<Q - Larry Biegelsen>**: You expect to hear in the next couple of months, Louise?

**<A - Louise Mehrotra>**: On tapentadol, yes.

**<Q - Larry Biegelsen>**: Thank you.

**<A - Dominic Caruso>**: Remember, tapentadol is approved by the FDA. So we're just waiting for the scheduling as it's a narcotic. And as Louise mentioned, the 30-day wait period is now over. So now we're basically just waiting for the product to get formal scheduling and then we'll be able to launch it.

**<Q - Larry Biegelsen>**: Thank you.

**<A - Louise Mehrotra>**: Next question, please?

## Operator

And your next question will come from the line of Catherine Arnold of Credit Suisse.

**<Q - Catherine Arnold>**: Good morning, thanks.

**<A - Dominic Caruso>**: Good morning.

**<Q - Catherine Arnold>**: A quick question was how REMICADE patient share has changed in RA in the United States. But a broader question is in regards to products like REMICADE and PROCRIT, where you may have seen economic sensitivity that would have surprised you, and if you could comment on that. We've heard from an oncology company that they've experienced some weakness in oncology business. And I wondered if you guys are doing anything new or noteworthy or increased your participation in programs to take away the burden from patients on things like their upfront deductibles for the year that might put off their treatment or out-of-pocket in the case of PROCRIT?

BSCTL000082405

Company Name: Johnson & Johnson
Company Ticker: JNJ US
Date: 2009-04-14
Event Description: Q1 2009 Earnings Call

Market Cap: 142,079.40
Current PX: 51.37
YTD Change($): -8.46
YTD Change(%): -14.140

Bloomberg Estimates - EPS
Current Quarter: 1.122
Current Year: 4.485
Bloomberg Estimates - Sales
Current Quarter: 15354.700
Current Year: 61684.077

**<A - Dominic Caruso>:** Let me just comment a little bit on PROCRIT, and I'm not going to speak specifically about what we may be doing in the marketplace. But as Louise mentioned, we actually gained share in PROCRIT. The market decline was as we anticipated it would be. But throughout the -- but in the first quarter, we actually gained two or three points in share. So we haven't seen much of an impact there on the PROCRIT business.

REMICADE, as Louise mentioned in the US, the market was growing about 13%. And our published sales are about 9%. So obviously we did lose a little share for REMICADE in the US.

**<Q - Catherine Arnold>:** And that 13% number, that's the broader market, not the infusional market demand, just to be clear?

**<A - Louise Mehrotra>:** It's the broader market.

**<A - Dominic Caruso>:** It's the broader market, yes.

**<Q - Catherine Arnold>:** Okay. And then if I could ask a quick follow-up, Dominic, I was wondering if you could comment on mandatory Medicare rebates. It's not something that we saw in the Presidential budget proposal in February. There was some surprise that we didn't see that and some relief that we didn't see that. Do you think that is something that is unlikely to be touched in future proposals?

**<A - Dominic Caruso>:** Right. It's a great question and you're right, it wasn't specifically called out in the President's budget. And we were glad to not see it in the President's budget. I think there's a realization that the Medicare Part D program has worked reasonably well and there seems to be a movement towards having a continued open market system with multiple insurance options for patients rather than one option, which would be a governmental plan, which would then result in the mandatory Medicare rebate issue that you discussed. So I think there is a general willingness to listen to the industry's point of view on this. It's not highlighted as a specific target in the President's budget proposal, and hopefully it will stay that way.

**<A - Louise Mehrotra>:** Next question please?

## Operator

And your next question will come from the line of David Lewis of Morgan Stanley.

**<Q - David Lewis>:** Good morning.

**<A - Dominic Caruso>:** Good morning, David.

**<A - Louise Mehrotra>:** Good morning.

**<Q - David Lewis>:** Dominic, a quick clarification on your comments about your confidence in EBIT margin improvement over the next several years. Would it be safe to say that that improvement is more tied to the pharmaceutical pipeline improvement as opposed to cost restructuring?

**<A - Dominic Caruso>:** I think the way to – let me just generalize here for a minute. We generally run our business with an objective to grow our earnings faster than sales. We've been doing that for 75-plus years, right. So when you look at what we've done in our business so far, we have streamlined the business through these restructuring efforts. We've implemented these standardization efforts that you've heard me talk about before. They're not fully implemented, so they need to continue to be implemented around the world. And then lastly, once the cost structure is well under control, and we've been able to demonstrate that, obviously we're very excited about the pipeline coming to fruition in Pharmaceuticals as well as in MD&D and new products in Consumer as well. So having a good handle on our ability to control cost gives me great confidence that as the new products come to market, we can remain very profitable as a company going forward.

Bloomberg

BSCTL000082406

| | | |
|---|---|---|
| Company Name: Johnson & Johnson | Market Cap: 142,079.40 | Bloomberg Estimates - EPS |
| Company Ticker: JNJ US | Current PX: 51.37 | Current Quarter: 1.122 |
| Date: 2009-04-14 | YTD Change($): -8.46 | Current Year: 4.485 |
| Event Description: Q1 2009 Earnings Call | YTD Change(%): -14.140 | Bloomberg Estimates - Sales |
| | | Current Quarter: 15354.700 |
| | | Current Year: 61684.077 |

So it's a combination of our ability to control costs, the additional steps that we're taking that are not yet fully implemented. And then when you put that in the backdrop and you say now on top of that you've launched very exciting new products into the marketplace, that bodes well for an operating profit improvement formula.

**<Q - David Lewis>**: That's helpful, Dominic. And would you say from a revenue perspective though, is there any strategic initiative you can think of other than the Pharmaceutical pipeline improving that would be a more acute driver of that profitability over the next three years?

**<A - Dominic Caruso>**: I don't think there is anything so specific that I can comment on. All of our businesses have a pretty robust pipeline of new products. You saw how we discussed those at the MD&D Day both in Comprehensive Care and Surgical Care, a wide array of products coming to market. And we'll give you a further update on what's happening with the Pharmaceutical business at our meeting on June 4.

**<Q - David Lewis>**: Great. And it sounds like, Dominic, based on, if you look at Pharma, Devices, and Consumer based on your prior comments in Q&A, the visibility on those lines seems relatively in line with where it was at the end of the year. So I wonder from a macro perspective if you think about inventory, global pricing, and emerging markets, would you say on those three categories that you feel as good as you did at the end of 2008, better, or worse?

**<A - Dominic Caruso>**: I would say pretty much in line. We had estimated emerging markets would be a slower impact, not as pronounced as it was in prior years and we're seeing that play out now as we expected. Inventory contraction, we expected it to play out. We've seen it a little bit. And then pricing, you may remember that we don't really base much of our growth projections on a heavy reliance on pricing. So it's never a major factor when we look at our outlook for the years ahead or in the future. Okay?

**<Q - David Lewis>**: Yes, Louise just one more nit and I'll wrap it up here. I don't think I caught on Orthopedics the specific US/OUS breakout for knees?

**<A - Louise Mehrotra>**: Sure, so the US is 4% in knees. OUS is 2%, for a total of 3%. Okay, so this will be the last question.

## Operator

And your last question will come from the line of Glenn Novarro of RBC.

**<Q - Glenn Novarro>**: Thanks for getting me in here.

**<A - Dominic Caruso>**: Hi.

**<Q - Glenn Novarro>**: Just a couple of things on Pharma. One, were there any price increases on any of the products in the quarter? Two, on TOPAMAX as it goes generic, is there going to be – should we assume 80 to 90% of the brand just goes away in the first quarter or two? Will there be any brand loyalty or whatever? And then lastly, can you give us an update on what we should expect R&D as a percentage of sales to be for the corporation this year? Thanks.

**<A - Dominic Caruso>**: Okay. Glenn, let's see. So yes, there was some pricing in the first quarter for Pharmaceutical products, but not anything that I want to speak about specifically. But it's really not that significant overall for the business.

With respect to TOPAMAX, we would model it like you would any generic entry. But obviously we're hopeful that there is some loyalty to a fabulous product over many, many years. And it has both an antiepileptic effect and a migraine effect. And so I would say we'll probably look at it as any other generic competition coming to the market. Louise, do you want to add anything to that?

**<A - Louise Mehrotra>**: No, it's just with the antiepileptic market, there may be a slightly smaller erosion curve, but remember the majority of TOPAMAX was for migraine.

Bloomberg

BSCTL000082407

| | | |
|---|---|---|
| Company Name: Johnson & Johnson | Market Cap: 142,079.40 | Bloomberg Estimates - EPS |
| Company Ticker: JNJ US | Current PX: 51.37 | Current Quarter: 1.122 |
| Date: 2009-04-14 | YTD Change($): -8.46 | Current Year: 4.485 |
| Event Description: Q1 2009 Earnings Call | YTD Change(%): -14.140 | Bloomberg Estimates - Sales |
| | | Current Quarter: 15354.700 |
| | | Current Year: 61684.077 |

**<A - Dominic Caruso>**: Was for migraine, right. And then, Glenn, I can't give you a specific target for R&D expense going forward other than the comment that we made earlier that we would expect the R&D expense in the Pharma business to moderate closer to the industry norms over time. And they have been as you've seen in our published reports higher than the industry norms over the last several years.

**<Q - Glenn Novarro>**: Just from a modeling point of view, just on R&D, we should expect it to tick up though for the rest of the year with always the fourth quarter traditionally being the biggest quarter for the year. I'm just trying to get an idea of the R&D expense because it did come in significantly less than I was thinking for the first quarter.

**<A - Dominic Caruso>**: Yes, as you know, Glenn, we don't comment on each and every line in the P&L because we have a great deal of flexibility on how we manage those lines throughout the year. So other than to say we expect our – as I said earlier, our operating profit margins to improve year over year but not to the extent that we saw in the first quarter, I'd just leave it at that.

**<Q - Glenn Novarro>**: Okay, great; thank you guys.

**<A - Louise Mehrotra>**: Okay, some final comments from Dominic.

## Dominic J. Caruso, Vice President, Finance and Chief Financial Officer

Thanks, Louise. In closing, let me just offer these final thoughts. Many of the factors that were anticipated to impact our results for 2009 are playing out as we expected. And as I noted earlier, the underlying growth of the business is solid, especially in this economy. While we recognize there are challenging factors in today's economic environment such as currency volatility and uncertainty surrounding the depth and length of the current recession, we remain financially strong and well positioned for long-term profitable growth. I am confident in our ability to address the matters we can control, continue bringing innovative products to the market, and thoughtfully managing our costs and expenses as we progress through 2009 thanks to the dedication and focus of the talented people across the Johnson & Johnson family of companies.

We remain committed to growing the business profitably over the long term and taking advantage of the current period to become an even stronger and more competitive leader in the global healthcare industry. I look forward to updating you on our progress throughout the year and I look forward to seeing you on our Pharmaceutical business review on June 4. Thanks everyone and have great day.

## Operator

This concludes today's Johnson & Johnson first quarter 2009 earnings conference call. You may now disconnect.

*This transcript may not be 100 percent accurate and may contain misspellings and other inaccuracies. This transcript is provided "as is", without express or implied warranties of any kind. Bloomberg retains all rights to this transcript and provides it solely for your personal, non-commercial use. Bloomberg, its suppliers and third-party agents shall have no liability for errors in this transcript or for lost profits, losses, or direct, indirect, incidental, consequential, special or punitive damages in connection with the furnishing, performance or use of such transcript. Neither the information nor any opinion expressed in this transcript constitutes a solicitation of the purchase or sale of securities or commodities. Any opinion expressed in the transcript does not necessarily reflect the views of Bloomberg LP.*

*© COPYRIGHT 2009, BLOOMBERG LP. All rights reserved. Any reproduction, redistribution or retransmission is expressly prohibited.*

BSCTL000082408

# EXHIBIT 9

# REDACTED IN ITS ENTIRETY

# EXHIBIT 10

# REDACTED IN ITS ENTIRETY

## CERTIFICATE OF SERVICE

I, Adam W. Poff, hereby certify that on May 8, 2009, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Steven J. Balick, Esquire
Ashby & Geddes
500 Delaware Avenue, 8th Floor
Wilmington, DE 19801

I further certify that on May 8, 2009, I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

**BY E-MAIL**

Gregory L. Diskant, Esquire
Patterson, Belknap, Webb & Tyler
1133 Avenue of the Americas
New York, NY 10036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Adam W. Poff*
Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Adam W. Poff (No. 3990)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600
apoff@ycst.com

Attorneys for Boston Scientific Corporation and
Boston Scientific Scimed, Inc.