IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CORDIS CORPORATION, | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 08-779-SLR |
| v. | ) ) ) | **REDACTED** |
| BOSTON SCIENTIFIC CORPORATION and BOSTON SCIENTIFIC SCIMED, INC., | ) ) ) | **PUBLIC VERSION** |
| Defendants. | ) ) | |

## CORDIS'S ANSWERING BRIEF IN OPPOSITION TO BSC'S MOTION TO DISMISS THIS ACTION ON *RES JUDICATA* GROUNDS, AND SUPPLEMENTAL BRIEF ON OTHER PRE-HEARING ISSUES

ASHBY & GEDDES
Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, DE 19899
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-gededs.com
tlydon@ashby-geddes.com

*Of Counsel*:

Gregory L. Diskant
Eugene M. Gelernter
Kathleen M. Crotty
Christopher M.P. Jackson
Leonard Braman
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000

*Attorneys for Plaintiff Cordis Corporation*

Dated:  May 13, 2009

{00296486;v1}

**Table of Contents**

**Page**

TABLE OF AUTHORITIES ...................................................................................................... iii

INTRODUCTION ..................................................................................................................1

    A.    THE 2005 TRIAL IN THE 03-027 CASE ....................................................3

        1.    The Proof on Infringement and Validity
            in the 2005 Trial..................................................................................3

            a.    The Evidence that Liberté and Taxus Liberté
                Have the Same Infringing Structure............................................4

            b.    The Judgment That Claim 2 of the Gray
                Patent is Not Invalid..................................................................5

            c.    BSC Did Not Raise Any Other Validity or
                Enforceability Defense for the Gray Patent..............................5

        2.    BSC's Motion to Dismiss the Taxus Liberté
            Claims for Lack of Proof of a U.S. Nexus as of June 2005 ...............5

    B.    The Federal Circuit's March 31, 2009 decision ...............................................9

        1.    The Federal Circuit Affirmed the Judgment That
            Claim 2 of the Gray Patent is Infringed by Liberté and is Not Invalid..............9

         2.    The Federal Circuit's Holding that the Absence of
            Evidence of a U.S. Nexus for Taxus Liberté
            Required a Dismissal "With Prejudice" ............................................10

ARGUMENT..........................................................................................................................11

I.    CLAIM AND ISSUE PRECLUSION BAR BSC FROM DISPUTING
    THAT TAXUS LIBERTÉ INFRINGES A VALID AND ENFORCEABLE
    CLAIM OF THE GRAY '406 PATENT ..........................................................11

    A.    The Legal Standard...........................................................................................12

    B.    Claim and Issue Preclusion Are Applicable Because
        Liberté and Taxus Liberté Are "Essentially the Same" for
        Purposes of the Gray Patent...............................................................................13

    C.    BSC Has No Defense on the Merits ...................................................................15

        1.    Claim and Issue Preclusion Bar BSC From
            Contesting Infringement.....................................................................15

{00296486;v1}

i

**TABLE OF CONTENTS**
**(continued)**

**Page**

    2.    Claim and Issue Preclusion Bar BSC From
        Challenging Validity ......................................................................16

    3.    Claim Preclusion Bars BSC From Asserting
        Inequitable Conduct .......................................................................16

II.      THE DISMISSAL OF 2005 CLAIMS AGAINST TAXUS LIBERTÉ
        DOES NOT BAR CLAIMS BASED ON U.S. SALES IN 2008-09 ...............................17

    A.    Claim Preclusion Does Not Bar Cordis's Claims, Which
        Could Not Have Been Raised in the Prior Action .........................................19

    B.    BSC's Argument Runs Counter to the "Interests of Justice" .......................................25

III.     EQUITABLE FACTORS FAVOR AN INJUNCTION ....................................................29

CONCLUSION.................................................................................................32

{00296486;v1}

# TABLE OF AUTHORITIES

**Page**

## CASES

*Acosta v. Honda Motor Co.*,
   717 F.2d 828 (3d Cir. 1983)................................................................................26

*Acumed LLC v. Stryker Corp.*,
   525 F.3d 1319 (Fed. Cir. 2008)........................................................... *passim*

*Akzona, Inc. v. E.I. Du Pont de Nemours & Co.*,
   607 F. Supp. 227 (D. Del. 1984)........................................................................10

*Alexander & Alexander, Inc. v. Van Impe*,
   787 F.2d 163 (3d Cir. 1986)..........................................................................20, 21

*Ammex, Inc. v. United States*,
   334 F.3d 1052 (Fed. Cir. 2003)....................................................................21, 23

*Board of Trustees of Trucking Employees Welfare Fund, Inc. v. Centra*,
   983 F.2d 495 (3d Cir. 1992)..........................................................................19, 20

*Brown v. Felsen*,
   442 U.S. 127 (1979)...........................................................................................26

*Callaway Golf Co. v. Acushnet Co.*,
   585 F. Supp. 2d 600 (D. Del. 2008)...................................................................30

*Cordis Corp. v. Boston Scientific Corp.*,
   2005 WL 1331172 (D. Del. June 3, 2005)..........................................................16

*CoreStates Bank, N.A. v. Huls America, Inc.*,
   176 F.3d 187 (3d Cir. 1999)...........................................................18, 19, 20, 22

*Ensign-Bickford Co. v. ICI Explosives USA, Inc.*,
   817 F. Supp. 1018 (D. Conn. 1993).....................................................................10

*Federated Dept. Stores, Inc. v. Moitie*,
   452 U.S. 394 (1981)............................................................................................19

*Foster v. Hallco Mfg. Co.*,
   947 F.2d 469 (Fed. Cir. 1991).............................................................................20

*Hazelquist v. Guchi Moochie Tackle Co.*,
   437 F.3d 1178 (Fed. Cir. 2006).........................................................................22

iii

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Hemphill v. Kimberly-Clark Corp.*,
530 F. Supp. 2d 108 (D.D.C. 2008) ...........................................................................24

*KSR Int'l Co. v. Teleflex, Inc.*,
550 U.S. 398 (2007) .................................................................................................26

*Kearns v. General Motors Corp.*,
94 F.3d 1553 (Fed. Cir. 1996) ...........................................................................3, 18, 26

*Kessler v. Eldred*,
206 U.S. 285 (1907) ...........................................................................................18, 24

*Labelle Processing Co. v. Swarrow*,
72 F.3d 308 (3d Cir. 1995) .................................................................................21, 23

*Lawlor v. National Screen Serv. Corp.*,
349 U.S. 322 (1955) ......................................................................................... passim

*Litecubes LLC v. Northern Light Prods., Inc.*,
523 F.3d 1353 (Fed. Cir. 2008) .........................................................................10, 28

*Mannesmann Demag Corp. v. Engineered Metal Products Co.*,
793 F.2d 1279 (Fed. Cir. 1986) ..............................................................................13

*Mayer/Berkshire Corp. v. Berkshire Fashions, Inc.*,
424 F.3d 1229 (Fed. Cir. 2005) ..............................................................................18

*Molinaro v. AT&T*,
460 F. Supp. 673 (E.D. Pa. 1978) ...........................................................................24

*Nanavati v. Burdette Tomlin Mem. Hosp.*,
857 F.2d 96 (3d Cir. 1988) .....................................................................................19

*Pactiv Corp. v. Dow Chem. Co.*,
449 F.3d 1227 (Fed. Cir. 2006) ..........................................................................16, 19

*Roche Palo Alto LLC v. Apotex, Inc.*,
531 F.3d 1372 (Fed. Cir. 2008) ......................................................................... passim

*Sharp Kabushiki Kaisha v. ThinkSharp, Inc.*,
448 F.3d 1368 (Fed. Cir. 2006) ..........................................................................18, 26

iv

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Single Chip Sys. Corp. v. Intermec IP Corp.*,
  495 F. Supp. 2d 1052 (S.D. Cal. 2007)........................................................................24

*Smith v. Pittsburgh Gage & Supply Co.*,
  464 F.2d 870 (3d Cir. 1972)...............................................................................3, 25

*Solaia Tech. LLC v. Arvinmeritor, Inc.*,
  2003 WL 22287381 (N.D. Ill. Sept. 30, 2003) ............................................................10

*TruePosition, Inc. v Andrew Corp.*,
  2009 WL 1173292 (D. Del. April 30, 2009)...............................................................29

*United States v. Athlone Indus., Inc.*,
  746 F.2d 977 (3d Cir. 1984)...........................................................................26, 29

*Wall v. United States*,
  592 F.2d 154 (3d Cir. 1979)........................................................................... 26-27

*Williams v. Gillette Co.*,
  887 F. Supp. 181 (N.D. Ill. 1995) ...........................................................21, 22, 23, 24

*Young Engineers, Inc. v. United States Int'l Trade Comm'n*,
  721 F.2d 1305 (Fed Cir. 1983)....................................................................21, 23, 24

### STATUTES AND RULES

Fed. R. Civ. P. 60(b) ..........................................................................................29

### MISCELLANEOUS

Restatement (Second) of Judgments...........................................................................22, 23

Wright & Miller, Federal Practice & Procedure...............................................................21

v

### INTRODUCTION

Cordis has moved at the outset of this case for summary judgment on liability, and for preliminary and permanent injunctive relief.  BSC moves to dismiss.

Both sides rely on the 03-027 case involving the Liberté and Taxus Liberté stents, and the doctrines of issue and claim preclusion.  The doctrines are well settled.  Where there has been a prior action involving the same parties and the same claim, issue preclusion bars re-litigation of issues that were actually litigated and decided; claim preclusion also bars assertion of claims that *could have been raised* in the earlier case, whether they were actually litigated or not.

Cordis properly can use claim and issue preclusion *offensively* to bar BSC from raising any infringement, validity or enforceability issue involving the Taxus Liberté stent and the Gray patent.  These issues were actually litigated, or could have been litigated, with respect to the structurally identical Liberté stent in the 03-027 action.   On the other hand, BSC cannot use those doctrines *defensively* to bar Cordis's claim.  Cordis's claim is based on BSC's decision to begin selling the Taxus Liberté stent in the United States in 2008.  That claim was not – and could not have been – litigated in 2005 and so Cordis is not precluded from bringing it now.

### Cordis's Reliance on Claim and Issue Preclusion

In the 03-027 case, Cordis obtained a judgment – now affirmed on appeal – that BSC's Liberté stent infringes claim 2 of the Gray '406 patent and that claim 2 is not invalid. Taxus Liberté is the same as the Liberté stent, except for an added drug/polymer coating that is irrelevant to infringement of the Gray patent.  Because Liberté and Taxus Liberté are "essentially the same" for purposes of the Gray patent, with "merely colorable" differences between them, both claim and issue preclusion bar BSC from re-litigating the infringement and validity issues that it actually litigated and lost in the 03-027 case.  *Roche Palo Alto LLC v. Apotex, Inc.*, 531

{00296486;v1}

F.3d 1372 (Fed. Cir. 2008).  Similarly, claim preclusion bars BSC from raising other validity or enforceability defenses that it could have raised earlier in the 03-027 case.  *Id*.  In short, the doctrines of issue and claim preclusion leave BSC with no defense on the merits of this case.

### BSC's Reliance on Claim Preclusion

BSC invokes the doctrine of claim preclusion, but not issue preclusion.  Its argument is at odds with black letter law.  BSC relies on the Federal Circuit's recent direction that the 2005 dismissal of Cordis's Taxus Liberté claims case for lack of proof of a U.S. nexus be "with prejudice."  It argues that that dismissal bars Cordis from challenging sales of the Taxus Liberté stent in the U.S. that began three years later.  But Cordis is not attempting to re-litigate in this case whether Taxus Liberté stents were made in the United States before June 2005 – the only issue regarding Taxus Liberté that was actually decided in the 2005 case.  Nor is it accusing any pre-2005 Taxus Liberté stents of infringement.  Claim preclusion would bar such claims. Cordis is bringing a *new* case based on *new* acts of infringement.  U.S. sales that began in 2008 were not the subject of the 2005 trial and they could not have been raised in that trial for a simple reason: they had not yet occurred.  The dismissal of the claims against Taxus Liberté in the 03-027 case "cannot be given the effect of extinguishing claims which did not even then exist…." *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 328 (1955).

Even if BSC could meet the black letter requirements for claim preclusion – and it cannot – its theory would still fail because it does not address the circumstances of the earlier dismissal.  In dismissing Cordis's case in 2005 without prejudice, the Court did *not* intend to preclude Cordis from bringing this claim, and it relied on BSC's concession – which contradicts its current position – that Cordis could properly invoke the 2005 verdict in pursuing claims against the Taxus Liberté stent.  As the Court stated during the April 24, 2009 teleconference (Tr. 9:14-25):

{00296486;v1}

> *[T]he fact that I didn't feel compelled to address the issue in 2005 does not mean I meant to preclude the issue being addressed when I felt it was ripe, which is actually when [the Taxus Liberté] was launched in the United States.* (Emphasis added).

It would not be in the "interests of justice" to construe the Federal Circuit's mandate to bar Cordis from pursuing this new claim. BSC acknowledges the fundamental unfairness of such an outcome by urging this Court to *ignore* the interests of justice. But under controlling precedent, claim preclusion may be applied only if "the interest of justice is not disserved. . . ." *Kearns v. General Motors Corp.*, 94 F.3d 1553, 1556 (Fed. Cir. 1996); *see also Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972).

BSC has no legal basis to avoid Cordis's claim.

## A.    THE 2005 TRIAL IN THE 03-027 CASE

In the 03-027 case, Cordis accused BSC's Liberté and Taxus Liberté stents of infringing claim 2 of the Gray '406 patent. That case was tried to a jury in June 2005.

### 1.    The Proof on Infringement and Validity in the 2005 Trial

In the 03-027 case, Cordis asserted one claim of the Gray '406 patent – claim 2 – against both Liberté and Taxus Liberté. Claim 2 is directed at a stent's structure, not its coating. Thus, claim 2 depends from claim 1, which covers "[a] stent … comprising: a plurality of longitudinally disposed bands, wherein each band defines a generally continuous wave having a spatial frequency along a line segment parallel to the longitudinal axis; and a plurality of links for maintaining the bands in a tubular structure …; such that the links and bands define an expandable structure having axial flexibility in an unexpanded configuration." Claim 2 adds a further requirement that "each link is axially displaced from any circumferentially adjacent link."

a.     **The Evidence that Liberté and Taxus Liberté Have
the Same Infringing Structure**

At trial in 2005, Cordis's expert Dr. Buller testified that Taxus Liberté is exactly the same stent as Liberté, with an added drug/polymer coating (D.I. 365 (03-027) at 414:14-22):

> Q.     .... [I]s there any difference in terms of the issues in our case between Liberté and Taxus Liberté?
>
> A.     No. They're exactly the same metallic stent.  The Taxus one has the drug on the surface.  The one with just the word Liberté is just the metal stent.



**The Liberté Stent**



**The Taxus Liberté Stent**

Dr. Buller explicitly testified that when he used the word "Liberté" in his testimony, he was referring to *both* Liberté and Taxus Liberté (*id.*):

> Q.     .... [W]hen we say Liberté, in this case, we'll be referring to Liberté and Taxus Liberté?
>
> A.     Yes.

Dr. Buller testified in detail that Liberté (meaning both Liberté and Taxus Liberté, *id.*) has every limitation of claim 2 of the Gray patent.  *See id.* at 498:4-538:22.  This included evidence, relevant here, that both stents meet the requirement of claim 2 that the stent have "axial flexibility in an unexpanded configuration."  *Id.* at 532:11-533:19.

At the time Dr. Buller testified, the issue whether Taxus Liberté infringed claim 2 was very much in the case.  Yet BSC did not cross-examine Dr. Buller in any respect about Taxus Liberté.  In particular, it did not question him about his testimony that Taxus Liberté is the

{00296486;v1}

same metal stent as Liberté, with an added drug/polymer coating, or his testimony that both stents provide the "axial flexibility" required by claim 2.  That testimony was unchallenged.

After the claims against Taxus Liberté were dismissed without prejudice, BSC still did not dispute that the Liberté stent meets the "axial flexibility" claim limitation.  Instead, it argued that the Liberté design does not have the "generally continuous wave" required by the claim.  The claim against Liberté was submitted to the jury.  The jury concluded that the metal structure of the Liberté stent infringes claim 2.  This Court denied BSC's post-trial motions on infringement and entered judgment that Liberté infringes claim 2.

### b.    The Judgment That Claim 2 of the Gray Patent is Not Invalid

At trial in 2005, BSC asserted that claim 2 of the Gray patent is invalid as anticipated by the Palmaz '762 patent.  The jury rejected BSC's defense and concluded that claim 2 is not invalid.  This Court denied BSC's post-trial motions on validity, and entered judgment that claim 2 is not invalid.

### c.    BSC Did Not Raise Any Other Validity or Enforceability Defense for the Gray Patent

In defending the charge in the 03-027 case that Liberté infringes claim 2 of the Gray '406 patent, BSC could have raised an inequitable conduct defense and could have challenged the validity of claim 2 on other grounds.  It did not do so.

### 2.    BSC's Motion to Dismiss the Taxus Liberté Claims for Lack of Proof of a U.S. Nexus as of June 2005

At the close of Cordis's case-in-chief during the 2005 trial, BSC moved for JMOL dismissing the claims against Taxus Liberté.  The stated basis for BSC's motion was that Cordis had offered "no proof" that Taxus Liberté was "made, used or sold in the United States" as of June 2005.  D.I. 367 (03-027) at 1027:17-20.  Thus, its counsel argued that "there's not any

proof that Taxus Liberté is made, used or sold in the United States ...." D.I. 368 (03-027) at 1048:1-5.

In response, Cordis's counsel explained that Cordis did not believe such proof was necessary on liability, since in its view Liberté and Taxus Liberté were the same product insofar as the Gray patent was concerned. Thus, Cordis had planned to offer such proof only in the damages phase. Cordis asked "for permission to reopen" its case-in-chief to present documentary evidence that BSC was making Taxus Liberté in Minnesota for ex-U.S. sale. *Id.* at 1052:18-1053:11, 1058:21-25.

**REDACTED**

Instead, the Court opted to deny leave to reopen and instead dismissed Cordis's claims without prejudice for lack of jurisdiction.

During colloquy on BSC's JMOL motion, the Court repeatedly described the issue as "a question of jurisdiction," D.I. 368 (03-027) at Tr. 1059:1-5, *i.e.*, "Do I have jurisdiction over products that have no connection to the United States?" *Id.*; *see also* D.I. 367 (03-027) at 1029:14-16 ("I don't know that I have jurisdiction over a product that isn't [made, used or sold in the U.S.]"), D.I. 368 (03-027) at 1066:15-16 ("I still think it's a matter of jurisdiction for me.").

The Court wrestled with whether to resolve this jurisdictional question by dismissing the Taxus Liberté claims (as BSC requested) or giving Cordis permission to reopen its case-in-chief to present evidence of a U.S. nexus (as Cordis requested). As the Court stated: "I think the question for me is whether I allow Cordis to reopen the record to put in its evidence that it thinks it has." *Id.* at 1066:16-18.

{00296486;v1}

6

Trying to persuade the Court to grant its motion, BSC emphasized that a dismissal of the Taxus Liberté claims would not bar Cordis from seeking relief in the future – *in this case* – if BSC launched Taxus Liberté in the U.S. notwithstanding a victory by Cordis on its claims against the structurally identical Liberté:

> If we get FDA approval [in the future for Taxus Liberté] and the structure hasn't changed and we've lost this case [as to Liberté], well, then, *it would be difficult for us to sell the product without taking some steps.  But that's a question for a future day*.

D.I. 367 (03-027) at 1031:15-19 (emphasis added)).

The Court pressed BSC's counsel on this issue, expressing concern about future "mischief [that] might come" from a dismissal, D.I. 368 (03-027) at 1054:23-1055:11, especially if BSC decided to launch Taxus Liberté in the United States (*id.* at 1061:24-1062:8):

> THE COURT:  -- *if, in fact, there comes a time when the Taxus Liberté product is sold in the United States* --
>
> Mr. DESMARAIS [BSC's counsel]:  If the FDA allows that --
>
> THE COURT:  *And if, in fact, the Taxus Liberté is nothing more than your miracle drug coating applied to the Liberté stent that has been tried thoroughly in this case* --
>
> MR. DESMARAIS:  Right.
>
> THE COURT:  -- *what happens?*  (Emphasis added).

In response, BSC's counsel assured the Court that if Cordis prevailed against Liberté (as it did) and obtained an injunction, and if Liberté and Taxus Liberté were "substantially the same or colorable difference or whatever the legal words are," *id.* at 1062:9-22, then "*[i]f it was the same, we'd be in trouble*."  *Id.* at 1063:6-15 (emphasis added)).  Notably, BSC gave these assurances *before* the Court decided whether the dismissal would be with, or without, prejudice, and they were not qualified.  That is, BSC did not suggest that it would be "in trouble" in the

{00296486;v1}

7

future if the dismissal were "without prejudice," but receive immunity from subsequent Cordis claims if the dismissal were "with prejudice."

This Court accepted BSC's assurances and dismissed the Taxus Liberté claims, rather than allowing Cordis to re-open its case-in-chief, as Cordis had requested. *Id.* at 1052:18-1053:11, 1058:21-25. The Court was explicit that the dismissal was on jurisdictional grounds: "Having researched and thought about it, I do not believe I have jurisdiction over the Taxus Liberté product …." *Id.* at 1307:12-16. The Court reiterated the point when BSC's counsel asked that the dismissal be "with prejudice": "[The dismissal] is without prejudice. I said I didn't have jurisdiction." *Id.* at 1307:25-1308:2.[1]

If the Court had known in 2005 that BSC would now be arguing that the dismissal gives it immunity to sell Taxus Liberté in the U.S. at will – thereby repudiating its earlier admission that it would be "in trouble" if it launched Taxus Liberté in the U.S. – it is reasonable to conclude the Court would instead have allowed Cordis to reopen its case to present additional proof. As the Court stated during the April 24, 2009 teleconference, the dismissal "does not mean I meant to preclude the issue being addressed when I felt it was ripe, which is actually when [the Taxus Liberté] was launched in the United States." Tr. 9:14-25.

---

[1] BSC mischaracterizes the basis for the dismissal by turning a question from the Court into a finding of noninfringement. In the course of argument, the Court did say, "The problem is that at this point, there is no proof that the Taxus Liberté, as it might be sold in the United States, has the same structure." D.I. 368 (03-027) at 1050:2-12. But Cordis immediately responded that "there is plenty of proof" that Liberté and Taxus Liberté have the same structure, *id.*, and the issue was not raised again. BSC moved to dismiss *only* for failure to prove a U.S. nexus, not for failure of proof of infringement, and the Court unequivocally based its dismissal – for lack of jurisdiction – *only* on that ground.

**B.      THE FEDERAL CIRCUIT'S MARCH 31, 2009 DECISION**

In November 2008, when Cordis filed this motion, BSC's appeal in the 03-027 case was pending.  This Court scheduled the hearing on this motion so that it could come after the Federal Circuit's decision on appeal.  On March 31, 2009, the Federal Circuit issued its decision.  A copy of the decision is attached hereto as Exhibit A.  In a teleconference with the Court on April 24, 2009, it was agreed that the parties would submit supplemental briefs addressing the Federal Circuit's decision.

**1.      The Federal Circuit Affirmed the Judgment That Claim 2
of the Gray Patent is Infringed by Liberté and is Not Invalid**

In its March 31, 2009 decision, the Federal Circuit affirmed the judgment in Cordis's favor in the 03-027 case that the Liberté stent infringes claim 2 of the Gray patent and that claim 2 is not invalid.

First, the Federal Circuit affirmed this Court's construction of the phrase "a plurality of longitudinally disposed bands, wherein each band defines a generally continuous wave …," and rejected BSC's challenge to this Court's construction.  Ex. A at 30-31.

Second, the Federal Circuit rejected BSC's challenge to the sufficiency of the evidence that the Liberté structure infringes claim 2 of the Gray patent.  As the Federal Circuit noted, the *only* disputed infringement issue for the Gray patent involved the limitation requiring a "generally continuous wave."  *Id*.  Thus, BSC did not dispute that the Liberté stent has "axial flexibility," as required by claim 2.  The Federal Circuit agreed with this Court "that Cordis presented substantial evidence to support the jury's infringement verdict," and it characterized BSC's argument as "without merit."  *Id*. at 31.  It accordingly "affirm[ed] the district court's denial of Boston Scientific's motion for judgment as a matter of law" on infringement.  *Id*.  As discussed above, the "substantial evidence" that Liberté infringes claim 2 of the Gray patent was

{00296486;v1}

equally applicable to Taxus Liberté, because both have the same metal structure and because Cordis's expert was explicit that in using the term "Liberté" he was referring to both Liberté and the coated Taxus version. D.I. 365 (03-027) at 414:14-22.

Third, the Federal Circuit affirmed the denial of BSC's motion for JMOL of invalidity. It held that "[t]he district court properly concluded that substantial evidence supported the jury's verdict that claim 2 of Cordis's '406 patent was not invalid." Ex. A at 25.

**2. The Federal Circuit's Holding that the Absence of Evidence of a U.S. Nexus for Taxus Liberté Required a Dismissal "With Prejudice"**

As noted above, this Court based its dismissal of Cordis's claims regarding Taxus Liberté for failure to establish a U.S. nexus on jurisdictional grounds, and accordingly held that the dismissal was "without prejudice." D.I. 368 (03-027) at 1307:12-1308:2.

This was consistent with authority that existed at the time of trial, in 2005.[2] However, in 2008, while BSC's appeal was pending, the Federal Circuit departed from earlier cases by holding in *Litecubes LLC v. Northern Light Products, Inc.*, 523 F.3d 1353 (Fed. Cir. 2008), that the requirement of a U.S. nexus is not jurisdictional, but rather is an element of a cause of action for patent infringement.

In the appeal in the 03-027 case, the Federal Circuit relied on *Litecubes* in holding that the question of "a nexus to the United States was an element of Cordis's liability claims, rather than a jurisdictional requirement." Ex. A at 32. It reasoned that a failure to establish a U.S. nexus "'requires a decision on the merits, not a dismissal for lack of subject matter

---

[2] *See*, *e.g.*, *Solaia Tech. LLC v. Arvinmeritor, Inc.*, 2003 WL 22287381, at *2 (N.D. Ill. Sept. 30, 2003) (treating the issue of the U.S. nexus for an allegedly infringing product as a question of subject matter jurisdiction); *Ensign-Bickford Co. v. ICI Explosives USA, Inc.*, 817 F. Supp. 1018 (D. Conn. 1993) (same); *Akzona, Inc. v. E.I. Du Pont de Nemours & Co.*, 607 F. Supp. 227, 229-230 (D. Del. 1984) (same). As the Federal Circuit later stated, before 2006 it was not unusual for courts to treat the limits on the extraterritorial effect of U.S. statutes as "jurisdictional." *Litecubes LLC v. Northern Light Prods., Inc.*, 523 F.3d 1353, 1363 & n.8 (Fed. Cir. 2008) (collecting cases).

{00296486;v1}

jurisdiction,'" *id.*, quoting *Litecubes*, 523 F.3d at 1361, and held that the dismissal of Cordis's

claims regarding Taxus Liberté in the 03-027 case "should have been with prejudice." Ex. A at

32-33. The Federal Circuit accordingly remanded the case "with instructions to dismiss the

claims [regarding to Taxus Liberté] with prejudice." *Id.* at 33.

## ARGUMENT

I.   **CLAIM AND ISSUE PRECLUSION BAR BSC FROM DISPUTING THAT TAXUS LIBERTÉ INFRINGES A VALID AND ENFORCEABLE CLAIM OF THE GRAY '406 PATENT**

In the 03-027 case, Cordis prevailed at trial and obtained a judgment that the

Liberté structure infringes claim 2 of the Gray patent and that claim 2 is not invalid. Under

principles of claim preclusion and issue preclusion, that judgment – which now has been

affirmed on appeal – bars BSC from re-litigating infringement or validity in this case. It also

bars BSC from raising an inequitable conduct defense that it could have raised (but did not raise)

in the earlier action.

In prior briefing on Cordis's motion, BSC tried to mount a defense on the merits

of this case by re-litigating the issues it litigated and lost in the 03-027 case. Thus, BSC:

(1) proposed a construction "a plurality of longitudinally disposed bands, wherein each band

defines a generally continuous wave" that differs from the one adopted in the 03-027 case, *see*

D.I. 39 at 8; (2) re-cycled the infringement theory that was rejected in the 03-027 case, that the

structure of the Liberté stent (which is the same structure as Taxus Liberté) does not have bands

with "the undulating appearance of a continuous wave," as required by this Court's construction,

*id.* at 8-9; and (3) recycled the validity theory that was rejected in the 03-027 case, that claim 2

of the Gray '406 patent is invalid over the Palmaz '762 patent. *Id.* at 9-10. In addition, BSC

11

raised an inequitable conduct theory that it could have raised – but chose not to raise – in the 03-027 case. *Id.* at 11.

The Federal Circuit decision in the 03-027 case is the complete answer to BSC's arguments. That decision – affirming this Court's claim construction, and affirming the judgments of validity and infringement – leaves BSC with no defense on the merits. Under basic principles of claim preclusion and issue preclusion, BSC no longer has any possible grounds for disputing that Taxus Liberté infringes a valid and enforceable claim of the Gray '406 patent.

A.      **The Legal Standard**

Claim and issue preclusion apply in patent cases where the products in issue in an earlier and later suit are "essentially the same." *Roche Palo Alto LLC v. Apotex, Inc.*, 531 F.3d 1372, 1379 (Fed. Cir. 2008); *Acumed LLC v. Stryker Corp.*, 525 F.3d 1319, 1324 (Fed. Cir. 2008). Accused products "are 'essentially the same' where the differences between them are merely 'colorable' or 'unrelated to the limitations in the claim of the patent.'" *Id.* (citation omitted).

*Roche*, 531 F.3d at 1379-80, illustrates these principles. The defendant in *Roche* resisted the application of claim preclusion by arguing – as BSC argues here – that its ANDA-2 product (which was the subject of the second case) was a different product from its ANDA-1 product (which was found to infringe in an earlier case). *Id.* at 1380. Despite the differences in the formulations of the ANDA-1 and ANDA-2 products, the Federal Circuit held that these two different products were no more than "colorably" different because "all of the concentrations [in both products] are well within the ranges claimed in the '493 patent." *Id.*:

> The fact that [the ANDA-1 and ANDA-2 products] are stabilized
> by different mechanisms … is irrelevant because both formulations
> are encompassed by the claims of the '493 patent. Thus, any
> difference in composition between the two formulations is merely
> colorable and the two formulations are "essentially the same."

Having held that the formulations of the two products were "essentially the same" for purposes of the asserted patent, the Federal Circuit affirmed the district court's application of *res judicata*. The same reasoning applies here.

### B. Claim and Issue Preclusion Are Applicable Because Liberté and Taxus Liberté Are "Essentially the Same" for Purposes of the Gray Patent

The undisputed facts are that: (1) Liberté and Taxus Liberté have the same metal structure, and (2) the only difference between them is that Liberté is uncoated while Taxus Liberté has an added drug/polymer coating.  D.I. 365 (03-027) at 414:14-22.  Indeed, BSC manufactures Taxus Liberté by making the infringing Liberté stent and adding a drug/polymer coating.

Claim 2 of the Gray patent is directed at the stent's structure (not its coating), and the added drug/polymer coating in Taxus Liberté is a "merely colorable" difference so that the two stents are "essentially the same"  for purposes of the Gray patent – just as the ANDA-1 and ANDA-2 products were deemed by the Federal Circuit to be "essentially the same" for purposes of the *Roche* case.  531 F.3d at 1379-80; *see Mannesmann Demag Corp. v. Engineered Metal Products Co.*, 793 F.2d 1279, 1282-83 (Fed. Cir. 1986) ("The presence of additional elements is irrelevant if all the claimed elements are present in the accused structure.").

To avoid this conclusion, BSC argues that Liberté and Taxus Liberté are "different product[s]."  D.I. 64 at 15.  While true, that simply frames the question rather than answers it.  If Liberté and Taxus Liberté were the same product, there would be no need to consider whether any differences are "merely colorable."  The question of "colorable differences" arises only when considering different products.  Thus, the ANDA-1 and ANDA-2 formulations in *Roche* were different products, but claim preclusion was applicable.  As *Roche* makes clear, the test when different products are involved is whether any differences in the

{00296486;v1}

13

products are "merely colorable," so that the products are "essentially the same" for purposes of the patent-in-suit. 531 F.3d at 1379-80.

BSC argues (D.I. 64 at 17) that Taxus Liberté's added drug/polymer coating makes it somewhat less flexible than the uncoated Liberté stent. This may be theoretically correct, but is a red herring. Claim 2 of the Gray patent does not claim any particular degree of flexibility; "axial flexibility" is all that is required, an improvement over the inflexible Palmaz design. In fact, the undisputed evidence in the 03-027 case established that the commercial embodiment of the Gray patent, Cordis's Crown stent, was viewed as "less flexible" than its competitors, even though it was an improvement over Palmaz. D.I. 365 (03-027) at 347:1-348:1; D.I. 369 (03-027) at 1351:13-19.

No witness has suggested that Taxus Liberté is inflexible or that it lacks the "axial flexibility" required by claim 2 of the Gray patent. As Dr. Buller has stated, Taxus Liberté's coating makes it microscopically thicker and gives a tackier surface than the bare metal Liberté, which could make it theoretically less flexible than Liberté – but not in a way that could affect the infringement analysis because Liberté and Taxus Liberté both are flexible. D.I. 63 at ¶ 7.

BSC and its witnesses boast of Taxus Liberté's flexibility. BSC's website describes Taxus Liberté as having even "greater flexibility" than Taxus Express stent, which is depicted as being highly flexible. Ex. D. William Kucheman, who is BSC's Senior VP and Group President of its Cardiovascular Group, describes Taxus Liberté as having excellent "***flexibility*** and conformability …." D.I. 42 at ¶ 11 (emphasis added). BSC's medical expert Mark A. Turco, M.D., described the Taxus Liberté stent as "***highly flexible***," Ex. B at 22:4-6, and as "***more flexible***" than other stents. D.I. 41 at ¶ 14 (emphasis added). Another BSC medical expert, Kirk Garratt, M.D., contrasts other stents with "***more flexible*** stent[s], like Taxus

{00296486;v1}

14

Liberté …." D.I. 40 at ¶ 15 (emphasis added). BSC's technical expert Dr. Moore describes Taxus Liberté as flexible. D.I. 43 at ¶ 11. No witness for BSC disputes this.

The closest BSC even comes to joining issue on this subject is a cryptic comment from its infringement expert, Dr. Moore, that Taxus Liberté's drug/polymer coating is "potentially" relevant to the axial flexibility limitation. *Id.* at ¶ 8. But Dr. Moore does not state that any differences between Liberté and Taxus Liberté are more than "merely colorable" for purposes of the Gray patent. To the contrary, Dr. Moore admits that Taxus Liberté (like Liberté) is flexible and he does not deny that it meets the claim requirement of having "axial flexibility in [its] unexpanded configuration." *That is, Dr. Moore does not assert that, if BSC were permitted to try this claim, it would have a non-infringement defense that the Taxus Liberté does not have the "axial flexibility" required by Gray.* Meanwhile, Dr. Buller asserts that Taxus Liberté does meet that claim limitation, D.I. 63 at ¶ 7, as he did at the 2005 trial, D.I. 365 (03-027) at 414:14-22, 532:11-533:19, and that opinion is not challenged by anyone.

On this record, BSC has offered no basis to avoid summary judgment. Any difference in flexibility between Liberté and Taxus Liberté is "irrelevant" and raises no issue of fact. Both products are flexible and are thus "encompassed by the claims of the ['406] patent." *Roche*, 531 F.3d at 1380. The differences between Liberté and Taxus Liberté just place them in the range of axially flexible stents embraced by Gray, but provide no distinction for purposes of claim and issue preclusion. Under controlling precedent, BSC has no basis for resisting the application of claim and issue preclusion. *Id.*; *Acumed*, 525 F.3d at 1324.

C.   **BSC Has No Defense on the Merits**

1.   **Claim and Issue Preclusion Bar BSC From Contesting Infringement**

In the 03-027 case, Cordis established that Liberté's structure infringes claim 2 of the Gray patent. The Federal Circuit has now affirmed the claim construction that was applied in

{00296486;v1}

15

the 03-027 case. Ex. A at 30-31. In addition, the Federal Circuit has affirmed the judgment that the Liberté stent infringes the Gray patent. *Id.* at 31. Taxus Liberté has the same metal structure as Liberté, plus an added drug/polymer coating, which is a "merely colorable" difference for purposes of the Gray patent. Claim and issue preclusion thus bar BSC from re-litigating the infringement issue in this case. *Roche*, 531 F.3d at 1379-80; *Acumed*, 525 F.3d at 1324.

### 2. Claim and Issue Preclusion Bar BSC From Challenging Validity

The Federal Circuit has also affirmed the judgment in the 03-027 case on the validity of claim 2 of the Gray patent, holding that claim 2 is not invalid. Ex. A at 25. Claim preclusion and issue preclusion bar BSC from re-litigating the validity issue in this case. *Roche*, 531 F.3d at 1379-80; *Acumed*, 525 F.3d at 1324; *Cordis Corp. v. Boston Scientific Corp.*, 2005 WL 1331172, at *6 (D. Del. June 3, 2005).

### 3. Claim Preclusion Bars BSC From Asserting Inequitable Conduct

In the 03-027 case, BSC could have raised an inequitable conduct defense. The defense it has sought to raise here was known to it in 2005 – it is simply based on the failure to disclose a particular patent to the PTO during the prosecution of Gray. There is nothing new about the defense now, and BSC had the same motive and opportunity to raise it then. Having failed to raise that defense in 2005, when it could have done so, principles of claim preclusion bar it from doing so here. *Pactiv Corp. v. Dow Chem. Co.*, 449 F.3d 1227, 1230 (Fed. Cir. 2006) (claim preclusion applies to issues that "*could have been*, raised in a prior action … which has been adjudicated on the merits.") (emphasis added); *Acumed*, 525 F.3d at 1323 (claim preclusion applies "'not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which *might have been offered* for that purpose.'") (emphasis added).

II.    **THE DISMISSAL OF 2005 CLAIMS AGAINST TAXUS LIBERTÉ**
       **DOES NOT BAR CLAIMS BASED ON U.S. SALES IN 2008-09**

Like Cordis, BSC also invokes the doctrine of claim preclusion.  However, BSC does so in ways that run directly counter to black letter law.

BSC relies on the Federal Circuit's decision that the dismissal in 2005 should have been "with prejudice," rather than "without prejudice."  BSC misapprehends the import of that ruling.  When the dismissal was "without prejudice," Cordis could have refiled *exactly* the same suit that was dismissed.  It could have contended, for a second time, that BSC was manufacturing Taxus Liberté stents in the United States as of 2005.  The dismissal "with prejudice" changes that.  Now issue preclusion bars re-litigating the issue actually decided – whether BSC was manufacturing Taxus Liberté stents in the United States as of 2005.  And now claim preclusion bars re-litigating the claims that were brought, or could have been brought, at that time, but not actually decided – whether Taxus Liberté stents made in the United States as of 2005 infringed valid claims of the Gray patent.  Thus, whether rightly or wrongly decided, based on good reasons or bad, issue and claim preclusion bar Cordis from bringing a lawsuit based on such pre-2005 activity.  BSC and its customers have complete immunity under the Gray patent with respect to those pre-2005 stents.  That is the import – and the only import – of the Federal Circuit's reversal.

BSC reads the decision more broadly, however, as meaning that the dismissal of the Taxus Liberté claims for failure to prove a U.S. nexus in 2005 bars claims based on BSC's launch of Taxus Liberté in the U.S. in 2008.  This is incorrect and is not remotely supported by any case BSC cites.  Rather, the law cited by BSC stands for two irrelevant propositions:  (1) the proposition of *claim* preclusion stated above – that a dismissal with prejudice precludes re-litigation over acts of infringement that occurred on or before the date of the dismissal (whether

or not the issue of infringement was actually decided), and (2) the proposition of *issue* preclusion that a litigant who has actually tried and lost a claim of infringement cannot re-litigate that exact same claim in the future.

*Kessler v. Eldred*, 206 U.S. 285 (1907), is in the second category.  It applied *issue* preclusion where a patentee brought a second infringement suit challenging the exact same product after the court had already determined on the merits that the product did not meet the limitations of the asserted patent.  The Supreme Court correctly observed that, having prevailed once on the merits of the infringement claim, the defendant, was now "entitl[ed] . . . to continue the business of manufacturing and selling throughout the United States the same [product]. . . without molestation by [plaintiff], through the [prior asserted] patent."  *Id.* at 286.  Such a routine application of issue preclusion has no bearing on the issues presented here.

The more relevant principle – the one that should control here – is the black letter rule that "*[c]laim preclusion does not apply unless the present claim was or could have been raised in the prior proceeding*."  *CoreStates Bank, N.A. v. Huls America, Inc.*, 176 F.3d 187, 203 (3d Cir. 1999) (emphasis added).  This limitation on the doctrine of claim preclusion reflects courts' unwillingness to deny a plaintiff a day in court on a claim not actually litigated.  *See Kearns v. General Motors Corp.*, 94 F.3d 1553, 1557 (Fed. Cir. 1996) ("[R]es judicata is not readily extended to claims that were not before the court … unless there is a clear and persuasive basis for that denial."); *Sharp Kabushiki Kaisha v. ThinkSharp, Inc.*, 448 F.3d 1368, 1372 (Fed. Cir. 2006) ("The public policy underlying the principles of preclusion … [requires] that the circumstances for preclusion 'must be certain to every intent.'"), quoting *Mayer/Berkshire Corp. v. Berkshire Fashions, Inc.*, 424 F.3d 1229, 1234 (Fed. Cir. 2005).

{00296486;v1}

18

The claims presented in this case – based on U.S. sales that began in 2008 – could not have been raised during the trial in 2005 because BSC did not launch Taxus Liberté until 2008.  Under settled law, the dismissal for failure to prove a U.S. nexus as of 2005, "*cannot be given the effect of extinguishing claims which did not even then exist ….*"  *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955).  There is no basis to deny Cordis its day in court.

**A.    Claim Preclusion Does Not Bar Cordis's Claims, Which Could Not Have Been Raised in the Prior Action**

Where the requirements for claim preclusion are met, that doctrine "precludes the parties or their privies from relitigating issues that *were or could have been raised* in [the earlier] action."  *Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981) (emphasis added).  As the Court of Appeals for this Circuit has stated:

> [C]laim preclusion (or res judicata as it is also called) "gives dispositive effect to a prior judgment if a particular issue, although not litigated, *could have been raised* in the earlier proceeding."

*CoreStates*, 176 F.3d at 194, quoting *Board of Trustees of Trucking Employees Welfare Fund, Inc. v. Centra*, 983 F.2d 495, 504 (3d Cir. 1992) (emphasis added in *CoreStates*); *see also Nanavati v. Burdette Tomlin Mem. Hosp.*, 857 F.2d 96, 111 (3d Cir. 1988) ("Res judicata bars not only claims that were raised in previous proceeding but also claims **that could have been raised**.") (emphasis added).

Federal Circuit decisions are to the same effect.  *E.g.*, *Acumed*, 525 F.3d at 1323 (claim preclusion applies "'not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which *might have been offered* for that purpose.'") (emphasis added); *Pactiv*, 449 F.3d at 1230 (claim preclusion applies to issues that "*could have been, raised* in a prior action … which has been adjudicated on the merits.") (emphasis added); *Foster v. Hallco Mfg. Co.*, 947 F.2d 469, 478 (Fed. Cir. 1991) (claim

{00296486;v1}

19

preclusion bars claims that "were raised or ***could have been*** raised…in [that] prior action"), citing Restatement (Second) of Judgments §§ 18, 19 & comments (emphasis in original).

This principle has a straightforward corollary. "***Claim preclusion does not apply unless the present claim was or could have been raised in the prior proceeding***." *CoreStates*, 176 F.3d at 203 (emphasis added); *Centra*, 983 F.3d at 504. As the Court of Appeals for this Circuit has held:

> Res judicata applies … only to claims arising ***prior*** to the entry of judgment. It does not bar claims arising ***subsequent to*** the entry of judgment and which did not then exist or could not have been sued upon in the prior action.

*Alexander & Alexander, Inc. v. Van Impe*, 787 F.2d 163, 166 (3d Cir. 1986) (emphasis in original), citing *Lawlor*, 349 U.S. at 329.

The Supreme Court's decision in *Lawlor*, 349 U.S. 322, is the leading case illustrating this basic principle. In *Lawlor*, the parties settled an antitrust suit and the case was dismissed "with prejudice" pursuant to the settlement. After this dismissal, the defendants continued to engage in the same pattern of antitrust violations alleged in the first suit. The plaintiffs sued again, and the defendants asserted that the new suit was barred by claim preclusion. The Supreme Court disagreed. It held that the later suit was not barred because it was not "based on the same cause of action" as the first. *Id.* at 327. Observing that "[t]he conduct presently complained of was all subsequent to the [prior] judgment," the Supreme Court held that "***[w]hile the [prior] judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist***…." *Id.* at 328 (emphasis added). The Court stated that accepting the defendants' claim preclusion argument would improperly "confer on them a partial immunity from civil liability for future violations" – a result not consistent with the doctrine of claim preclusion. *Id.* at 329.

{00296486;v1}

20

Courts have applied *Lawlor* repeatedly, in many different contexts, to hold that an earlier judgment does not bar claims based on conduct occurring after the judgment. *E.g.*, *Ammex, Inc. v. United States*, 334 F.3d 1052, 1057 (Fed. Cir. 2003) (suit involving new facts arising after prior judgment not barred by claim preclusion); *Young Engineers, Inc. v. United States Int'l Trade Comm'n*, 721 F.2d 1305, 1316-17 (Fed Cir. 1983) (same); *Labelle Processing Co. v. Swarrow*, 72 F.3d 308, 313-14 (3d Cir. 1995) ("[N]ew facts (i.e. events occurring after the events giving rise to the earlier claim) may give rise to a new claim, which is not precluded by the earlier judgment."); *Alexander & Alexander*, 787 F.2d at 166; *see also* 18 Wright & Miller, Federal Practice & Procedure § 4409, at 230 (2009) ("A substantially single course of activity may continue through the life of a first suit and beyond. The basic claim-preclusion result is clear: a new claim or cause of action is created as the conduct continues.").

*Williams v. Gillette Co.*, 887 F. Supp. 181 (N.D. Ill. 1995), applied *Lawlor* in a case much like this one. In *Williams*, a prior patent infringement case was dismissed "with prejudice" as part of a settlement. The settlement did not include a release or a covenant not to sue. Thus, when the defendant continued to infringe, the plaintiff brought a new case, based on the same patent and same accused product, claiming infringement only for acts occurring after the date of the first judgment. *Id.* at 182. Since no issue had actually been decided in the first case, issue preclusion had no application. Focusing on claim preclusion, and applying *Lawlor*, the court held that claim preclusion did not bar the second suit because it was based on new acts of infringement occurring after the first judgment. As the court stated (*id.* at 183-84):

> *Lawlor* has come to stand for the proposition that *res judicata* will not bar a subsequent suit based upon the same course of conduct as a prior suit if the second suit alleges wrongful behavior occurring after judgment in the first suit.

*Williams* is a straightforward, and correct, application of *Lawlor*. "[E]ach act of patent infringement gives rise to a separate cause of action." *Hazelquist v. Guchi Moochie Tackle Co.*, 437 F.3d 1178, 1180 (Fed. Cir. 2006). Accordingly, a dismissal with prejudice of a case involving earlier acts of infringement cannot, in and of itself, immunize future acts of infringement. That would improperly give the prior judgment "the effect of extinguishing claims that did not even then exist." *Lawlor*, 349 U.S. at 328.

Resolution of this case is properly governed by *Williams*. Indeed, this case is simpler. As in *Williams*, the previous judgment was not based on a finding that the accused product does not practice a valid claim of the asserted patent, so there is no conceivable application of issue preclusion. (The only issue actually decided in the 03-027 case – that there were no Taxus Liberté stents made in the United States as of 2005 – is irrelevant to Cordis's claim based on post-2008 sales. BSC does not even purport to rely on issue preclusion). But unlike *Williams*, where the defendant simply continued without interruption the same infringing conduct, here there has been a material change. Three years after the 2005 judgment, BSC launched Taxus Liberté in the United States.

This implicates another limitation on the doctrine of claim preclusion, one recognized by the Restatement (Second) of Judgments. Under the Restatement, which the Federal Circuit and Third Circuit both follow on claim preclusion, *Acumed*, 525 F.3d at 1323 ("In applying the doctrine of claim preclusion, this court is guided by the Restatement (Second) of Judgments."); *CoreStates*, 176 F.3d 187:

> ***Material operative facts occurring after the decision of an action with respect to the same subject matter may in themselves, or taken in conjunction with the antecedent facts, comprise a transaction which may be made the basis of a second action not precluded by the first.***

Restatement (Second) of Judgments § 24 cmt. (f) (1982) (emphasis added).

The Third Circuit's decision in *Labelle*, 72 F.3d at 313-14, illustrates the application of this principle.  There, the plaintiff's initial claim under the Black Lung Benefits Act was denied because he did not satisfy the statutory requirement of being totally disabled.  Later, the plaintiff brought a subsequent claim in which he alleged that he now was totally disabled.  Citing both *Lawlor* and the Restatement, the Third Circuit held that the denial of the first claim did not bar the later claim, which was based on a "'material change in conditions.'"  *Id.* at 313.  Here, too, Cordis's claim is based on "material operative facts occurring after the [prior] decision," *i.e.*, BSC's U.S. launch of Taxus Liberté in 2008, and Cordis's claim likewise is not precluded by the earlier judgment.  *Id.* at 314, quoting Restatement (Second) of Judgments § 24 cmt. (f); *see also Ammex*, 334 F.3d at 1057 (relying on the Restatement in holding that claim based on new "material operative facts" was not barred by *res judicata*).  For this reason, this case is easier than *Williams.*

BSC has no basis for distinguishing the authority that Cordis relies upon.  BSC tries to distinguish *Lawlor* by arguing (D.I. 64 at 13) that the first and second cases involved violations that differed in kind.  However, the Supreme Court stated that "both suits involved 'essentially the same course of wrongful conduct'" and found it dispositive that "[t]he conduct presently complained of was all subsequent to the [prior] judgment."  349 U.S. at 327-28.  In any event, the facts in issue here *are* different from those in the 03-027 case.  *See Young Engineers*, 721 F.2d at 1316 ("Even under the broad view that a claim may embrace continuing conduct subsequent to the judgment, we find no authority that claim preclusion would apply to conduct of a different nature from that involved in the prior litigation.").

BSC does not – and cannot – distinguish *Williams*.  Instead, it argues (D.I. 64 at 12) that the *Williams* court did not rely on Federal Circuit precedent.  This criticism is theoretical

{00296486;v1}

23

at best because BSC does not identify – and we are not aware of – any difference between Seventh Circuit and Federal Circuit law on this issue.  More important, *Williams* applied the Supreme Court decision in *Lawlor*, which is binding precedent on this issue.

Meanwhile, BSC cites no cases that bear on the issue at hand.  Besides *Kessler v. Eldred*, 206 U.S. 285 (1907), which is discussed above at page 18, the only appellate decision cited by BSC is *Young Engineers*, 721 F.2d 1305, which presented the issue whether a prior determination of noninfringement in an ITC proceeding barred a later infringement action.  The Federal Circuit held that claim preclusion did not apply because the defendant had not shown that the same product was in issue in the two proceedings.[3]  Thus, *Young Engineers* did not address the issue presented here.[4]

Finally, BSC offers a parade of horribles, arguing that its position must be accepted if patent litigation is to have any finality.   But BSC's horribles are false.  Properly applied, the doctrines of claim and issue preclusion provide all the finality the law – and fairness – require.   Thus, if there had there been a final determination in the 03-027 case that Taxus Liberté does not infringe claim 2, or if claim 2 had been found invalid, then *issue preclusion* would bar Cordis from re-litigating these issues in a subsequent suit.  Indeed, issue preclusion

---

[3] Subsequently, the Federal Circuit has clarified the law by explaining that preclusion applies if the differences in the products in the two suits are "merely 'colorable'" or "unrelated to the limitations in the claim of the patent."  *Acumed*, 525 F.3d at 1324.

[4] BSC also cites several inapposite district court decisions.  In *Molinaro v. AT&T*, 460 F. Supp. 673 (E.D. Pa. 1978), *aff'd without opinion*, 620 F.2d 288 (3d Cir. 1980), the patent-in-suit expired *before* the judgment in the first case; as a result, that case did not involve any post-judgment acts of infringement.  In *Hemphill v. Kimberly-Clark Corp.*, 530 F. Supp. 2d 108 (D.D.C. 2008), a textbook claim preclusion case, a plaintiff who brought two prior infringement actions asserting infringement of claim 1 of a patent, both of which were disposed of on summary judgment, was precluded from bringing yet another action asserting claim 2 of the same patent against the same products of the same defendants.  *Id.* at 110-11.  In *Single Chip Sys. Corp. v. Intermec IP Corp.*, 495 F. Supp. 2d 1052 (S.D. Cal. 2007), the district court applied the doctrine of "claim-splitting" to preclude a defendant from circumventing the denial of its request for leave to file an amended counterclaim by instead filing that counterclaim as a new action.  *Id.* at 1065.

would have barred this suit if BSC won the 03-027 case on Liberté.  A prior judgment that the claim 2 was invalid would have barred Cordis from re-litigating the issue here.  A prior judgment that the Liberté stent did not infringe would have barred Cordis from re-litigating the issue here against the "essentially the same" Taxus Liberté stent.  But BSC lost those issues in the 03-027 case.  As the loser, BSC is bound by those decisions and it is BSC, not Cordis, that is barred from re-litigation now.

B.     **BSC's Argument Runs Counter to the "Interests of Justice"**

Even if BSC could satisfy the technical requirements for claim preclusion – and it cannot – its theory still would fail because it runs counter to the circumstances surrounding the 2005 dismissal.  In reliance upon statements by BSC, the Court dismissed Cordis's claim, rather than permitting it to reopen its case to present evidence of a U.S. nexus, because it believed that it could dismiss the case without prejudice, thus not interfering with Cordis's claim.  Thereafter, Cordis won its case against the Liberté stent, which removes any defense that BSC could have to selling the infringing Taxus Liberté stents.  The result BSC now seeks – immunity to begin selling an infringing stent – runs counter to the interests of justice, an essential element of any *res judicata* analysis.

BSC argues (D.I. 64 at 10) that in applying the doctrine of claim preclusion this Court should ignore the circumstances of the earlier dismissal and should ignore the interests of justice.  Controlling precedent compels the opposite conclusion.  Under Third Circuit law, claim preclusion "***should not be applied inflexibly to deny justice***."  *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972) (emphasis added).  Similarly, the Federal Circuit has held that claim preclusion will not bar claims unless it is "shown that they necessarily were included in the [prior] judgment, ***and that the interest of justice is not disserved*** …."  *Kearns*, 94

F.3d at 1556 (emphasis added), citing *Brown v. Felsen*, 442 U.S. 127, 132 (1979); *see also Sharp*, 448 F.3d at 1372 (same).[5]

The burden of demonstrating the applicability of claim preclusion – including the requirement that its application would be consistent with the interests of justice – properly rests with the party seeking to deny a litigant its day in court. *United States v. Athlone Indus., Inc.*, 746 F.2d 977, 983 (3d Cir. 1984). BSC has not met – and cannot meet – this burden. Barring a suit based on BSC's sales of Taxus Liberté beginning in 2008 would be contrary to this Court's stated intent in 2005 and contrary to the interest of justice.

When BSC moved for JMOL during the trial, asserting that Cordis had not demonstrated a U.S. nexus for Taxus Liberté, it did so pursuant to Rule 50(a)(2), Fed. R. Civ. P., which required BSC to make this motion "before the case [was] submitted to the jury." The purpose of this requirement "is to assure the responding party ***an opportunity to cure any deficiency*** in that party's proof that may have been overlooked." Advisory Committee's Note to Rule 50(a) (1991 amdt.) (emphasis added); *see also Acosta v. Honda Motor Co.*, 717 F.2d 828, 831-32 (3d Cir. 1983) (purpose of requiring JMOL motion prior to submission of a case to the jury is "to afford the [non-movant] … an '***opportunity to cure*** possibly technical defects in proof which might otherwise make his case legally insufficient'") (emphasis added), quoting *Wall v. United States*, 592 F.2d 154, 160 (3d Cir. 1979).

Consistent with these cases, Cordis responded to BSC's motion by asking for the opportunity it was permitted under the rules to correct the alleged defect in its proof, by

---

[5] *Roche*, 531 F.3d 1372, which BSC cites, involved inapposite facts and does not support a different conclusion. After losing a challenge to a patent's validity in a prior case, the defendant in *Roche* argued in a later suit that the intervening decision in the *KSR* case, *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007), entitled it to re-litigate the same validity theory that it had previously actually litigated and lost. *Roche*, 531 F.3d at 1380. In rejecting that argument, the Federal Circuit did not disturb the requirement of *Kearns* and *Sharp* that the party asserting claim preclusion must show that application of claim preclusion would be in the "interest of justice."

reopening its case-in-chief.  Thus, Cordis asked for "permission to reopen [the record] and put [in evidence]" that Taxus Liberté was being made in the U.S. for ex-U.S. sale.  As Cordis explained, any other result would be "very unfair," D.I. 368 (03-027) at 1052:18-1053:11, especially because Cordis had reasonably believed that the issue was appropriately addressed in the damages phase and had "documentary evidence" that Taxus Liberté was being "made in Minnesota" for ex-U.S. sale.  *Id.* at 1058:21-25.

During colloquy, the Court considered allowing Cordis to reopen its case-in-chief to present this evidence.  As the Court stated:  "I think the question for me is whether I allow Cordis to reopen the record to put in its evidence that it thinks it has."  *Id.* at 1066:15-18.

To avoid that result – and to obtain a dismissal of the claims involving Taxus Liberté – BSC assured the Court that a dismissal would not give it *carte blanche* to launch Taxus Liberté in the U.S. if Cordis prevailed on its infringement claims against Liberté.  For example, BSC told this Court that "[i]f we get FDA approval [for Taxus Liberté in the future] and the structure hasn't changed and we've lost this case [on Liberté], well, then, ***it would be difficult for us to sell the product without taking some steps.***"  D.I. 367 (03-027) at 1031:15-19 (emphasis added).  BSC's counsel also assured the Court that if Cordis prevailed against Liberté (as it did) and obtained an injunction, and if Liberté and Taxus Liberté were "substantially the same or colorable difference or whatever the legal words are," D.I. 368 (03-027) at 1062:9-22, then "***[i]f it was the same, we'd be in trouble.***"  *Id.* at 1063:6-15 (emphasis added)).

Ultimately, the Court did not allow Cordis to re-open the record.  However, it served the interests of justice – and acted consistent with the rationale for Rule 50(a) – by providing that the dismissal would be "without prejudice," *id.* at 1307:25-1308:2, thus preserving Cordis's ability to seek relief if and when BSC launched Taxus Liberté in the U.S.  In doing so,

the Court relied on BSC's repeated representations that a dismissal would not give it *carte blanche* to begin selling Taxus Liberté in the U.S.

Three years after the June 2008 trial, the Federal Circuit held for the first time in *Litecubes*, that the requirement of a U.S. nexus is an element of a cause of action for patent infringement, not a jurisdictional issue. 523 F.3d at 1366. And relying on *Litecubes*, the Federal Circuit held that the dismissal of the Taxus Liberté claims for failure to prove a U.S. nexus should have been "with prejudice," rather than "without prejudice." Ex. A at 33. Meanwhile, events unfolded exactly as the Court suspected they might in 2005. BSC did "get FDA approval" for Taxus Liberté in 2008, three years later. Meanwhile, "the structure hasn't changed." And, of course, by then BSC had "lost this case" on Liberté. In 2005, BSC told the Court that, in these circumstances, "well, then, ***it would be difficult for us to sell the product without taking some steps.***" D.I. 367 (03-027) at 1031:15-19 (emphasis added). The Court had reason to believe, from that colloquy, that the steps to which counsel referred were trying to get a license from Cordis or redesigning the product. Instead, contrary to the arguments on which the dismissal was granted, BSC has returned to Court to say that it is entitled to sell its infringing Taxus Liberté stent even though "the structure hasn't changed" and it "lost this case."

According to BSC, claim preclusion bars Cordis from bringing this case even though Cordis never lost a disputed issue on the merits relevant to this case and, to the contrary, has obtained a judgment, affirmed on appeal, that conclusively establishes that Taxus Liberté infringes a valid patent. BSC's argument offends the interests of justice. The dismissal should be strictly confined to the issue actually decided and the claim actually presented: Cordis should

{00296486;v1}

28

be barred from re-litigating whether any pre-2005 Taxus Liberté stents infringe the Gray patent, but left free to sue BSC over its 2008 decision to sell Taxus Liberté stents in the United States.[6]

### III.    EQUITABLE FACTORS FAVOR AN INJUNCTION

BSC does not join issue on the three key facts that warrant issuance of an injunction.

First, it does not – and cannot – dispute that it has built its entire stent business as a serial infringer, repeatedly infringing Cordis patents.  BSC's pattern of infringement began in 1998, with the NIR stent, which was adjudicated in the 97-550 case to infringe Cordis's Palmaz '762 patent.  It continued with the Express and Taxus Express stents, which were adjudicated in the 03-027 case also to infringe the '762 patent.  It continued again with BSC's Liberté stent, which was adjudicated in the 03-027 case to infringe both the '762 patent and Cordis's Gray '406 patent.  And it continues today with BSC's launch of the Taxus Liberté stent, which also infringes the Gray patent.  During the life of the Palmaz patent, every single coronary stent sold by BSC infringed that patent.

BSC has built its entire business on infringement of Cordis's patents.  At some point, enough is enough.

Second, BSC does not – and cannot – dispute that an injunction in this case would leave it free to sell two other drug-eluting stents: Promus and Taxus Express (which uses the same drug as Taxus Liberté).  BSC thus cannot contend that the balance of hardships weighs in

---

[6]  Moreover, once the mandate issues and a "with prejudice" judgment is entered consistent with the Federal Circuit's direction, the Court would have "broad discretion" to provide Cordis with relief from the judgment under Fed. R. Civ. P. 60(b).  "A motion filed pursuant to Rule 60(b) is addressed to the sound discretion of the trial court guided by accepted legal principles applied in light of all relevant circumstances."  *TruePosition, Inc. v Andrew Corp.*, 2009 WL 1173292, *5 (D. Del. April 30, 2009) (Robinson, J.).  Relief from a "with prejudice" judgment would, of course, eliminate one of the basic prerequisites for claim preclusion, *i.e.*, the requirement that there was a "final judgment" in the prior action.  *United States v. Athlone Indus., Inc.*, 746 F.2d 977, 983 (3d Cir. 1984).

{00296486;v1}

its favor.  BSC does not have a compelling interest in marketing yet another stent, one which

*does* infringe the Gray patent.  *See Callaway Golf Co. v. Acushnet Co.*, 585 F. Supp. 2d 600, 622 (D. Del. 2008) (Robinson, J.) (discounting any injury to the infringer where "the infringing balls are not defendant's only golf ball products").

Third, BSC does not dispute that there is no medical necessity for the Taxus Liberté stent.  As Cordis has demonstrated, there are numerous other drug-eluting stents available on the market – including Cordis's Cypher stent; BSC's Taxus Express and Promus stents; Abbott's Xience stent; and Medtronic's Endeavor stent.  With all of these stents on the market there is no medical necessity for another drug-eluting stent, one that infringes the Gray '406 patent.  *See*, *e.g.*, D.I. 8 at ¶¶ 10-12; D.I. 57 at ¶¶ 10-11.

Recent scientific evidence confirms this.  The results of the ZEST trial were presented to the medical community at the American College of Cardiology conference in Orlando this past March.  The ZEST trial is discussed in Dr. Buller's Supplemental Declaration dated April 30, 2009 (D.I. 63).  As explained in Dr. Buller's Supplemental Declaration, the ZEST trial was a large, multi-center trial involving more than 2600 patients.  It compared Taxus Liberté with Medtronic' Endeavor stent and Cordis's Cypher Select stent, and it is the only randomized clinical trial to date comparing Taxus Liberté to other drug-eluting stents.  Thus, it is the most specific current evidence bearing on BSC's assertion that there is a medical need for the Taxus Liberté stent.  *See* D.I. 63 at ¶¶ 3-7.

The results of the ZEST trial showed that the results with Taxus Liberté were inferior to those for both Cypher and Endeavor.  The rate of adverse consequences (including death, myocardial infarction and ischemia driven target vessel revascularization (TVR) was worse – to a statistically significant extent – for patients treated with Taxus Liberté (14.2%) than

for patients treated with Cypher (8.3%); it also was worse for Taxus Liberté patients than for Endeavor patients (10.1%). *Id.*

Other recent clinical trials have yielded similar results. For example, the three-year results from the SPIRIT II trial, which also were presented in Orlando this past March, showed that patients treated with BSC's paclitaxel stents (including Taxus Express and Taxus Liberté) had significantly more adverse cardiac events (MACE) than patients treated with Abbott's Xience stent. *See* D.I. 63 at ¶ 8.

These recently available studies provide additional scientific evidence that there is no medical necessity for the infringing Taxus Liberté stent. Unlike the situation in 2003, when this Court denied a preliminary injunction against Taxus Express, today there are many drug-eluting stents on the market – including Cordis's Cypher stent, Medtronic's Endeavor stent, Abbott's Xience stent and BSC's own Taxus Express, Taxus Liberté and Promus stents. Removing Taxus Liberté from this list would still leave physicians with ample choices among drug-eluting stents. The availability of these other alternatives weighs in favor of injunctive relief. *Acumed LLC v. Stryker Corp.*, 525 F.3d 1319, 1331 (2008).

## CONCLUSION

For the reasons set forth above and in Cordis's previous briefs in support of its motion for a preliminary injunction, this Court should grant Cordis's motion for summary judgment and deny BSC's motion to dismiss this case on *res judicata* grounds.

In addition, this Court should grant Cordis's motion for a preliminary injunction and a permanent injunction, prohibiting the manufacture and sale of Taxus Liberté in the U.S.

ASHBY & GEDDES

*/s/ Tiffany Geyer Lydon*

_____

Steven J. Balick (I.D. #2114)
John G. Day (I.D. #2403)
Tiffany Geyer Lydon (I.D. #3950)
500 Delaware Avenue, 8th Floor
P.O. Box 1150
Wilmington, Delaware  19899-1150
(302) 654-1888
sbalick@ashby-geddes.com
jday@ashby-geddes.com

*Of Counsel*:                                          tlydon@ashby-geddes.com

Gregory L. Diskant                           *Attorneys for Plaintiff Cordis Corporation*
Eugene M. Gelernter
Kathleen M. Crotty
Christopher M.P. Jackson
Leonard Braman
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036
(212) 336-2000

Dated:  May 13, 2009

# EXHIBIT A

# United States Court of Appeals for the Federal Circuit

2008-1003, -1072

CORDIS CORPORATION,

Plaintiff-Appellant,

v.

BOSTON SCIENTIFIC CORPORATION
and SCIMED LIFE SYSTEMS, INC.,

Defendants-Cross Appellants.

Gregory L. Diskant, Patterson, Belknap Webb & Tyler LLP, of New York, New York, argued for plaintiff-appellant. With him on the brief were Eugene M. Gelernter, Thomas W. Pippert, Kathleen M. Crotty, Scott W. Parker and Scott B. Howard. Of counsel was Michael J. Timmons. Of counsel on the brief was Constantine L. Trela, Jr., Sidley Austin LLP, of Chicago, Illinois.

John M. Desmarais, Kirkland & Ellis LLP, of New York, New York, argued for defendants-cross appellants. With him on the brief were Peter J. Armenio, Young J. Park and Timothy K. Gilman.

Appealed from: United States District Court for the District of Delaware

Judge Sue L. Robinson

# United States Court of Appeals for the Federal Circuit

2008-1003, -1072

CORDIS CORPORATION,

Plaintiff-Appellant,

v.

BOSTON SCIENTIFIC CORPORATION
and SCIMED LIFE SYSTEMS, INC.,

Defendants-Cross Appellants.

Appeals from the United States District Court for the District of Delaware
in case no. 03-CV-027, Judge Sue L. Robinson.

_____

DECIDED:    March 31, 2009

_____

Before MAYER and DYK, <u>Circuit Judges</u>, and HUFF, <u>District Judge.</u>[*]

DYK, <u>Circuit Judge</u>.

Cordis Corporation ("Cordis") appeals, and Boston Scientific Corporation and Scimed Life Systems, Inc. ("Boston Scientific") cross-appeal, from a final judgment of the United States District Court for the District of Delaware. The judgment was based on two separate jury verdicts of infringement: (1) infringement by Boston Scientific of claims 1 and 23 of U.S. Patent No. 4,739,762 ("the '762 patent") and claim 2 of U.S. Patent No. 5,895,406 ("the '406 patent"), and (2) infringement by Cordis of claim 36 of U.S. Patent No. 5,922,021 ("the '021 patent"). The judgment also determined that those

_____

[*] Honorable Marilyn L. Huff, District Judge, United States District Court for the Southern District of California, sitting by designation.

claims were not invalid.  Cordis Corp. v. Boston Scientific Corp., Civ. No. 03-027-SLR (D. Del. Sept. 24, 2007) (judgment).  With one minor exception, we affirm.

BACKGROUND

Cordis and Boston Scientific own patents relating to intravascular stents, which are cylindrical lattice-like scaffolds inserted into a blood vessel and then expanded, often by using a balloon catheter, in order to hold the vessel open.  Cordis owns the '762 patent and the '406 patent, and Boston Scientific owns the '021 patent.

In January 2003, Cordis filed suit against Boston Scientific, alleging that several of Boston Scientific's stents infringe various claims of the '762 patent and the '406 patent.  Boston Scientific counterclaimed, alleging that several of Cordis's stents infringe various claims of the '021 patent.  The district court denied Cordis's motion for a preliminary injunction against sales of one of Boston Scientific's stents, and we affirmed. Cordis Corp. v. Boston Scientific Corp., 99 F. App'x 928 (Fed. Cir. 2004).

We treat the Cordis claims and the Boston Scientific claims separately.  Since Cordis is the appellant, we first discuss Boston Scientific's claims against Cordis that are the subject of the Cordis appeal.

The Boston Scientific claims:  The jury returned a verdict in July 2005 that (a) Cordis's Cypher, BX Velocity, BX Sonic, and Genesis stents do not literally infringe claim 36 of the '021 patent; (b) "the Cypher, BX Velocity, BX Sonic and Genesis stents infringe the 'corners' limitation of claim 36 of the '021 patent under the doctrine of equivalents"; and (c) claim 36 of the '021 patent is not invalid for obviousness. Cordis Corp. v. Boston Scientific Corp., Civ. No. 03-027-SLR, 2006 WL 1305227, at *1 (D. Del.

2008-1003, -1072                                    2

May 11, 2006) ("Memorandum Opinion"). The district court denied Cordis's motion for judgment as a matter of law or, in the alternative, a new trial.

The Cordis claims: On summary judgment, the district court determined that claims 1 and 23 of the '762 patent were not invalid. A separate jury returned a verdict in favor of Cordis in June 2005 that (a) Boston Scientific's Express, Taxus Express, Express Biliary, and Liberté stents literally infringe claim 23 of the '762 patent; (b) Boston Scientific induced literal infringement of claim 1 of the '762 patent with respect to these stents; (c) the Liberté stent literally infringes claim 2 of the '406 patent; and (d) claim 2 of the '406 patent is neither anticipated nor rendered obvious by the prior art. The district court denied Boston Scientific's motion for judgment as a matter of law or, in the alternative, a new trial.

After the district court entered judgment, Cordis and Boston Scientific both timely appealed. We have jurisdiction under 28 U.S.C. §§ 1291, 1292(c)(2), and 1295(a)(1).

## DISCUSSION

We review the denial of a motion for judgment as a matter of law without deference, and we review the denial of a motion for a new trial for abuse of discretion. Hewlett-Packard Co. v. Mustek Sys., Inc., 340 F.3d 1314, 1318 (Fed. Cir. 2003). Each party raises issues that have little merit. We dispose of those arguments summarily, reserving more extended discussion for the few issues that merit attention.

2008-1003, -1072                3

I

We first address Cordis's appeal.

## A. "Wherein" clause construction

Cordis challenges the judgment that its BX Velocity stent infringes claim 36 of the '021 patent. Claim 36 depends from claim 24, which in turn depends from claim 23. '021 patent col.22 l.42, col.21 l.16.

The procedural posture of this issue is unclear. The jury found that the accused Cordis stents do not literally infringe claim 36 of the '021 patent. Instead of addressing whether Cordis's stents infringed claim 36 under the doctrine of equivalents, the jury was asked only to determine whether Cordis's stents "infringe the 'corners' limitation of claim 36 of the '021 patent under the doctrine of equivalents." J.A. at 11,238. The jury found that the "corners" limitation was infringed under the doctrine of equivalents. Apparently the parties agreed that the BX Velocity stent infringes all limitations of claim 36 (if properly construed by the district court) except the "corners" limitation, but the parties provided no reference in the record reflecting this agreement. However, the district court entered judgment of infringement of claim 36, and we assume that the judgment rests upon such an agreement.

Cordis first argues that the district court erred in construing the "wherein" clause of claim 23, and that under a proper construction of this clause Cordis's BX Velocity stent does not infringe claim 36.[1] The "wherein" clause of claim 23 describes how the

---

[1]    This argument does not apply to Cordis's Cypher, BX Sonic, and Genesis stents.

struts within one expansion column or ring of a stent are connected to the struts of another column or ring,

> wherein the first expansion strut of the first expansion strut pair in the first expansion column has a longitudinal axis offset from a longitudinal axis of the first expansion strut of the second expansion strut pair in the second expansion column.

'021 patent col.21 ll.11-15 (emphasis added). The district court construed this "wherein" clause in claim 23 to mean "the first expansion strut in the first column does not share a longitudinal axis with the second expansion strut in the second column." Cordis Corp. v. Boston Scientific Corp., Civ. No. 03-027-SLR, 2005 WL 1322966, at *2 (D. Del. June 3, 2005) ("Claim Construction"). The district court refused to construe the "wherein" clause in claim 23 to exclude so-called "180 degrees out of phase" stent designs.

Claim construction is an issue of law, Markman v. Westview Instruments, Inc., 52 F.3d 967, 970-71 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996), that we review without deference, Cybor Corp. v. FAS Technologies Inc., 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc).

Cordis urges that the district court's construction improperly failed to exclude stents whose strut pairs are arranged "180 degrees out of phase," a phrase that both parties agree is in common usage in stent design. In such a 180-degree out-of-phase arrangement, the struts within each expansion column or ring are connected to form pairs, and the connected ends of the pairs in one ring face the connected ends of the pairs in the next ring, forming a mirror-image pattern. Cordis argues that if claim 23 excludes such 180-degree out-of-phase designs, then Cordis's BX Velocity stent (which

uses a 180-degree out-of-phase design) would not infringe claim 36. Cordis illustrated the 180-degree out-of-phase design with a diagram:



The BX Velocity

Br. for Pl.-Appellant Cordis Corp. 3.

Cordis argues that the same "wherein" clause appears in both claim 1 and claim 23; that the clauses must have the same meaning; and that the prosecution history shows that the "wherein" clause excludes 180-degree out-of-phase designs. Cordis's argument is a bit confusing. The issue is not the meaning of the "wherein" clause. Rather, the problem stems from the fact that claim 23 and claim 1 use different numbering systems, so that, for example, the "first expansion strut of the second expansion strut pair in the second expansion column" is not the same strut in claim 23 as in claim 1.

Under the numbering system of claim 1, each strut in a column or ring is either the "first" or "second" strut of a pair, each pair in the first ring is a "first . . . pair," and each pair in the second ring is a "second . . . pair."[2] Thus in claim 1, the "wherein"

---

[2]    Claim 1 of the '021 patent states:

1. A stent in a non-expanded state, comprising:
    a <u>first expansion strut pair</u> including a <u>first expansion strut</u> positioned adjacent to a <u>second expansion strut</u> and a joining strut of the first expansion strut pair that couples the first and

clause requires the first strut of every strut pair in the first ring to be offset from the first strut of every strut pair in the second ring, which would not be possible in a 180-degree out-of-phase design. However, under the numbering system of claim 23, each strut in a ring is individually numbered "first . . . second . . . third . . . fourth . . . ," each pair in the first ring is individually numbered "first . . . second . . . third . . . fourth . . . ," and each pair in the second ring is individually numbered "first . . . second . . . third . . . fourth

---

second expansion struts at a distal end of the first expansion strut pair, a plurality of the first expansion strut pair forming a first expansion column;

a second expansion strut pair including a first expansion strut positioned adjacent to a second expansion strut and a joining strut of the second expansion strut pair that couples the first and second expansion struts of the second expansion strut pair at a proximal end of the second expansion strut pair, a plurality of the second expansion strut pair forming a second expansion column;

a first connecting strut including a first connecting strut proximal section, a first connecting strut distal section and a first connecting strut intermediate section, the first connecting strut proximal section being coupled to the distal end of the first expansion strut pair in the first expansion column and the first connecting strut distal section being coupled to the proximal end of the second expansion strut pair of the second expansion column, a plurality of the first connecting strut forming a first connecting strut column that couples the first expansion column to the second expansion column, the first connecting strut intermediate section being non-parallel to the first connecting strut proximal and distal sections, wherein the first expansion strut of the first expansion strut pair in the first expansion column has a longitudinal axis offset from a longitudinal axis of the first expansion strut of the second expansion strut pair in the second expansion column.

'021 patent col.18 ll.9-41 (emphases added).

2008-1003, -1072                    7

. . . ."[3]  Thus in claim 23, the "wherein" clause requires only one specific strut (the first

---

[3]  Claim 23 of the '021 patent states:

23. A stent in a non-expanded state, comprising:

a first expansion column formed of a plurality of first expansion column strut pairs, a <u>first expansion strut pair</u> including a <u>first expansion strut</u> adjacent to a <u>second expansion strut</u> and a first joining strut that couples the first and second expansion struts at a proximal end of the first expansion strut pair, <u>a second expansion strut pair</u> including a <u>third expansion strut</u> adjacent to the second expansion strut and a second joining strut that couples the second and third expansion struts at a distal end of the second expansion strut pair, a <u>third expansion strut pair</u> including a <u>fourth expansion strut</u> adjacent to the third expansion strut and a third joining strut that couples the third and fourth expansion struts at a proximal end of the third expansion strut pair, a <u>fourth expansion strut pair</u> including a <u>fifth expansion strut</u> adjacent to the fourth expansion strut and a fourth joining strut that couples the fourth and fifth expansion struts at a distal end of the fourth expansion strut pair, a first expansion strut pair <u>first corner</u> formed where the first joining strut is coupled to the first expansion strut, and a first expansion strut pair <u>second corner</u> formed where the first joining strut is coupled to the second expansion strut, and a second expansion strut pair <u>first corner</u> formed where the second joining strut is coupled to the second expansion strut, and a second expansion strut pair <u>second corner</u> formed where the second joining strut is coupled to the third expansion strut, and a third expansion strut pair <u>first corner</u> formed where the third joining strut is coupled to the third expansion strut, and a third expansion strut pair <u>second corner</u> formed where the third joining strut is coupled to the fourth expansion strut, and a fourth expansion strut pair <u>first corner</u> formed where the fourth joining strut is coupled to the fourth expansion strut, and a fourth expansion strut pair <u>second corner</u> formed where the fourth joining strut is coupled to the fifth expansion strut;

a second expansion column formed of a plurality of second expansion column strut pairs, a <u>first expansion strut pair</u> including a <u>first expansion strut</u> adjacent to a <u>second expansion strut</u> and a first joining strut that couples the first and second expansion struts at a proximal end of the first expansion strut pair, a <u>second expansion strut pair</u> including a <u>third expansion strut</u> adjacent to the second expansion strut and a second joining strut that couples the second and third expansion struts

at a distal end of the second expansion strut pair, a <u>third expansion strut pair</u> including a <u>fourth expansion strut</u> adjacent to the third expansion strut and a third joining strut that couples the third and fourth expansion struts at a proximal end of the third expansion strut pair, a <u>fourth expansion strut pair</u> including a <u>fifth expansion strut</u> adjacent to the fourth expansion strut and a fourth joining strut that couples the fourth and fifth expansion struts at a distal end of the fourth expansion strut pair, a first expansion strut pair <u>first corner</u> formed where the first joining strut is coupled to the first expansion strut, and a first expansion strut pair <u>second corner</u> formed where the first joining strut is coupled to the second expansion strut, and a second expansion strut pair <u>first corner</u> formed where the second joining strut is coupled to the second expansion strut, and a second expansion strut pair <u>second corner</u> formed where the second joining strut is coupled to the third expansion strut, and a third expansion strut pair <u>first corner</u> formed where the third joining strut is coupled to the third expansion strut, and a third expansion strut pair <u>second corner</u> formed where the third joining strut is coupled to the fourth expansion strut, and a fourth expansion strut pair <u>first corner</u> formed where the fourth joining strut is coupled to the fourth expansion strut, and a fourth expansion strut pair <u>second corner</u> formed where the fourth joining strut is coupled to the fifth expansion strut; and

a first connecting strut column formed of a plurality of first connecting struts, each connecting strut of the first connecting strut column including a connecting strut proximal section, a connecting strut distal section and a connecting strut intermediate section, a first connecting strut proximal section is coupled to the joining strut of the second expansion strut pair of the first expansion strut column, and a first connecting strut distal section is coupled to the joining strut of the first expansion strut pair of the second expansion strut column, and a second connecting strut proximal section is coupled to the joining strut of the fourth expansion strut pair of the first expansion strut column, and a second connecting strut distal section is coupled to the joining strut of the third expansion strut pair of the second expansion strut column, the first connecting strut intermediate section being non-parallel to the first connecting strut proximal and distal sections <u>wherein the first expansion strut of the first expansion strut pair in the first expansion column has a longitudinal axis offset from a longitudinal axis of the first expansion strut of the second expansion strut pair in the second expansion column.</u>

'021 patent col.19 l.53 – col.21 l.15 (emphases added).

2008-1003, -1072                              9

strut of the first pair in the first ring) to be offset from one other specific strut (the "first expansion strut of the second expansion strut pair" in the second ring).    Cordis numbered a figure from the '021 patent (also known as the Jang patent) to illustrate these different numbering systems:



Br. for Pl.-Appellant Cordis Corp. 40.  Because these two specific struts could be offset from each other but yet aligned with other struts to form a 180-degree out-of-phase pattern, the language of claim 23 includes 180-degree out-of-phase designs.  Indeed, the parties appear to agree that on their face claim 1 and claim 23 each use a different

numbering system to describe the relative arrangement of a stent's struts, with the result that the claim 23 "wherein" clause does not exclude 180-degree out-of-phase designs. The question is whether the prosecution history requires that, despite its plain language, the "wherein" clause of claim 23 be construed to use the same numbering system as claim 1. Cordis argues that the prosecution history reflects such a "clear and unmistakable" disclaimer. Free Motion Fitness, Inc. v. Cybex Int'l, Inc., 423 F.3d 1343, 1353 (Fed. Cir. 2005); see also Omega Eng'g, Inc., v. Raytek Corp., 334 F.3d 1314, 1325-26 (Fed. Cir. 2003). We cannot agree.

The "wherein" clause was added to claims 1 and 23 during the prosecution of the '021 patent after the examiner rejected both claims as anticipated by European Patent Application No. 95307687.4, Pub. No. 0 709 067 A2 ("Pinchasik"). Pinchasik discloses a stent whose struts are arranged in a 180-degree out-of-phase design but whose struts are not numbered. During the first office action, the examiner rejected claims 1 and 23 as anticipated by Pinchasik, coloring one of Pinchasik's stent design figures and numbering parts of the figure (labeled "Figure 2") according to the numbering system of claim 1 of the '021 patent.[4] The examiner's numbering system is, however, different than claim 23's numbering system. The examiner's rejection in light of Pinchasik made no reference to 180-degree out-of-phase designs, but simply stated that claim 1, claim 23, and other claims "are rejected under 35 U.S.C. § 102(b) as being anticipated by Pinchasik" and that "[w]ith respect to [these claims] . . . refer to the modified Figure 2

---

[4]    The exhibit included at page 7994 of the Joint Appendix shows that the examiner colored in and labeled the figure from Pinchasik, but does not disclose numbering of the figure by the examiner. The parties appear not to dispute that the examiner did number the figure according to the numbering system of claim 1 of the '021 patent.

attached to this office action." J.A. at 1705. After the "wherein" clause was added to claims 1 and 23, the examiner allowed both claims. Cordis argues that the examiner used only the numbering system of claim 1 when allowing both claim 1 and claim 23, and that the examiner necessarily assumed that claim 23 used the same numbering system as claim 1. However, the examiner did not say so, and we cannot simply suppose that the claims were allowed based on an assumed identity of numbering systems. We note that Cordis does not argue that Pinchasik anticipates claim 23 of the '021 patent under the district court's claim construction, which suggests that the examiner could have allowed the claim on other grounds. Cordis also argues that both the applicant and the examiner referred to stent pairs as "longitudinally offset," but these references simply repeat the "wherein" clause and say nothing about different numbering systems. Finally, on the disclaimer issue, Cordis argues that the '021 patent's provisional application described the invention as consisting of stents whose flexibility depended on connections between "split level" (and thus offset) strut pairs, but again this language in the provisional application did not discuss the system for numbering these connected strut pairs. A disclaimer must be "clear and unmistakable," and unclear prosecution history cannot be used to limit claims. Free Motion Fitness, 423 F.3d at 1352-53; see also Inverness Med. Switz. GmbH v. Warner Lambert Co., 309 F.3d 1373, 1381-82 (Fed. Cir. 2002). The plain language of claim 23 cannot be overcome by such unclear prosecution history. Although Cordis urges that no figure in the '021 patent uses a 180-degree out-of-phase design, a patent is not confined to its disclosed embodiments. See Phillips v. AWH Corp., 415 F.3d 1303, 1323 (Fed. Cir. 2005) (en banc).

2008-1003, -1072                         12

We affirm the district court's construction of the "wherein" clause in claim 23 of the '021 patent.

## B. Corners limitation

Alternatively, Cordis argues that the judgment of infringement of claim 36 of the '021 patent by the BX Velocity stent should be set aside, because the jury erred in concluding that the "corners" limitation of claim 36 was satisfied under the doctrine of equivalents, and because the district court erred in denying judgment as a matter of law on this ground. The "corners" limitation appears both in the language of claim 36 itself and in claim 23, on which claim 36 depends.[5]  Cordis does not dispute the district court's construction of "corners" as "a place where two surfaces meet to form an angle." Claim Construction, 2005 WL 1322966, at *1.

First, Cordis argues that the evidence did not support the jury's verdict of infringement of this limitation under the doctrine of equivalents. A jury's determination of infringement is a question of fact that we review to consider whether it is supported by substantial evidence. B. Braun Med., Inc. v. Abbott Labs., 124 F.3d 1419, 1423 (Fed. Cir. 1997).

---

[5]    Claim 36 of the '021 patent states:

36.  The stent of claim 24, wherein the first connecting strut proximal section is coupled to the <u>second corner</u> of the second expansion strut pair of the first expansion strut column, and the first connecting strut distal section is coupled to the <u>first corner</u> of the first expansion strut pair of the second expansion strut column, and the second connecting strut proximal section is coupled to the <u>second corner</u> of the fourth expansion strut pair of the first expansion strut column, and the second connecting strut distal section is coupled to the <u>first corner</u> of the third expansion strut pair of the second expansion strut column.

'021 patent col.22 ll.42-52 (emphases added).

2008-1003, -1072                    13

The district court properly found that Boston Scientific presented sufficient expert testimony that Cordis's BX Velocity stent meets the "corners" limitation of claim 36 under the doctrine of equivalents under the function-way-result test of Graver Tank & Manufacturing Co. v. Linde Air Products Co., 339 U.S. 605, 608 (1950), a test that is still useful under Warner-Jenkinson Co. v. Hilton-Davis Chemical Co., 520 U.S. 17, 39-40 (1997), particularly for mechanical inventions.   Boston Scientific's expert Dr. Moore testified that the "corners" in claim 36 and the circular arcs or rounded corners of the BX Velocity stent both function as actual and potential reference points for joining adjacent stent rings, fulfill this function through their similar locations, and can or do result in offset connections between stent rings.   Such testimony fulfills Boston Scientific's obligation to "provide particularized testimony and linking argument . . . with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents."   Tex. Instruments Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1567 (Fed. Cir. 1996).

Cordis next argues that the doctrine of equivalents should not be applied in this case because the jury's finding of infringement vitiated the "corners" limitation.[6]  Cordis asserts that the circular arcs of the BX Velocity stent cannot "form an angle" as required by the district court's claim construction.  Whether the doctrine of equivalents vitiated a patent claim is a question of law we review de novo.  Pfizer, Inc. v. Teva Pharms. USA, Inc., 429 F.3d 1364, 1379 (Fed. Cir. 2005).

---

[6]    Cordis also argues that circular arcs were disclaimed.  We find no basis for this in the prosecution history of the '021 patent.

The district court properly found that vitiation did not bar a doctrine of equivalents analysis here. Although we have "refused to apply the doctrine [of equivalents] . . . where the accused device contained the antithesis of the claimed structure," Planet Bingo, LLC v. GameTech International, Inc., 472 F.3d 1338, 1345 (Fed. Cir. 2006), the circular arcs of the BX Velocity are not antithetical to the "corners" limitation in claim 36 of the '021 patent. Boston Scientific's theory that the circular arcs of the BX Velocity stent are equivalent to the "corners" in claim 36 does not vitiate the "corners" limitation, because it does not "render[ ] the pertinent limitation meaningless," Freedman Seating Co. v. Am. Seating Co., 420 F.3d 1350, 1359 (Fed. Cir. 2005), or "effectively eliminate that element in its entirety," Warner-Jenkinson, 520 U.S. at 29. See Primos, Inc. v. Hunter's Specialties, Inc., 451 F.3d 841, 850 (Fed. Cir. 2006).

We affirm the district court's denial of Cordis's motions for judgment as a matter of law or, in the alternative, a new trial on infringement of the '021 patent.

## C. New claim construction arguments

Cordis argues that the district court improperly declined after trial to adopt a new construction of "expansion columns" and "connecting strut columns" in the claims of the '021 patent. In a motion for judgment as a matter of law on infringement of the '021 patent, Cordis raised for the first time the argument that the district court should adopt the construction of these terms that Boston Scientific had advocated in a different case relating to the '021 patent.[7] The district court declined to do so. Cordis Corp. v. Boston

---

[7] The claim construction Cordis urged the district court to adopt was appealed to this court and has since been vacated and remanded. Jang v. Boston Scientific Corp., 532 F.3d 1330, 1331 (Fed. Cir. 2008).

Scientific Corp., Civ. Nos. 03-027-SLR, 03-283-SLR, 2007 WL 2775087, at *1 (D. Del. Sept. 24, 2007).

Raising this argument for the first time in a motion for judgment as a matter of law more than a year after the jury's infringement verdict was too late. "[L]itigants waive their right to present new claim construction disputes if they are raised for the first time after trial." Conoco, Inc. v. Energy & Envtl. Int'l, L.C., 460 F.3d 1349, 1359 (Fed. Cir. 2006); see also Abbott Labs. v. Syntron Bioresearch, Inc. 334 F.3d 1343, 1357 (Fed. Cir. 2003). The district court properly declined to revise its claim construction in response to Cordis's argument.

### D. Indefiniteness

Cordis asserts that the district court erred in finding that claim 23 of the '021 patent is not indefinite. Cordis argues that claim 36, and claim 23 on which it depends, are invalid unless claim 23's "wherein" clause is construed to exclude 180-degree out-of-phase designs. Indefiniteness under 35 U.S.C. § 112 ¶ 2 is an issue of claim construction and a question of law that we review de novo. Praxair, Inc. v. ATMI, Inc., 543 F.3d 1306, 1319 (Fed. Cir. 2008). We see no basis for Cordis's argument. Claim 23 as construed by the district court is not indefinite.

### E. Obviousness

Cordis argues that the jury erred in finding that claim 36 of the '021 patent was not invalid for obviousness, and that the district court erred in denying Cordis's motion for judgment as a matter of law of obviousness.

The '021 patent claims priority to its provisional application. '021 patent col.1 ll.6-8. Cordis first argues that the district court should have ruled as a matter of law that the

'021 patent was not entitled to a priority date of April 26, 1996 (when the '021 patent's provisional application was filed), and that the correct priority date is April 25, 1997 (when the '021 patent's non-provisional application was filed). Cordis asserts that the priority date is important because after April 26, 1996, and before April 25, 1997, inventors had created stents that demonstrated that claim 36 of the '021 patent was invalid as obvious under 35 U.S.C. § 103. Cordis's basis for challenging the priority date is its theory that the '021 patent's April 1996 provisional application did not provide a sufficient written description of the patent's limitations, namely the limitation of claim 36 requiring connecting struts to be attached on one end at a "second" or bottom corner of a strut pair and on the other end at a "first" or top corner.

The written description requirement of 35 U.S.C. § 112 ¶ 1 is a question of fact, and we review a jury's findings of fact relating to the written description requirement for substantial evidence. PIN/NIP, Inc. v. Platte Chem. Co., 304 F.3d 1235, 1243 (Fed. Cir. 2002). To comply with the written description requirement, an applicant must "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention," New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co., 298 F.3d 1290, 1295 (Fed. Cir. 2002) (quoting Vas-Cath Inc. v. Mahurkar, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991) (emphasis omitted)), namely that he or she "had invented each feature that is included as a claim limitation," New Railhead, 298 F.3d at 1295. The district court cited uncontradicted testimony from Boston Scientific's expert Dr. Moore that the '021 patent's provisional application provided a sufficient written description of the limitations of claim 36. We conclude that the jury could properly find that the '021 patent was entitled to an April 1996 priority date.

2008-1003, -1072                    17

Cordis alternatively argues that regardless of whether the '021 patent has a priority date of April 1996 or April 1997, several earlier patents[8] were prior art rendering claim 36 obvious. Cordis asserts that it would have been obvious to one of ordinary skill in the art to combine features of these patents to create stents with the bottom-corner-to-top-corner connecting struts disclosed in claim 36 of the '021 patent.

"We review '[the] jury's conclusions on obviousness, a question of law, without deference, and the underlying findings of fact . . . for substantial evidence.'" Johns Hopkins Univ. v. Datascope Corp., 543 F.3d 1342, 1345 (Fed. Cir. 2008) (quoting LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc., 275 F.3d 1347, 1353 (Fed. Cir. 2001)). The district court cited uncontradicted testimony from Boston Scientific's expert Dr. Moore that the prior art patents cited by Cordis would be unlikely to be combined to create the connectors of claim 36 of the '021 patent, and that these prior art patents taught away from the bottom-to-top connectors described in claim 36 by describing features of such connectors as potentially harmful. The district court properly concluded there was substantial evidence that these prior art patents did not render claim 36 obvious.

We affirm the district court's denial of Cordis's motion for judgment as a matter of law or, in the alternative, a new trial on invalidity of the '021 patent.

---

[8]    U.S. Patent Nos. 5,102,417; 5,449,373; 5,643,312; 5,733,303; and 6,348,065.

2008-1003, -1072                    18

II

We next address Boston Scientific's cross-appeal.

A. Monographs

Boston Scientific argues that the district court erred in holding that two monographs prepared by the inventor of the '762 patent are not prior art, and erred in granting Cordis's motion for summary judgment that the asserted claims of the '762 patent are not invalid "as to the asserted claims being invalidated by the Palmaz Monographs." Cordis Corp. v. Boston Scientific Corp., Civ. No. 03-027-SLR (D. Del. June 3, 2005) (summary judgment order).

If there are no facts in dispute, whether a reference is a prior art "printed publication" within the meaning of 35 U.S.C. § 102(b) is a question of law.[9] In re Klopfenstein, 380 F.3d 1345, 1347 (Fed. Cir. 2004). Because the facts of the distribution of Dr. Palmaz's monographs are not in dispute, we review de novo the issue of whether the monographs are prior art printed publications.

In 1980 the inventor of the '762 patent, Dr. Palmaz, prepared a ten-page paper describing his work on stents. This paper is the "1980 monograph." At that time he was a resident at a hospital in California. His name was not on the paper. He gave copies of the paper to approximately six of his teachers at an oral presentation of his work to these physicians and several other colleagues. Pursuant to agreements, Palmaz later gave copies of the monograph to two companies (Vascor, Inc., and Shiley, Inc.) while

---

[9]    Under 35 U.S.C. § 102, "[a] person shall be entitled to a patent unless . . . (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

attempting to commercialize his stent technology.[10]    Neither agreement required confidentiality, and the Shiley agreement specifically stated that Shiley "shall not be committed to keep secret any idea or material submitted." J.A. at 19,473.  In 1983 Dr. Palmaz revised the paper; the revised paper became the "1983 monograph."  In 1983 he also gave a copy of both monographs to Werner Schultz, a technician from whom Dr. Palmaz was seeking fabrication assistance.  When Dr. Palmaz joined the faculty in 1983 at the University of Texas, San Antonio, he gave a copy of the 1983 monograph to a doctor there (who then gave it to the technician setting up Dr. Palmaz's laboratory) and to the university as part of a research proposal.  Dr. Palmaz applied for the patent that became the '762 patent in 1985.

A document is publicly accessible if it "has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation." In re Wyer, 655 F.2d 221, 226 (CCPA 1981) (quoting I.C.E. Corp. v. Armco Steel Corp., 250 F. Supp. 738, 743 (S.D.N.Y.1966)).  In general, "[a]ccessibility goes to the issue of whether interested members of the relevant public could obtain the information if they wanted to." Constant v. Advanced Micro-Devices, Inc., 848 F.2d 1560, 1569 (Fed. Cir. 1988).  Many of our cases in this area have concerned publications available in libraries, and the question has been whether the publication has been sufficiently indexed to be publicly accessible. See, e.g., In re Cronyn, 890

---

[10]    The parties here agree that there is no evidence that copies of the monographs were given to a third commercial entity, Cook Inc., before the critical date of the '021 patent.

2008-1003, -1072                20

F.2d 1158, 1161 (Fed. Cir. 1989); In re Hall, 781 F.2d 897, 899 (Fed. Cir. 1986); In re Wyer, 655 F.2d at 226. Other cases have involved widespread distribution so that the public could easily obtain copies of the publication. See, e.g., Kyocera Wireless Corp. v. Int'l Trade Comm'n, 545 F.3d 1340, 1350-51 (Fed. Cir. 2008).

Here we have a somewhat different question: whether the distribution to a limited number of entities without a legal obligation of confidentiality renders the monographs printed publications under § 102(b). We have held that where a distribution is made to a limited number of entities, a binding agreement of confidentiality may defeat a finding of public accessibility. But we have also held that such a binding legal obligation is not essential. Klopfenstein, 380 F.3d at 1351. We have noted that "[w]here professional and behavioral norms entitle a party to a reasonable expectation" that information will not be copied or further distributed, "we are more reluctant to find something a 'printed publication.'" [11] Id. at 1350-51.

We first discuss Dr. Palmaz's distribution of copies of his monographs to his university and hospital colleagues. We have recognized the importance of "preserv[ing] the incentive for inventors to participate in academic presentations or discussions" by noting that professional norms may support expectations of confidentiality. Id. at 1351. The record here contains clear evidence that such academic norms gave rise to an

---

[11] In the public use context of § 102(b), we have similarly noted that a lack of an express promise of confidentiality is not determinative of public use, but is instead "one factor to be considered in assessing all the evidence." Bernhardt, L.L.C. v. Collezione Europa USA, Inc., 386 F.3d 1371, 1379 (Fed. Cir. 2004) (quoting Moleculon Research Corp. v. CBS, Inc., 793 F.2d 1261, 1266 (Fed. Cir. 1986)), abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc., 543 F.3d 665 (Fed. Cir. 2008) (en banc); see also Invitrogen Corp. v. Biocrest Mfg., L.P., 424 F.3d 1374, 1382 (Fed. Cir. 2005).

expectation that disclosures will remain confidential.[12]    Cordis's expert Dr. Buller

testified that the "code of practice which occurs worldwide in academic circles, in

departments, in medicine" includes treating a document describing scientific research in

the "same confidential manner as you would if you had been given it directly by the

author."   J.A. at 8540-41.   The district court properly concluded that Dr. Palmaz's

distribution of the monographs to his academic and research colleagues did not render

the monographs prior art printed publications.

However, Boston Scientific urges that, even if the academic and hospital

distributions did not create public accessibility, the distribution of monographs to two

commercial entities did so.   These distributions occurred during attempts to interest the

two companies in development of Dr. Palmaz's stent designs.   There is no claim here

that the two commercial entities provided any express agreement to keep the document

confidential; indeed, one entity's disclosure agreement did not discuss the entity's

confidentiality obligations, and the other entity's disclosure agreement specifically

disclaimed such obligations (most likely to avoid a lawsuit resulting from inadvertent

disclosure).   Boston Scientific argues that under the decision of our predecessor court,

the Court of Claims, in <u>Garrett Corp. v. United States</u>, "[w]hile distribution [of a

government report] to government agencies and personnel alone may not constitute

publication, distribution to commercial companies without restriction on use clearly

does." 422 F.2d 874, 878 (Ct. Cl. 1970) (citation omitted).

---

[12]    The only potentially contrary testimony is a statement in a report by
Boston Scientific's expert that a "colleague, faculty member or other recipient [of the
monographs] . . . would be under no obligation to maintain the disclosure in confidence."
J.A. at 19,386. As we have discussed, whether or not recipients have a legal obligation
to maintain confidentiality is not determinative.

2008-1003, -1072                    22

However, the evidence here was sufficient to support a conclusion that there was an expectation of confidentiality between Dr. Palmaz and each of the two commercial entities. While the Shiley legal agreement executed before development discussions disclaimed a confidentiality requirement, Dr. Palmaz testified that he requested confidentiality during subsequent discussions and was "surprise[d]" when he was shown the language of the Shiley agreement. J.A. at 8517; id. at 19,354. There is no suggestion that the request for confidentiality was not, in fact, honored. Dr. Palmaz confirmed that the entities kept their copies of the monograph confidential, whether or not they were legally obligated to do so. J.A. at 8502. The district court noted that "there is no evidence that [the commercial entities] would have distributed, or in fact did distribute, the 1980 Monograph outside of the company." Cordis Corp. v. Boston Scientific Corp., Civ. No. 03-027-SLR, 2005 WL 1331172, at *4 (D. Del. June 3, 2005). There was no showing that similar documents in the past became available to the public as a result of disclosure by these or similar commercial entities, that these or similar commercial entities typically would make the existence of such documents known and would honor requests for public access, or that these or similar commercial entities had an incentive to make the document available, etc. The mere fact that there was no legal obligation of confidentiality—all that was shown here—is not in and of itself sufficient to show that Dr. Palmaz's expectation of confidentiality was not reasonable.[13]

---

[13]     Boston Scientific asserted that the district court improperly did not allow it to argue that the monographs were prior art in light of the result of a different litigation involving the '762 patent. We do not need to reach the question of whether the earlier determination that the '762 patent was "valid" precluded further litigation of the validity determination in this case.

2008-1003, -1072                23

We affirm the district court's holding that Dr. Palmaz's 1980 and 1983 monographs were not prior art printed publications under § 102(b), and we affirm the district court's grant of Cordis's summary judgment motion that the claims of the '762 patent are not invalidated by the Palmaz monographs.

### B. Anticipation

Boston Scientific argues that the jury erred in finding that claim 2 of the '406 patent is not invalid, and that the district court erred in not granting judgment as a matter of law on grounds of anticipation. Anticipation is a question of fact; we review the jury's verdict for substantial evidence. Voda v. Cordis Corp., 536 F.3d 1311, 1321 (Fed. Cir. 2008).

Boston Scientific's theory is that Cordis's '762 patent anticipates claim 2 of Cordis's '406 patent. The parties agree that the '762 patent includes all elements of claim 2 of the '406 patent, save for the functional language in claim 1 of the '406 patent (on which claim 2 of the '406 patent depends). This functional language states, "such that the links and bands define an expandable structure having axial flexibility in an unexpanded configuration." '406 patent col.5 ll.35-39 (emphases added).[14]

---

[14]    Claims 1 and 2 of the '406 patent state:

> 1. A stent having first and second ends with an intermediate section therebetween, and a longitudinal axis, comprising:
> > a plurality of longitudinally disposed bands, wherein each band defines a generally continuous wave having a spatial frequency along a line segment parallel to the longitudinal axis; and
> > a plurality of links for maintaining the bands in a tubular structure, wherein the links are so disposed that any single circumferential path formed by the links is discontinuous;
> > such that the links and bands define an expandable structure having axial flexibility in an unexpanded configuration.

2008-1003, -1072                    24

Boston Scientific argues that this "such that" claim language cannot operate as a claim limitation to distinguish the '406 patent over the prior art. Contrary to Boston Scientific's argument, we have held that functional language can be a claim limitation. See Microprocessor Enhancement Corp. v. Tex. Instruments Inc., 520 F.3d 1367, 1375 (Fed. Cir. 2008). We conclude that the jury could properly find that the "such that" claim language is a limitation of claim 1 of the '406 patent that barred a finding of anticipation.

Boston Scientific alternatively argues that even if the "such that" functional language limits claim 2 to stents "having axial flexibility," the evidence demonstrated that the '762 patent disclosed such axial flexibility. The district court, citing both the testimony of Boston Scientific's expert Dr. Moore and the presumption of a patent's validity, held that the evidence presented was sufficient for the jury to find that the '762 patent did not anticipate claim 2 of the '406 patent. The district court properly concluded that substantial evidence supported the jury's verdict that claim 2 of Cordis's '406 patent was not invalid.

We affirm the district court's denial of Boston Scientific's motion for judgment as a matter of law that claim 2 of the '406 patent is anticipated and invalid.

### C. "Thin-walled"

Boston Scientific argues that the jury erred in finding that Boston Scientific's Express and Taxus Express stents literally infringe claim 23 of the '762 patent, and in finding that Boston Scientific induced literal infringement of claim 1 of the '762 patent

---

2. A stent according to claim 1, wherein each link is axially displaced from any circumferentially adjacent link.

'406 patent col.5 ll.26-41 (emphases added).

with respect to these stents.[15]  Claim 23 of the '762 patent depends from claim 13. '762

patent col.12 ll.55-60.  Boston Scientific also argues that the district court erred in

---

[15]    Claims 1, 13, and 23 of the '762 patent state:

1.  A method for implanting a prosthesis within a body passageway comprising the steps of:
    utilizing a thin-walled, tubular member as the prosthesis, the tubular member having a plurality of slots formed therein, the slots being disposed substantially parallel to the longitudinal axis of the tubular member;
    disposing the prosthesis upon a catheter;
    inserting the prosthesis and catheter within the body passageway by catheterization of said body passageway; and
    expanding and deforming the prosthesis at a desired location within the body passageway by expanding a portion of the catheter associated with the prosthesis to force the prosthesis radially outwardly into contact with the body passageway, the prosthesis being deformed beyond its elastic limit.

13.  An expandable intraluminal vascular graft, comprising:
    a thin-walled tubular member having first and second ends and a wall surface disposed between the first and second ends, the wall surface having a substantially uniform thickness and a plurality of slots formed therein, the slots being disposed substantially parallel to the longitudinal axis of the tubular member;
    the tubular member having a first diameter which permits intraluminal delivery of the tubular member into a body passageway having a lumen; and
    the tubular member having a second, expanded and deformed diameter, upon the application from the interior of the tubular member of a radially, outwardly extending force, which second diameter is variable and dependent upon the amount of force applied to the tubular member, whereby the tubular member may be expanded and deformed to expand the lumen of the body passageway.

denying its motion for judgment as a matter of law of noninfringement under the "thin-walled" limitation of claim 1 and claim 13.

First, Boston Scientific argues that the district court construed the term "thin-walled" improperly. The district court construed "thin-walled" in claim 1 and claim 13 of the '762 patent as "the wall of the tubular member must have little extent from one surface to its opposite at both its first and second diameters." Claim Construction, 2005 WL 1322966, at *2. The district court's claim construction was proper, and the district court was not obligated, as Boston Scientific urges, to construe "thin-walled" to exclude stent walls whose struts are thicker than they are wide.

Second, Boston Scientific complains that the district court refused to allow Boston Scientific to argue the prosecution history of the '762 patent to the jury, and that the district court's exclusion of this argument prejudiced Boston Scientific's noninfringement case. Boston Scientific had sought to use the prosecution history of the '762 patent to show that Cordis had admitted that stents whose thicknesses were within a particular numerical range were not "thin-walled."[16] In effect, Boston Scientific sought to argue claim construction to the jury. We have held that it is improper to argue claim construction to the jury because the "risk of confusing the jury is high when

---

23. The expandable intraluminal vascular graft of claim 13, wherein the outside of the wall surface of the tubular member is a smooth surface, when the tubular member has the first diameter.

'762 patent col.10 l.6–col.11 l.9; col.11 l.62–col.12 l.15; col.12 ll.55-60 (emphases added).

[16]    When affirming the district court's denial of Cordis's preliminary injunction motion in this case, we found no error in the district court's conclusion that the prosecution history did not limit "thin-walled" to "thicknesses no greater than 0.0045 inches." Cordis Corp., 99 F. App'x at 933.

2008-1003, -1072                    27

experts opine on claim construction." <u>CytoLogix Corp. v. Ventana Med. Sys., Inc.</u>, 424 F.3d 1168, 1172-73 (Fed. Cir. 2005); <u>see</u> <u>Sundance, Inc. v. DeMonte Fabricating Ltd.</u>, 550 F.3d 1356, 1364 n.6 (Fed. Cir. 2008). The district court thus properly excluded Boston Scientific's claim construction argument before the jury, and properly held that its exclusion of this argument did not entitle Boston Scientific to a new trial.

Third, Boston Scientific argues that even under the district court's claim construction, Cordis did not present sufficient evidence that the Express and Taxus Express stents meet the "thin-walled" limitations of claim 1 and claim 13 (on which claim 23 depends). The district court cited testimony by Cordis's expert Dr. Buller describing how the Express and Taxus Express stents meet the "thin-walled" limitation of claims 1 and 23 under the district court's construction of this limitation. <u>Memorandum Opinion</u>, 2006 WL 1305227, at *12. We conclude that the district court properly found that Cordis presented substantial evidence to support the jury's infringement verdict.

We affirm the district court's denial of Boston Scientific's motion for judgment as a matter of law that the Express and Taxus Express stents do not infringe claims 1 and 23 of the '762 patent under the "thin-walled" limitation of these claims.

D. <u>"Substantially parallel"</u>

Boston Scientific argues that the jury erred in finding that Boston Scientific's Liberté stent infringes claims 1 and 23 of the '762 patent, and that the district court erred in denying Boston Scientific's motion for judgment as a matter of law of noninfringement under the "substantially parallel" limitations of claim 1 and claim 13 (on which claim 23 depends). Both claim 1 and claim 13 describe stents whose slots (spaces or openings within a stent's lattice design) are "disposed <u>substantially parallel</u> to the longitudinal

2008-1003, -1072                               28

axis" of the stent.  '762 patent col.10 l.61–col.11 l.9; col.11 l.62–col.12 l.15 (emphasis added).

Boston Scientific first contends that the district court erred by not construing the term "parallel" in claim 1 and claim 13 of the '762 patent.  This argument was not timely raised before the district court and has been waived.  Conoco, 460 F.3d at 1359.

Next, Boston Scientific argues that Cordis did not present substantial evidence that the Liberté stent meets the "substantially parallel" limitation in claims 1 and 23.  Boston Scientific asserts that the Liberté stent's banana-shaped slots are not substantially parallel to the stent's longitudinal axis.  The district court cited testimony of both parties' experts to support its finding that Cordis provided sufficient evidence to support the jury's infringement verdict under the "substantially parallel" limitation.  Memorandum Opinion, 2006 WL 1305227, at *10.  We conclude that substantial evidence supported the jury's verdict.

Boston Scientific further asserts that the district court's exclusion of the deposition testimony about the Liberté stent by Dr. Palmaz, the inventor of the '762 patent, warrants a new trial.  Dr. Palmaz testified during a deposition that the slots of the Liberté stent "deviate from the longitudinal axis" of the stent.  J.A. at 11,520.  The district court excluded this testimony, finding that Dr. Palmaz was not an expert on the Liberté stent and that his testimony did not provide relevant evidence of infringement and created a risk of prejudice.  Memorandum Opinion, 2006 WL 1305227, at *14.  Boston Scientific argues that this testimony of Dr. Palmaz was important in defining the meaning of the claim term "substantially parallel" and in rebutting Cordis's evidence that the Liberté stent infringed claims 1 and 23 of the '762 patent.  As noted earlier, claim

2008-1003, -1072                    29

construction cannot be argued to the jury.  CytoLogix Corp., 424 F.3d at 1172-73; see also Sundance, 550 F.3d at 1364 n.6.  "[I]nventor testimony as to the inventor's subjective intent is irrelevant to the issue of claim construction," and as the inventor of the '762 patent, Dr. Palmaz also had no special expertise regarding the alleged infringement of the patent by the Liberté stent.  Howmedica Osteonics Corp. v. Wright Med. Tech., Inc., 540 F.3d 1337, 1346-47 (Fed. Cir. 2008); see also Air Turbine Tech., Inc. v. Atlas Copco AB, 410 F.3d 701, 714 (Fed. Cir. 2005).  The district court's exclusion of the Liberté stent portion of Dr. Palmaz's deposition testimony was within its discretion.

We affirm the district court's denial of Boston Scientific's motion for judgment as a matter of law or a new trial that the Liberté stent does not infringe claims 1 and 23 of the '762 patent under the "substantially parallel" limitation of these claims.

### E.  "Wave"

Boston Scientific contends that the jury erred in finding that the Liberté stent infringes claim 2 of the '406 patent, and that the district court erred in denying Boston Scientific's motion for judgment as a matter of law of noninfringement.  Claim 2 of the '406 patent depends from claim 1.  '406 patent col.5 ll.39-41.  The parties agree that the Liberté stent infringes all limitations of claim 2, except the limitation in claim 1 (on which claim 2 depends) describing "a plurality of longitudinally disposed bands, wherein each band defines a generally continuous wave having a spatial frequency along a line segment parallel to the longitudinal axis."  '406 patent col.5 ll.29-32 (emphasis added).

First, Boston Scientific argues that the district court improperly refused to construe the term "wave" in claim 1.  In fact, the district court did construe the claim

2008-1003, -1072                    30

language "longitudinally disposed bands, wherein each band defines a generally continuous wave having a spatial frequency along a line segment parallel to the longitudinal axis" as "the stent has multiple elongated surfaces that run parallel to the stent's long axis, each of these surfaces having the undulating appearance of a continuous wave," though it did not separately construe the term "wave." Claim Construction, 2005 WL 1322966, at *1.

As the district court pointed out, Boston Scientific did not suggest until after the close of the trial that the district court was required to construe the term "wave" in any other respect. Memorandum Opinion, 2006 WL 1305227, at *6. Under Conoco, this argument thus was not timely raised before the district court and has been waived. 460 F.3d at 1359.

Alternatively, Boston Scientific argues that even under the district court's claim construction, the evidence did not sufficiently support the jury's infringement verdict. This contention is without merit. The district court cited testimony by Cordis's expert Dr. Buller applying the court's claim construction and describing how the Liberté stent meets the limitations of claim 2 of the '406 patent. Memorandum Opinion, 2006 WL 1305227, at *4. We conclude that Cordis presented substantial evidence to support the jury's infringement verdict.

We affirm the district court's denial of Boston Scientific's motion for judgment as a matter of law that the Liberté stent does not infringe claim 2 of the '406 patent.

### F. Dismissal without prejudice

The district court granted Boston Scientific's motion for judgment as a matter of law that its Taxus Liberté stent (not to be confused with its Liberté stent or its Taxus

Express stent) did not infringe the asserted claims of Cordis's '762 and '406 patents. The district court held that it did not have jurisdiction to consider infringement claims relating to the Taxus Liberté stent because that stent had "no nexus to the United States." Memorandum Opinion, 2006 WL 1305227, at *24.

However, Boston Scientific argues that the district court erred in dismissing Cordis's infringement claims against the Taxus Liberté stent without prejudice, rather than with prejudice, and asserts that Cordis failed to prove that the Taxus Liberté stent infringed the asserted claims of the '762 and '406 patents. Cordis asserts that it did not present evidence at trial that the Taxus Liberté stent infringed the asserted claims of the '762 and '406 patents under 35 U.S.C. § 271(f) because it believed such evidence related only to damages rather than to infringement liability.[17]

"Congress has not clearly stated in 35 U.S.C. § 271 or in any other statute that § 271's requirement that the infringing act happen within the United States is a threshold jurisdictional requirement as opposed to an element of the claim." Litecubes, LLC v. N. Light Prods., Inc., 523 F.3d 1353, 1363 (Fed. Cir. 2008), cert. denied sub nom. GlowProducts.com v. Litecubes, LLC, 129 S. Ct. 578 (2008). Thus, the question of whether the Taxus Liberté stent had a nexus to the United States was an element of Cordis's liability claims, rather than a jurisdictional requirement. Because "a failure to prove the allegations alleged in a complaint requires a decision on the merits, not a dismissal for lack of subject matter jurisdiction," id. at 1361, the district court's dismissal

---

[17]    Cordis argues that the Taxus Liberté stent has the same structure as the Liberté stent. We see no error in the district court's determination that the Taxus Liberté stent and the Liberté stent are different products.

of Cordis's infringement claims regarding the Taxus Liberté stent should have been with prejudice.

We reverse the district court's dismissal without prejudice of Cordis's claims that the Taxus Liberté stent infringed the asserted claims of the '762 and '406 patents, and remand with instructions to dismiss the claims with prejudice.

### III

We affirm the district court's judgment in all respects save one.  We reverse the district court's dismissal without prejudice of Cordis's claims that the Taxus Liberté stent infringed the asserted claims of the '762 and '406 patents, and remand with instructions to dismiss the claims with prejudice.

AFFIRMED-IN-PART, REVERSED-IN-PART, REMANDED

COSTS

No costs.

2008-1003, -1072                           33

# EXHIBIT B

# EXHIBIT REDACTED

# EXHIBIT C

# EXHIBIT REDACTED

# EXHIBIT D

Boston Scientific :: Products :: TAXUS® Liberté® Paclitaxel-Eluti...          http://www.bostonscientific.com/Device.bsci?page=HCP_Overvie...



United States    | About Us | Newsroom | Investor Relations | Careers | FAQ | Contact Us   Enter Search Keywords ▶

**Delivering what's next.**

**Medical Areas**       **Procedures**       **Products**

Home » Products » TAXUS® Liberté® Paclitaxel-Eluting Coronary Stent System

**Image Gallery**

## TAXUS® Liberté® Paclitaxel-Eluting Coronary Stent System
Designed for Drug Delivery

**Contact Us About This Product**

**Product Type**
Stent

**HEALTH CARE PROFESSIONALS**

Overview

Directions for Use

Patient Guides

Prescriptive Information

**Used in Procedures**
Coronary Angioplasty (PTCA)

**Advancing Stent Design for Drug Delivery**
The TAXUS® Liberté® Paclitaxel-Eluting Coronary Stent System is engineered specifically for consistent drug elution and impressive performance. Enhanced deliverability features allow access to the target lesion, because first you have to get there.

**Related Medical Areas**
Interventional Cardiology

**Related Conditions**
Heart Conditions

- Uniform stent geometry promotes even and consistent neointimal coverage
- Thin struts and enhanced stent delivery system improve deliverability
  Proven performance of paclitaxel supported by the rigor of the TAXUS clinical program

**Engineered for Consistent Drug Distribution**
**Unique Uniform Cell Geometry**

   Supports even drug delivery and distribution
- Provides uniform vessel coverage for arterial support
- Reduces gaps in drug concentration loaded on the stent



TAXUS® Express² Stent          TAXUS® Liberté® Stent

Blue = low levels of drug concentration*
Red = high levels of drug concentration*

**Three Customized Stent Models**

- Allows for more consistent stent-to-artery coverage in varying anatomies
- Innovative hybrid cell design for support and flexibility

  

Small Model          Workhorse Model          Large Model
2.5mm          2.75mm - 3.5mm          4.0mm

**The TAXUS Liberté Stent's Unique Design Results in Uniform Neointimal Coverage**

   25% more uniform neointimal coverage and improved stent apposition**
- Consistent low levels of neointimal volume

 

Hypothetical Stent          TAXUS Liberté Stent

Boston Scientific :: Products :: TAXUS® Liberté® Paclitaxel-Eluti...          http://www.bostonscientific.com/Device.bsci?page=HCP_Overvie...

*Computer modeling of drug distribution uniformity in vascular tissue. Modeling results are for demonstration purposes only and may not necessarily be indicative of clinical performance. Testing completed by Boston Scientific Corporation. Data on file.
**As compared to the TAXUS® Express$^2$™ Stent System. Data on file.

Enhanced Design for Deliverability

**Thinner Stent Struts**

- 27% thinner stent struts than the TAXUS® Express® Stent for greater flexibility and improved deliverability
- Conformable design for improved stent apposition



27% Reduction

TAXUS Express Stent
0.0052"

TAXUS Liberté Stent
0.0038"

**Reduced Stent Profile**

- 6.1% reduction in stent profile over TAXUS® Express$^2$™ Stent System
- Lowest tip profile (0.017")

**Enhanced Stent Delivery System**

- Improved tip design for greater flexibility and smooth tip-to-balloon transitions
- Improved trackability to navigate distal lesions
- New five wing fold design on workhorse and large models for a tighter rewrap



Proven Performance and the TAXUS Family Clinical Program

The safety and efficacy of paclitaxel and the Translute™ Polymer have been tested and proven extensively in robust pre-clinical, clinical and real-world applications.

**Unique, multifunctional anti-restenotic effect of paclitaxel**
- Stabilizes microtubules to inhibit smooth muscle cell migration and proliferation
- Unlike other anti-restenonic agents, paclitaxel is not dependent on blocking a specific pathway and helps inhibit cell migration and proliferation regardless of the cellular signaling process or pathway

**Stable, durable and reliable Translute Polymer**
- Vascular compatible and biocompatible
- Provides consistent and controlled dose release of paclitaxel

**TAXUS clinical program built upon the proven performance of paclitaxel**

    

Trust Your Own Experience...

The TAXUS® Stent family of products is built on long-term clinical outcomes and the proven performance of paclitaxel. Look to Boston Scientific's TAXUS Drug-Eluting Stent family, implanted in over four million patients worldwide, for proven drug-eluting stent performance.

Device Illustration

5/13/2009 3:17 PM

Boston Scientific :: Products :: TAXUS® Liberté® Paclitaxel-Eluti...          http://www.bostonscientific.com/Device.bsci?page=HCP_Overvie...

**TAXUS Liberté Monorail' Catheter**



1. 1.8/2.0F full length hypotube shaft
2. Tapered corewire
3. Bioslide™ hydrophilic coating
4. Pebax® distal shaft 2.7F
5. DynaLEAP™ balloon material provides controlled growth
6. Laser Bonded technology
7. Enhanced TrakTip™ with 0.017" lesion entry profile

**TAXUS Liberté Over-the-Wire Catheter**



1. Low profile (3.2F) proximal shaft
2. Polyamide proximal shaft
3. Variable stiffness PushCoil
4. Bioslide™ hydrophilic coating
5. Transitionless distal shaft 2.7F
6. DynaLEAP™ balloon material provides controlled growth
7. Laser Bonded technology
8. Tapered TrakTip™ with 0.017" lesion entry profile

TAXUS Liberté Coronary Stent System Size Matrix

### Stent Length

| Stent Diameter | 8mm | 12mm | 15mm | 16mm | 18mm | 20mm | 23mm | 24mm | 28mm | 32mm |
|---|---|---|---|---|---|---|---|---|---|---|
| 2.50mm | | | | | | | | | | |
| 2.75mm | | | | | | | | | | |
| 3.00mm | | | | | | | | | | |
| 3.50mm | | | | | | | | | | |
| 4.00mm | | | | | | | | | | |

▨ Available Sizes

---

Medical Areas | Procedures | Products | About Us | Newsroom | Investor Relations | Careers | FAQ | Site Map | Contact Us |

© 2009 Boston Scientific Corporation or its affiliates. All rights reserved. | Copyright Notice | Web Site Privacy Policy for the United States | Terms of Use

Please click on the Prescriptive Information tab above for important information about intended uses as well as relevant warnings, risks, precautions, side effects and contraindications for Boston Scientific products featured on this page.

Boston Scientific :: Products :: Express²® Coronary Stent System ::...         http://www.bostonscientific.com/Device.bsci?page=HCP_Overvie...


**Boston Scientific**
*Delivering what's next.*

🇺🇸 United States     | About Us | Newsroom | Investor Relations | Careers | FAQ | Contact Us   Enter Search Keywords   ▶

**Medical Areas**          **Procedures**          **Products**

Home » Products » Express²® Coronary Stent System

## Express²® Coronary Stent System

A fusion of first class deliverability, acute angiographic results and excellent versatility.

Contact Us About This Product

| **HEALTH CARE PROFESSIONALS** | **Product Information** |
|---|---|
| Overview | · **First Class Deliverability:** Micro™ elements of Tandem Architecture™ stent design contribute to flexibility. |
| Prescriptive Information | · **First Class Deliverability:** Laser Bonded TrakTip™ provides precise, smooth transitions for enhanced crossability. Crimp 360™ offers excellent stent-to-balloon securement. |
| Print Materials | **Clean Angiographic Results:** Outstanding conformability enables the Express stent to respect natural contours of vessel. Uniform coverage provides consistent vessel support. Controlled growth of the DynaLEAP™ balloon promotes precise stent dilatation. |

· **Excellent Versatility:** Long, wide Macro™ elements contribute to diameter. Low profile and high securement provide confidence in crossing the lesion.

· Available in a full range of sizes and 5F guide compatibility for rapid exchange platforms up to and including 4.0 diameter.

Device Illustration



Device Highlights

1. Low profile (3.2F) proximal shaft
2. New variable stiffness PushCoil
3. Bioslide® hydrophilic coating
4. Transitionless distal shaft 2.7F
5. DynaLEAP balloon material
6. Tapered TrakTip with .017" lesion entry profile

**Product Type**

Stent

**Used in Procedures**

Coronary Angioplasty (PTCA)

**Related Medical Areas**

Interventional Cardiology

**Related Conditions**

Heart Conditions

**Image Gallery**

 

 

Medical Areas | Procedures | Products | About Us | Newsroom | Investor Relations | Careers | FAQ | Site Map | Contact Us |
© 2009 Boston Scientific Corporation or its affiliates. All rights reserved. | Copyright Notice | Web Site Privacy Policy for the United States | Terms of Use

Boston Scientific :: Products :: Express²® Coronary Stent System ::...          http://www.bostonscientific.com/Device.bsci?page=HCP_Overvie...

Please click on the Prescriptive Information tab above for important information about intended uses as well as relevant warnings, risks, precautions, side effects and contraindications for Boston Scientific products featured on this page.

5/13/2009 3:36 PM